UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                  :

JEAN MINSKOFF GRANT,

                 Plaintiff,       :

                              :

            v.                :     No. 08 CV 508 (CLB)

MYCA, LLC and 2220 EQUITIES      **FILED BY ECF**
MANAGEMENT LIMITED PARTNERSHIP,  :

              Defendants.    :

                              :
------------------------------------------------------------x

## AFFIDAVIT OF JEAN MINSKOFF GRANT

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK  )

JEAN MINSKOFF GRANT, being duly sworn, states as follows:

### The Minskoff Family Partnerships

1.      Beginning in the 1950's, my father, Henry Minskoff, along with his two

brothers, Jerome and Myron, formed a number of partnerships for the purpose of acquiring,

owning, and leasing real estate in and around New York City.  Halstead Harrison Avenue

Venture, 77th Queens Associates, 82nd - 83rd Street Venture, 9th Street Associates, and 29 Court

Street Venture (the "Partnerships") are five of the partnerships that were formed by my father

and his brothers.

2.      After my father and his brothers passed away, their interests in the various

partnerships they formed were assigned to various members of my family and trusts.  In addition

to interests in other partnerships that were formed by my father and his brothers, I currently own

a direct partnership interest in Halstead Harrison Avenue Venture (also known as "Halstead-

Harrison Associates"), 9th Street Associates, and 29 Court Street Venture, and an indirect

partnership interest in 77th Queens Associates (through my general partnership interest in the

limited partnership MLP I).

3.      Over the years, there has been a steady deterioration in the relationships

among certain members of my family, such that the partners (and their spouses) in the

Partnerships have divided into camps.  One camp is comprised of me and my husband along with

my cousin Patricia Minskoff Breede and her husband Michael Edward Breede.  The other camp

is comprised of my cousin Sara Minskoff Allan, her husband Robb Allan, my brother Alan

Minskoff, and his wife Royanne Minskoff.  Because of that deterioration, there has been broad

recognition among those people, as well as others, that the Partnerships cannot continue to

operate constructively in their present forms.  As a result, there have been periodic efforts, most

recently in late 2007, to negotiate some framework for dissolving the Partnerships and

reallocating their assets among the partners.

4.      Because of the deterioration in the relationships among the partners in the

Partnerships, Patricia Minskoff Breede, Michael Edward Breede, my husband, and I all have

concluded that the Partnerships no longer can function effectively.  As a result, on January 18,

2008, I, along with Ms. Breede, commenced actions seeking dissolution of the Partnerships.

## Minskoff Grant Realty & Management Corp.

5.      I am the Chief Operating Officer of Minskoff Grant Realty & Management Corp. ("MGRMC").  My husband, Francis C. Grant III, is MGRMC's Chief Executive Officer.

6.      My husband and I formed MGRMC twenty-four years ago as a successor company to property management companies that have been run by members of my family for the past 100 years.

7.      MGRMC provides direct and asset management for a diversified portfolio of urban and suburban office buildings and retail properties.  Currently, MGRMC directly manages a portfolio of sixteen properties in Westchester, Manhattan, and Queens.  In 2007, MGRMC leased 86,077 square feet, including 13 new leases, and more than half of the properties managed by MGRMC were fully leased.

## MGRMC's Successful Management Of Properties Owned By Family Partnerships

8.      Since at least January 2002, my husband and I, through MGRMC, have managed the Partnerships' properties (the "Properties") and the properties of other partnerships that originally were formed by my father and his brothers.

9.      MGRMC has managed the Properties pursuant to contracts between MGRMC and the Partnerships.  At this point, each of those management agreements provides for annual automatic renewal of the contract unless a party gives at least 90 days notice of non-renewal.  Copies of such management agreements are attached hereto as Exhibit A.

10.    My husband and I believe that, if the Properties do well, the Partnerships are benefited and we are benefited through our personal ownership interests in the Properties. Indeed, although I am the COO of MGRMC, I receive the lowest salary at the company because I have always run MGRMC to benefit the Properties and not myself personally and have known that I will do well if the Properties do well.

11.    My husband and I have worked very hard to manage the Properties prudently and cost-effectively, and we have succeeded in that endeavor.  For example, since the time that MGRMC took over the management of the Properties, it has worked to eliminate "inter-property loans" that were necessitated by the poor practices of the prior managers. Additionally, MGRMC has decreased arrears, increased security deposits, and decreased vacancies at the Properties.

12.    MGRMC is bonded and also has developed an excellent relationship with Sterling Bancorp, with which it maintains separate bank accounts for each and every Property. Because of the strong relationship between MGRMC and Sterling Bancorp, Sterling Bancorp does not penalize the Properties for early or partial withdrawals from CDs or for low balances on accounts.  If such penalties ever are posted, they always are credited back to the Property.

13.    MGRMC also has been able to leverage its banking relationships to obtain favorable mortgages and interest rates for the Partnerships.  For its total portfolio of properties, MGRMC successfully has negotiated more than a dozen initial financings and/or re-financings for the benefit of the property owners that reflects over $58 million in mortgages.

14.    MGRMC maintains offices in close proximity to all Properties (MGRMC offices are located in Manhattan, White Plains, and Rego Park) and has nine employees who

assist in the management of the Properties. Each Property is visited every day by one or more MGRMC employees. In addition, each Property is visited at least twice a week by MGRMC's Property Manager, who uses his 17 years of experience to oversee preventative maintenance and construction that to assure that the Properties are maintained in excellent repair for the least possible cost.

15.     For each Property, MGRMC has created a binder that contains information regarding vendors, certificates of insurance, work contracts, emergency contacts, and more. The binder is provided to the superintendent of the Property and is updated as needed to ease operations, track vendors' responsibilities, maintain historical records for the buildings, and keep track of communications between the main office and the site, which is a very time-consuming but valuable function. Additionally, MGRMC has compiled a tenant book for each Property that houses office tenants. The tenant books contain a detailed summary of building rules and regulations, important contact information, fire safety guidelines, and more.

16.     MGRMC devotes a great deal of time to identifying and correcting tenants' violations of building rules and regulations. We assist tenants in curing violations and, when necessary, MGRMC participates in depositions and legal actions.

17.     My husband and I regularly have apprised all of the partners in the various Partnerships of our management efforts regarding the Properties. For example, MGRMC has developed a detailed interactive process with partners of each Partnership regarding proposed leases, which includes an analysis of each proposed tenant's viability along with proposed lease terms. For every proposed tenant for the Properties, MGRMC always has presented an analysis to the applicable partners for approval before proceeding with lease negotiations, which ensures

that legal fees are not wasted to negotiate leases that the partners ultimately would not approve, and ensures that all partners have the opportunity to comment on potential leases.

18.    MGRMC has attracted as tenants national retail establishments such as CVS and Starbucks, and banks such as Washington Mutual.

19.    MGRMC has improved the leases used by the Partnerships.  Prior to MGRMC's management, for example, tenants were not assessed any charges for necessary maintenance of common areas.  MGRMC implemented common area maintenance charges that significantly have reduced unnecessary costs to the Partnerships.  Clauses relating to common area maintenance must be negotiated individually with respect to each lease, require complex calculations, and necessitate a labor-intensive billing and collections process.

20.    In 2007, MGRMC collected on behalf of its total portfolio of properties over $1 million in common area maintenance charges and over $1.6 million in real estate tax escalations.

21.    MGRMC has provided to all partners of each Partnership detailed monthly and quarterly property and management reports on each Property.  Examples of quarterly reports for the fourth quarter of 2007 are attached hereto as Exhibit B.  Those reports provide general information regarding the status of each Property as well as information regarding bank account balances, payments and receivables, and the monthly rent roll.  In addition to those monthly and quarterly reports, MGRMC also periodically issues "executive summaries" that highlight each Property's most recent successes and challenges.  Examples of executive summaries are attached hereto as Exhibit C.  MGRMC also promptly communicates with the partners of each Partnership whenever a material issue arises with respect to any Property.

22.    Additionally, MGRMC has developed and implemented a budgeting process pursuant to which draft budgets for each Property regularly are circulated along with master budget note descriptions.  Examples of draft budgets and budget notes are attached hereto as Exhibit D.  The partners of each relevant Partnership are asked for their input regarding the draft budgets and MGRMC coordinates conference calls to discuss all relevant issues with respect thereto.  As to tax-related filings, including Financial Statements and K-1s, MGRMC's Controller and Assistant Controller, who have a collective nine years of experience working with MGRMC and its tenants, work closely with the outside tax consultants who prepare the documents for filing.

## Certain Partners' Efforts To Remove MGRMC As Manager Of Partnership Properties

23.    In late 2007, a handful of partners in three of the Partnerships embarked on an effort to remove MGRMC as manager of the properties of 77th Queens Associates, 82nd - 83rd Street Venture, and Halstead Harrison Avenue Venture, and to replace MGRMC with Armstrong Realty Management, Corp. ("Armstrong"); these partners have not attempted to remove MGRMC as managers of the properties of 9th Street Associates or 29 Court Street Venture.

24.    On November 25, 2007, while I was outside of the United States, I received an email notifying me that there would be a meeting of the Halstead Harrison Avenue Venture on November 30, 2007.  I attended a portion of the November 30, 2007 meeting telephonically from England.  One of the items that was discussed at the meeting was a proposal from Armstrong regarding the management of Halstead Harrison Avenue Venture's property.  At the time of the meeting, I had not yet seen, and did not have access to, any of the documents that

were being discussed. During that meeting I made a motion to postpone the meeting until such time as I would have the same information that was available to the other partners and would be able to review the proposal that was the subject of the meeting. No other partner was willing to second this motion. I left the meeting without participating in any further discussions regarding the proposal from Armstrong. I was not present for any motion or vote regarding the management of Halstead Harrison Avenue Venture's property. I do not consider the minutes of this meeting, drafted by Robb Allan, to accurately reflect the events that transpired at the meeting. A transcript of this meeting is attached hereto as Exhibit E.

25.     In response to a request from Michael Edward Breede, MGRMC immediately sent Sara Minskoff Allan and Royanne Minskoff copies of the management agreements with MGRMC that were, in every case, executed by a majority of partners of each respective partnership and previously distributed to all of the applicable partners.

26.     Nonetheless, on December 11, 2007, Sara Minskoff Allan and Royanne Minskoff sent me letters, purportedly on behalf of the Partnerships, stating that each Partnership had "elected to retain the services of a successor management firm (Armstrong Realty Management, Corp.) and leasing firm, effective January 1, 2008." Copies of the letters are attached hereto as Exhibit F. I was not provided with a copy of the proposed agreement with Armstrong, and there was no further discussion at the partnership level about the matter. In fact, I was completely excluded from the purported hiring process, and I did not receive a copy of any documents concerning the purported agreement with Armstrong until January 30, 2008.

27.     Additionally, a handful of partners in 77th Queens Associates, 82nd - 83rd Street Venture, and Halstead Harrison Avenue Venture commenced an action in New York State

Supreme Court in New York County, purportedly on behalf of those partnerships, in further

support of their effort to replace MGRMC with Armstrong. Although this action was

purportedly commenced on behalf of partnerships in which I am a member, I was not consulted

before this action was commenced. I object strenuously to its having been filed. I believe that

action will not benefit the Partnerships but instead was intended by certain partners to further

their own interests in disputes with other partners

      28.    Although Armstrong purportedly has assumed management

responsibilities for certain Properties for the past three months, Armstrong has not provided any

information whatsoever to me or certain other partners regarding the status of such Properties or

the actions that it has taken with respect to them. More specifically, and for example, Armstrong

has not provided any leasing or property updates, accounting for any funds it has received or the

location of such funds, or management recommendations.

      29.    I believe that MGRMC is far better suited than Armstrong to manage the

Properties. Among other things, I do not believe that Armstrong has the resources, experience,

or expertise to manage the Properties as efficiently and productively as has MGRMC. In fact,

despite Royanne Minskoff's claims to the contrary in documents filed with the Court, even Alan

and Royanne Minskoff evidenced their confidence in MGRMC's management abilities by

executing a management agreement with MGRMC with respect to another Minskoff family

property as recently as September 2007.

30.    To protect against mismanagement of the Properties, waste of Partnership resources, and erosion of landlord-tenant relations, I and the other plaintiffs in these actions have included in our complaints requests for orders permitting MGRMC to continue to manage the Properties during the dissolution of the Partnerships and the winding up of the Partnerships' affairs.

JEAN MINSKOFF GRANT

Sworn to before me this
26th day of March, 2008

Notary Public

**DANIEL S. GOLDMAN**
**Notary Public, State of New York**
**No. 01GO6164831**
**Qualified in New York County**
**Commission Expires April 30, 2011**

REAL ESTATE MANAGEMENT AGREEMENT

FOR

COURT MARTINE ASSOCIATES

JANUARY 1, 2002

# TABLE OF CONTENTS

ARTICLE 1    APPOINTMENT AND AUTHORITY OF THE AGENT; DEFINED TERMS    3

ARTICLE 2    THE AGENT'S AGREEMENTS    4

ARTICLE 3    INSURANCE; INDEMNIFICATION    11

ARTICLE 4    MANAGEMENT FEES    12

ARTICLE 5    TERM/TERMINATION    14

ARTICLE 6    ARBITRATION    17

ARTICLE 7    MISCELLANEOUS    18

# REAL ESTATE MANAGEMENT AGREEMENT

**THIS AGREEMENT**, made as of the 1st day of January, 2002, between **Court Martine Associates** (the "Owner"), having offices in care of Minskoff Grant Realty & Management Corp., 1350 Avenue of the Americas, 32nd Floor, New York, New York 10019, and **MINSKOFF GRANT REALTY & MANAGEMENT CORP.** (the "Agent"), a New York corporation having an office at 1350 Avenue of the Americas, 32nd Floor, New York, NY 10019.

## WITNESSETH:

**WHEREAS**, the Owner is the owner of certain real property located at 39-55 Court Street/167-183 Martine Avenue, White Plains, NY, County of Westchester, State of New York (the "Property"); and

**WHEREAS**, the Owner and the Agent desire to enter into this Real Estate Management Agreement (this "Agreement");

**NOW, THEREFORE**, the parties hereto agree as follows:

## ARTICLE 1.

## APPOINTMENT AND AUTHORITY

## OF THE AGENT; DEFINED TERMS

1.1.    The Owner hereby appoints the Agent as the managing agent and the exclusive leasing agent for the Property, and hereby authorizes the Agent to exercise such powers with respect to the Property as may be necessary for the performance of the Agent's obligations under Article 2, and the Agent accepts such appointment on the terms and conditions hereinafter set forth.

# ARTICLE 2.

## THE AGENT'S AGREEMENTS

2.1.    Provided the Owner makes available the funds required therefore, including the payment of Agent's compensation, the Agent agrees to manage, lease, operate and maintain the Property, at the Owner's expense, in compliance with the Owner's instructions, and in connection therewith:

2.1.1.   To contract, for periods limited to the Owner's ownership of the Property but not in excess of one year, in the name and at the expense of the Owner, for gas, electricity, water and such other services as are being currently furnished to the Property.  All service contracts shall be negotiated and reviewed by the Agent and shall be written to include a thirty (30) day notice of cancellation by the Owner whenever possible.  Agent shall notify the Owner and obtain its consent before entering into any contract with any person related to or affiliated with the Agent or any principals of the Agent.  All contracts or purchase orders in excess of $10,000 entered into by the Agent on behalf of the Owner, whether for capital or operating expenses, shall be bid with at least two contractors whenever practicable (but no more frequently than every two years with respect to contracts for continuing work) and approved by the Owner.  Competitive bidding shall not be required (i) for work requiring an expenditure of less than $10,000, (ii) work to be performed by engineers, architects, space planners, consultants and similar professionals, or (iii) work necessitated by the occurrence of an emergency or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty, if, under the relevant circumstances, the time required for competitive bidding would make competitive bidding impractical;

2.1.2.   At the expense of the Owner, and subject to the Owner's approval of any employees not reflected in the budget, to select, employ, pay, supervise, monitor the performance of and direct all employees necessary for the operation, maintenance and repair of

the Property, discharge any such employees, carry workers compensation insurance, as applicable (and, when required by law, compulsory non-occupational disability insurance) covering such employees, and to use reasonable care in the selection of such employees. The cost of any employee providing services to more than one property shall be allocated among such properties based on the proportion of time spent servicing each property. The Agent will be and will continue throughout the term of this Agreement to be an equal opportunity employer. All persons employed in connection with the operation and maintenance of the Property shall be employees of the Agent or of its independent contractors, unless the Owner shall otherwise consent. Upon the expiration or earlier termination of this Agreement, the Agent agrees unconditionally to the Owner's or successor managing agent's employment of all personnel employed by the Agent in connection with the operation or maintenance of the Property, should the Owner or successor managing agent elect in its sole discretion. On-site staffing shall not be hired for the Property without the prior approval of the Owner;

     2.1.3.  To keep the Property in a clean and sightly condition, to procure contractors or subcontractors for making all repairs, alterations, replacements and installations at the Property, decorate, purchase all supplies and perform all other acts necessary for the proper operation of the Property, the fulfillment of the Owner's obligations under any lease, building loan or mortgage agreement (relating to the operation, maintenance or leasing of the Property) and the compliance with all governmental and insurance requirements relating to the Property. The Agent shall prepare a plan, where necessary, with respect to the management, maintenance and operation of the Property and shall advise the Owner with respect to alternatives for renovating, rehabilitating, maintaining, altering, repairing and operating the Property; included in such plan shall be a comprehensive review of the Property's mechanical systems. The Owner shall receive the benefit of all discounts and rebates obtainable by the Agent in its operation of the Property. With the Owner's prior written consent, the Agent or general contractor working under the supervision of the Agent is authorized to make repairs and alterations and perform

other services to the Property at a tenant's request and at the tenant's sole expense (such work is hereinafter referred to as "Tenant Work"), and the Agent may collect from such tenant or such general contractor, for its sole account, commercially reasonable charges for performance of the work, for supervisory overhead on all such Tenant Work, and for other reasonable and customary charges, except that the Agent shall pay the Owner reasonable compensation for its use of any building personnel in performing any such Tenant Work during normal business hours. The Agent, when acting for its own account as independent contractor and not acting on behalf of the Owner, shall hold the Owner harmless from any and all claims which may be advanced by any such tenant in connection with Tenant Work performed by the Agent or under the Agent's supervision. Notwithstanding the foregoing, the Agent shall not be required to indemnify the Owner in connection with repairs and alterations undertaken on the Owner's behalf, at the Owner's direction, or in connection with the Agent's oversight of routine repairs and alterations performed by third party contractors on behalf of the Owner and in such events, the indemnity provisions in Section 3.2(a) shall control.

2.1.4.  To handle complaints and requests from tenants, to notify the Owner of any major complaint made by a tenant of which the Agent has actual knowledge, and to notify the Owner promptly (together with copies of supporting documentation) of any material defect in the Property or any other material condition or occurrence concerning the Property of which the Agent has actual knowledge. The Agent shall also refer inquiries by members/partners in the Owner as directed by the Owner;

2.1.5.  To notify the Owner's general liability insurance carrier and the Owner promptly of any personal injury or property damage occurring to or claimed by any tenant or third party on or with respect to the Property of which the Agent has actual knowledge, and promptly to forward to the carrier, with copies of all such documents to the Owner, any summons, subpoena or other similar legal document served upon the Agent relating to actual or alleged potential liability of the Owner, the Agent or the Property;

2.1.6. To forward to the Owner, upon request, any certificates of insurance and renewals thereof, required to be furnished by tenants or contractors;

2.1.7. Unless the Owner elects otherwise, to calculate rental payments due from tenants, including but not limited to escalation payments, to render bills for the same on a timely basis and to receive and collect rent and all other monies payable to the Owner by all tenants, licensees and other persons using or occupying the Property and to deposit the same promptly in the bank named in <u>Exhibit A</u> (the "Bank") in an account of the Owner (the "Bank Account"), which account shall be used exclusively for such funds;

2.1.8. At the expense, and with the prior approval, of the Owner, to institute legal actions or proceedings for the collection of rent or other income for the Property, or the ousting or dispossessing of tenants or other persons therefrom, and all other matters requiring legal attention. The Owner reserves the right to designate counsel and to control litigation of any character affecting or arising out of the operation of the Property;

2.1.9. To bond by a fidelity bond, at the Agent's expense and with coverage terms and amounts reasonably acceptable to Owner, the Agent and all of the Agent's employees who may handle or be responsible for monies or property of the Owner;

2.1.10.        To notify the Owner promptly (together with copies of supporting documentation) of: any notice of violation of any governmental requirements, including, but in no way limited to, violations existing relative to the leasing, use, repair and maintenance of the Property, under federal, state and municipal laws and ordinances, of which the Agent has actual knowledge; any lawsuits or threats thereof involving the Property of which the Agent has actual knowledge; any fire or other damage to the Property of which the Agent has actual knowledge and in connection therewith, to immediately telephone notice to the Owner's general insurance office (to be promptly followed up with written notice), in an effort to enable an insurance adjuster to view the damage before repairs are started and complete customary loss reports in connection with fire or other damage to the Property;

2.1.11.     To review all real estate tax assessments, and assist the Owner in trying to reduce real estate taxes;

2.1.12.     To prepare checks and make other arrangements to pay, on behalf of the Owner, all taxes, including sales tax, special assessments, ground rents, insurance premiums and mortgage payments and other payments required to be made by the Owner pursuant to agreements by which the Owner is bound or to which the Owner is a party (of which the Agent is aware), including but not limited to the Owner's joint venture/partnership/limited liability company agreement, mortgage and other similar agreements.  The Agent shall also prepare checks for cash distributions to partners in accordance with the Owner's instructions.  All checks over $10,000 shall be signed by two members/partners of the Owner in accordance with Section 7.1. hereof, except for checks in payment of budgeted and/or approved expenditures.

2.1.13.     To undertake work required to address emergencies or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty.

2.1.14.     Subject to the continuing control and approval of the Owner, to advertise the Property for lease, to prepare and secure signs, plans, circular matter and/or other forms of advertising, to investigate and develop offers and inquiries received by Agent or the Owner with respect to the leasing of any space in the Property and to solicit as exclusive broker the cooperation of other licensed real estate brokers to endeavor at all times to lease all space at the Property, provided, however, that Agent shall have no authority, and shall not hold itself out as having authority, to sign or bind the Owner to any lease or other agreements relating to the occupancy of space or any renewals, amendments or extensions thereof (collectively, "Lease Agreements"), the Owner expressly reserving all right and authority to execute or cause to be executed all Lease Agreements on its own behalf (through any two of its members/partners in accordance with Section 7.1. hereof, and sole right in its discretion to approve or disapprove proposed tenants or lease transactions.  No Lease Agreement shall be treated as authorized unless it shall have been expressly approved in writing by a majority-in-

interest of the partners/members of the Owner.

2.2.    The Agent agrees to render monthly reports relating to the management and operation of the Property for the preceding calendar month, on or before the fifteenth (15th) day of each month, or as soon after the receipt and processing of all of the monthly bank statements, in form reasonably satisfactory to the Owner. The Agent agrees that the Owner shall have the right to require the transfer to the Owner at any time of any funds in the Bank Account considered by the Owner to be in excess of the amount reasonably required by the Agent for disbursement purposes in connection with the Property. No funds held or collected by the Agent in connection with the Property shall be commingled with any other funds of the Agent, including security deposits by tenants under leases. The Agent agrees to keep proper records with respect to the management and operation of the Property, including a general ledger, and to retain those records for periods specified by the Owner. Each partner/member of the Owner shall have the right to inspect and copy such records upon five (5) business days' written notice and audit the reports required by this Agreement for a period of two (2) years following the applicable year.

2.3.    The Agent agrees to render within (i) fifteen (15) days after the end of a particular month, (ii) thirty (30) days after the end of a particular quarter, and (iii) one hundred and twenty (120) days after the end of a particular year, the following reports:

2.3.1.  a statement of rents and other receipts collected for the preceding relevant calendar period (month, quarter or year) to date;

2.3.2.  a statement of disbursements for the preceding relevant calendar period (month, quarter or year) to date, together with reconciliation of such disbursements with the Owner's bank statements;

2.3.3.  a summary cash flow statement for the preceding relevant calendar period (month, quarter or year) to date showing beginning and ending cash balances;

2.3.4.  a monthly tenant arrears statement aging the balances as required;

2.3.5.  Quarterly rent roll and budget comparisons; and

       2.3.6. a monthly building operating Status report summarizing major events affecting the Property.

       2.4.    The Agent shall ensure that such controls are maintained over accounting and financial transactions relating to the Property or the Agent's activities under this Agreement as are reasonably required to protect the Owner's assets from loss or diminution.

       2.5.    Commencing with respect to the calendar year 2003, the Agent shall prepare and submit to the Owner by October 31 of the previous calendar year a preliminary annual operating and capital budget for the promotion, operation, repair and maintenance of the Property. Such budgets shall be prepared on an accrual basis, showing a month-by-month projection of income and expense. With respect to calendar year 2002, the Agent shall prepare a budget as soon as is practicable. Such budgets shall be subject to the Owner's approval and shall be revised during the year, if appropriate. Until the Owner approves a new budget, the Agent shall operate the Property under the proposed budget, including non-discretionary items, such as real estate taxes and utilities, which shall be deemed approved by Owner.

       2.6.    Notwithstanding anything contained in this Agreement to the contrary, the Agent shall not, without the prior written approval of the Owner, make any expenditure or incur any obligation by or on behalf of the Owner involving a sum in excess of $10,000 for any transaction, except for (i) normal expenses incurred in the ordinary course under an Owner-approved operating or capital budget, (ii) obligations incurred pursuant to an Owner-approved contract or (iii) expenditures required to remedy a condition of an emergency nature as described in paragraph 2.1(a)(iii) hereof.

       2.7.    The Agent shall cooperate with the Owner's accountants, attorneys and other advisors in connection with annual reviews, audits or otherwise. In addition, the Agent shall attend periodic meetings with the Owner and its partners as may be reasonably required to advise the Owner of the status of operations in the Property. Owner's members/partners may participate personally or by conference call.

## ARTICLE 3.

## INSURANCE; INDEMNIFICATION

3.1.    The Owner shall carry casualty and liability insurance upon the Property and shall look solely to such insurance with respect to any loss or damage to the Property, except as provided herein. The Owner shall either obtain waivers by the insurer of rights of subrogation against the Agent under such policies or shall have such policies name the Agent as an additional insured.

3.2.    (a) The Owner shall indemnify and hold harmless the Agent, its affiliates and their respective officers, directors, shareholders, partners and employees from and against all claims, losses and liabilities occasioned by or in connection with or arising out of acts or omissions of the Agent arising in connection with this Agreement, except in cases of negligence, willful misconduct or bad faith. The foregoing indemnity and hold harmless provision shall include, but not be limited to, claims, losses, liabilities, costs and expenses arising directly or indirectly out of the Owner's failure to provide funds to enable the Agent to address any emergency, failure to comply with laws or legal requirements or work necessitated in connection therewith. The Owner shall also indemnify, defend and hold Agent and its shareholders, partners, directors, officers, employees and representatives harmless against any damage, loss or expense it actually suffers or incurs, including reasonable attorneys' fees, arising from (i) distributions made by Agent in accordance with instructions by the Owner or its representatives and (ii) the failure to make distributions if not authorized to do so by Owner or its representatives. Notice of the assertion of any such claim shall be promptly given to the Owner after the Agent obtains knowledge of such assertion. To the extent that Owner is the employer of persons involved with the operation and maintenance of the Property, Owner shall be responsible for, and shall indemnify Agent from and against claims made against Agent for, any sales or similar taxes that may be due with respect to such employees.

3.2.1. The Agent agrees to indemnify and hold the Owner and each partner, member, officer, employee, agent or other representative of the Owner harmless against any claims, losses and liabilities to the extent that they result from the Agent's negligence, willful misconduct or bad faith in connection with the Agent's performance of its duties under this Agreement.

3.3.    In the event a claim against the Agent arising out of or related to the Agent's conduct with respect to the Property to which the Agent is entitled to indemnification under Article 3 is brought by any third party against the Agent, the Owner shall pay the Agent's reasonable legal fees and expenses.  Alternatively, the Owner may assume the defense of any claim against the Agent through counsel of Owner's choosing.  Upon the rendering of a final, non-appealable judgment by a court or other authorized party that the damages, loss, costs or expense resulting from the claim was caused by Agent's negligence, willful misconduct or bad faith, then Agent shall reimburse the Owner for expenses so paid to the extent, but only to the extent, that the Court determines that the claim was attributable to such negligence, willful misconduct or bad faith.

3.4.    The provisions of this Article 3 shall survive the termination of this Agreement.

## ARTICLE 4.

## MANAGEMENT FEES

4.1.    For and in consideration of the services to be performed by the Agent pursuant to Article 2, the Owner agrees to pay the Agent a fee of 3.50% of the total income per year.  The management fee shall be payable monthly prior to the last day of each such calendar month.

4.1.1.  On a monthly basis, the Owner shall reimburse the Agent for: the cost of the Agent's personnel (viz. any building manager, assistant building manager, building

employees) who devote full time to the Property and who have been employed pursuant to an Owner-approved budget or otherwise with the Owner's approval, including payroll, insurance, taxes, vacation, sick leave, severance, retirement, pension, benefits and related expenses (collectively "Payroll Costs") (but excluding the Payroll Costs of the Agent's leasing brokers); an allocable portion of the Payroll Costs of the Agent's employees devoting a portion of their time to the Property; all taxes, assessments, levies and fees payable by the Agent in connection with the performance of its duties under this Agreement (other than income, gross receipts, franchise and other similar taxes payable by the Agent); out-of-pocket costs and expenses paid by the Agent in connection with advertising, monthly brokerage listing sheets and promotional events; maintaining an office at the Property and purchasing supplies therefore (but excluding costs incurred by the Agent with respect to its home office); fees and expenses paid to consultants for services rendered to the Agent in connection with the services provided hereunder (and to the extent that the Agent's off-site personnel devotes time to the Property in lieu of a third party consultant, then the Agent shall be reimbursed for such time spent).

      4.1.2.  In addition to fees payable to the Agent as provided above, the Agent shall be paid a full leasing commission as set forth in Exhibit B in connection with transactions consummated during the term of this Agreement for which the Agent is the effective procuring cause for a fully executed lease by a tenant approved by the Owner acting in its sole and absolute discretion, except that (i) the Agent shall be paid a commission equal to 50% of a full commission (computed on the basis that the original term of the lease included the renewal term) in connection with a tenant's renewal or extension of the term of a lease or the occupancy of replacement space, if pursuant to, or in satisfaction of, the exercise of a right or option in an existing agreement, (ii) the Agent shall be paid a commission equal to 75% of a full commission (computed as though the first year of the renewal period were the first year of the lease) in connection with lease renewals other than pursuant to, or in satisfaction of, an option contained in the lease, (iii) the Agent shall be paid a commission equal to 100% of a full commission in connection with a tenant's leasing additional space in the Property, whether pursuant to an option

or otherwise, (iv) the Agent shall be paid an override commission at one half the rate otherwise payable hereunder in the event a commission is payable to a third broker unaffiliated with the Agent in connection with a new lease, an expansion or an extension, and (v) no commission is payable in connection with any transaction for which a prior leasing agent for the Property is entitled to a commission. The Agent shall obtain written instructions or consent from the Owner for the payment of commissions to an unaffiliated third broker representing an existing tenant in the Property. The commission shall be earned, due and payable in three equal installments: one third upon the execution of the lease by the tenant and the Owner; one third upon the later of the commencement of the lease and actual occupancy of the leased premises by the tenant, and one third six (6) months after the tenant commences payment of rent, or at such other time(s) as Owner and Agent shall agree for any part of a commission if the tenant fails to take actual occupancy under the lease agreement. The Owner shall not be liable for any portion of the commission yet to be paid to the Agent if the tenant defaults in the payment of base rent for three (3) consecutive months and such default is not thereafter cured.

## ARTICLE 5.
## TERM/TERMINATION

5.1.    (a) This Agreement shall be in effect for the period from January 1, 2002 through December 31, 2006. If not otherwise earlier terminated as provided in this Agreement, this Agreement shall continue thereafter for additional periods of one year. The Owner and the Agent shall have the option, exercisable upon ninety (90) days' prior written notice, to terminate this Agreement for any reason effective as of December 31, 2006 and thereafter as to each annual extension, as of October 1 of each year.

5.1.1.    Notwithstanding anything herein to the contrary, this Agreement may be terminated by the Owner at any time during the term hereof upon five (5) business days' prior written notice "for cause" which shall include, but not be limited to the following: (i) if the

Agent shall fail to pay any sum of money due and payable by the Agent to the Owner or any third party (provided the Owner shall provide sufficient funds to the Agent therefore) within ten (10) days after notice from the Owner that any such sum is due and payable, or, in the case of a mortgage affecting the Property, if the Agent is required to make payments to the mortgagee (provided the Owner shall provide sufficient funds to the Agent therefore) and fails to make any required payments when due; or (ii) if the Agent shall fail to perform any of its other obligations under this Agreement within thirty (30) days after notice from the Owner, or within such longer period as may be reasonably required for such performance, provided that the Agent has commenced such cure within the above 30 day period and thereafter continuously and diligently prosecutes the same to completion.

The Agent shall not be in default under this Agreement if its performance of monetary (only if the Owner is obligated to provide funds but does not) or non-monetary obligations is prevented by circumstances beyond the Agent's reasonable control, including, without limitation, fire or other unavoidable casualty,  national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, inability to obtain labor or materials, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

5.1.2.  Either Agent or a majority interest in Owner shall have the option, exercisable upon written notice, to terminate this Agreement upon the sale of the Property to an unrelated third party, or a condemnation of all or substantially all of the Property.

5.1.3.  Upon thirty (30) business days' prior written notice, the Agent shall have the right to terminate this Agreement  "for cause," which shall include but not be limited to (i) failure by the Owner to pay to the Agent amounts due hereunder within thirty (30) days of receipt of written notice thereof or (ii) failure by the Owner to provide funds or otherwise enable the Agent to (A) operate the property in a first class and professional manner and undertake work in connection with an emergency, which failure is not cured by the Owner within thirty (30) days of receipt of written notice, or (B) to avoid civil or criminal liability or imposition of a fine or

other penalty. The Owner shall not be in default under this Agreement if its performance of monetary or non-monetary obligations is prevented by circumstances beyond the Owner's reasonable control, including, without limitation, fire or other unavoidable casualty, national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

5.2.     Upon termination of this Agreement for any reason, the Agent shall deliver, as soon as reasonably possible, but no later than the deadlines set forth below in this Section 5.2., the following to the Owner or the Owner's appointed agent:

5.2.1. upon termination and written directions concerning payment, all tenant security deposits held by the Agent with respect to the Property and ninety percent (90%) of any funds of the Owner held by Agent (provided that the Agent shall not be responsible for any delay by the depository institution or of any bank which issued a letter of credit);

5.2.2. Any balance of monies of the Owner or tenant security deposits, or both, held by the Agent with respect to the Property within thirty (30) days after termination with an adjustment upon delivery of the final accounting;

5.2.3. a final accounting, reflecting the balance of income and expenses for the Property as of the date of termination, within ninety (90) days after termination;

5.2.4. All books and records, contracts, leases, insurance policies, tenant files, receipts for deposits, unpaid bills, a summary of all leases in existence at the time of termination, and all other papers or documents in Agent's possession that pertain to the Property upon termination; and

5.2.5. a statement of all pending or completed negotiations and transactions as to which the Agent claims that a commission is or may be due, within thirty (30) days of termination.

If the Agent fails to turn over any of the foregoing materials or monies when required, the Agent shall pay to the Owner upon demand liquidated damages of $25,000, it being agreed that the Owner will incur damages the exact amount of which cannot be ascertained.

5.3.    Upon termination of this Agreement, by sale or otherwise, the Owner promptly shall pay to the Agent all amounts due hereunder, except that commissions payable to the Agent as real estate broker hereunder shall be paid by the Owner (or by its assignee or transferee in the event of a sale of the Property) when the same would otherwise be due hereunder. ·

5.4.    Upon any termination of this Agreement, the Agent shall:

5.4.1.  assign, transfer or convey to the Owner or its designee all service contracts and personal property relating to or used in the operation and maintenance of the Property, except any personal property which was paid for and is owned by the Agent;

5.4.2.  remove all signs that the Agent may have placed on the Property indicating that the Agent is the manager of the Property, and replace and restore any damage resulting therefrom; and

5.4.3.  otherwise cooperate with the Owner or its designee in the transition to new management, including, without limitation, by making itself available to consult with and advise the Owner or its designee with respect to the operation and maintenance of the Property.

## ARTICLE 6.

## ARBITRATION

6.1.    <u>Arbitration</u>.

6.1.1.  For disputes and claims between the parties that are not resolved within ten (10) days after any party gives notice to the other party of its desire to arbitrate the dispute or claim, the dispute shall be settled by binding arbitration in accordance with the then-prevailing rules of the American Arbitration Association. The arbitration panel shall consist of one arbiter. Within twenty (20) days after the above notice is given, the parties shall mutually agree upon and appoint one arbiter, such person being a lawyer actively engaged in the practice of real estate law in New York City and having at least fifteen (15) years experience in the field, a judge, or a licensed New York real estate broker with at least fifteen (15) years experience in

commercial real estate. If the parties do not agree upon and appoint an arbiter within said twenty (20) days, any party may apply to the AAA for appointment of the arbiter.

6.1.2. The parties shall file with the arbiter, and exchange among counsel within ten (10) business days after the arbiter is appointed, opening briefs and proposed witness lists (including brief statements of the purpose for which each witness will be offered) and exhibits of all proposed documentary evidence (including brief statements of the purpose for which each document will be offered). At the same time, the parties shall provide the arbiter with a joint statement of any relevant facts upon which they are able to agree (or a joint statement that there are no relevant facts upon which they are able to agree). No witnesses or documents may be used at the hearing, except as disclosed in such lists, exhibits and statement, and then only to the extent not inconsistent with any applicable discovery responses.

6.1.3. The arbiter shall resolve any dispute submitted to the arbiter within forty-five (45) days of appointment. The decisions of the arbiter shall be final and binding and may not be appealed to the courts of any jurisdiction except upon claim of fraud or corruption. Both parties shall continue performing their lease obligations pending the award in the arbitration proceeding. Judgment upon the arbitration award may be entered in any court having jurisdiction. The arbiter shall award the prevailing party reasonable expenses and costs including reasonable attorneys' fees (to be conclusively determined by the arbiter) plus interest on any amount due at fifteen (15%) percent per annum or the maximum then allowed by applicable law, whichever is less. The losing party shall pay to the prevailing party the amount of the final arbitration award, and 100% of the costs and fees of the arbiter.

## ARTICLE 7.
## MISCELLANEOUS

7.1.    Wherever in this Agreement reference is made to "the Owner's consent", "the Owner's approval", "the agreement of the Owner" or phrases to similar effect, such references shall be deemed to refer to and require the written approval of a majority-in-interest of

C:\DOCUME~1\zielv\LOCALS~1\Temp\SaveToiManageTemp\ManagementAgreement1402-20071203093757.doc

the partners/members of the Owner.

7.2    All approvals, notices, requests and demands to be made hereunder shall be given in the manner provided below at the addresses set forth on Exhibit A attached hereto. Any statement, notice, recommendation, request, demand, consent or approval under this Agreement shall be in writing and shall be deemed given when delivered personally with receipt acknowledged by an officer for the Agent or the Owner, as the case may be, or twenty-four hours after being sent by hand or Federal Express (or other nationally recognized overnight delivery service), or seventy-two hours after being sent by registered or certified mail, postage prepaid, return receipt requested. Either party may, by notice, designate a different address.

7.3.    This Agreement shall not be assignable by either party and cannot be changed orally, but only by a writing signed by both parties, except that the Owner may transfer all of its rights and obligations hereunder to a limited liability company of which at least a majority in interest of its members are members or partners of the Owner or immediate family members of the members/partners of the Owner. For the purposes of this provision, "immediate family members" shall mean the husband, wife, adult child, adult grandchild, father, mother, adult sister or adult brother of a member/partner, or a trust for the benefit of any of the foregoing individuals.

7.4.    No shareholder, officer or director of the Agent and no partner or member of the Owner shall have individual responsibility for the performance of any of the duties of the Agent or the Owner hereunder.

7.5.    All terms and words used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender, as the context may require.

7.6.    The Article headings herein contained are for purposes of identification only and shall not be considered in construing this Agreement.

7.7.    No remedy of either party is exclusive of any other remedy provided herein or at law, and all remedies available to either party shall be cumulative.

7.8.    The failure of either party to insist upon the strict performance of any obligation to be performed by the other party shall not be deemed to be a waiver thereof. No provision of this Agreement may be waived except by a writing signed by the party waiving any provision hereof. The waiver of any breach of this Agreement shall not be deemed a waiver of any subsequent breach of the same or any other obligation to be performed hereunder.

7.9.    This Agreement contains the entire Agreement of the parties with respect to the subject matter hereof, and all prior agreements or understandings, oral or written, are merged herein.

7.10.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

7.11.   This Agreement shall bind the parties hereto and their successors and assigns, and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

7.12.   The parties hereto hereby waive the right to trial by jury in any action or proceeding concerning the subject matter of this Agreement.

**COURT MARTINE ASSOCIATES**

BY:_____
                Marjorie Minskoff Schleifer
                Partner MLPIII

BY:_____
                Patricia Minskoff
                Maggie P. Minskoff QTIP Trust

BY:_____
                Carolyn Minskoff
                Estate of Myron A. Minskoff

**MINSKOFF GRANT REALTY & MANAGEMENT CORP., AS AGENT**

BY:_____
                Jean Minskoff Grant, President

<u>EXHIBIT A</u>

1. Owner's Address:

> 82nd - 83rd Street Venture
> c/o Minskoff Grant Realty and Management Corp.
> 1350 Avenue of the Americas
> 32nd Floor
> New York, NY 10019

> with copies to:

> Marjorie Minskoff Schleifer
> Partner MLPIII
> c/o Minskoff Grant Realty & Management Corp.
> 1350 Avenue of the Americas/32nd Floor
> New York, NY 10019

> and

> Patricia Minskoff
> Maggie P. Minskoff QTIP Trust
> 435 Lower County Road
> Harwich Port, MA 02646

> and

> Carolyn Minskoff
> Estate of Myron A. Minskoff
> 1350 Avenue of the Americas/23rd Floor
> New York, NY 10019

2. Agent's Address:

> Minskoff Grant Realty & Management Corp.
> 1350 Avenue of the Americas
> 32nd Floor
> New York, New York  10019

> Attention:  Jean Minskoff Grant

3. Name of Bank Account:

        Account No.  251-001665

4. Name of Bank:        JPMorganChase

5. Independent Auditors:        Altman & Dick
        350 Broadway
        New York, NY 10013

All designations in this Exhibit A may be changed at any time by the Owner.

## EXHIBIT B

Leasing Commissions Schedule as per current published rates in the marketplace, to be updated accordingly.

First year or any fraction thereof ............................6%

Second & Third year.....................................…......6%

Fourth year up to and including the tenth year ........3%

The eleventh year and beyond ...............…………....2%

The Commission shall be based upon the actual rentals payable by tenants under leases, excluding the following:

        (a)  charges, if any, for electric and steam to be supplied to Tenant;

        (b)  any payments to be made by tenant on account of increases in real estate taxes, labor costs or expenses of maintaining and operating the Building, escalation provisions, overage rents or any other payments made by Tenant during the term of said lease that are considered to be "additional rent";

        (c)  any payments to be made by Tenant on account of work, labor and materials to be furnished by Landlord;

        (d)  any lease takeover payments made by Landlord or costs and expenses assumed by Landlord in connection with tenant's lease obligations for space previously rented by it in premises other than the Building;

        (e) rent concessions or other payments granted or paid to tenant, including work letters above the building standard maximum applicable to installation of new tenants, to be reviewed from time to time in light of existing market conditions.

Where the Owner has the sole right to cancel a lease at any time subsequent to the execution and delivery of the lease, Agent shall be paid a commission for the entire lease term as though such right to cancel did not exist.  Where a tenant, or the Owner and tenant, have the right to cancel a lease at a time subsequent to the commencement of the term but prior to the expiration date set forth in the lease, Agent shall initially be paid a commission based on the rental set forth in the lease for the uncancellable portion of the term.  If the lease shall be canceled by tenant pursuant to such option or other right, no commission shall be due or payable for the remainder of the term of such lease, unless the lease contains provisions obligating the tenant to pay or reimburse the Owner for the unamortized portion of the Agent's commission, in which event the entire commission shall be paid.  If the lease is not so canceled by the tenant or the right of cancellation

is waived by the tenant, then, within thirty (30) days thereafter, Agent shall be paid the balance of the commission based on the rental for the remaining portion of the lease term.  A lease shall not be deemed canceled within the meaning of this paragraph unless the tenant vacates the Property.

REAL ESTATE MANAGEMENT AGREEMENT

FOR

HALSTEAD HARRISON AVENUE VENTURE

JANUARY 1, 2002

# TABLE OF CONTENTS

ARTICLE 1    APPOINTMENT AND AUTHORITY OF THE AGENT; DEFINED TERMS      3

ARTICLE 2    THE AGENT'S AGREEMENTS      4

ARTICLE 3    INSURANCE; INDEMNIFICATION      11

ARTICLE 4    MANAGEMENT FEES      12

ARTICLE 5    TERM/TERMINATION      14

ARTICLE 6    ARBITRATION      17

ARTICLE 7    MISCELLANEOUS  18

# REAL ESTATE MANAGEMENT AGREEMENT

**THIS AGREEMENT**, made as of the 1st day of January, 2002, between **HALSTEAD HARRISON AVENUE VENTURE** (the "Owner"), having offices in care of Minskoff Grant Realty & Management Corp., 1350 Avenue of the Americas, 32nd Floor, New York, New York 10019, and **MINSKOFF GRANT REALTY & MANAGEMENT CORP.** (the "Agent"), a New York corporation having an office at 1350 Avenue of the Americas, 32nd Floor, New York, NY 10019.

## WITNESSETH:

**WHEREAS**, the Owner is the owner of certain real property located at 270-278 Halstead Avenue, Harrison, NY, 10528, County of Westchester, State of New York (the "Property"); and

**WHEREAS**, the Owner and the Agent desire to enter into this Real Estate Management Agreement (this "Agreement");

**NOW, THEREFORE**, the parties hereto agree as follows:

## ARTICLE 1.

## APPOINTMENT AND AUTHORITY
## OF THE AGENT; DEFINED TERMS

1.1.    The Owner hereby appoints the Agent as the managing agent and the exclusive leasing agent for the Property, and hereby authorizes the Agent to exercise such powers with respect to the Property as may be necessary for the performance of the Agent's obligations under Article 2, and the Agent accepts such appointment on the terms and conditions hereinafter set forth.

# ARTICLE 2.

## THE AGENT'S AGREEMENTS

2.1.    Provided the Owner makes available the funds required therefore, including the payment of Agent's compensation, the Agent agrees to manage, lease, operate and maintain the Property, at the Owner's expense, in compliance with the Owner's instructions, and in connection therewith:

2.1.1.    To contract, for periods limited to the Owner's ownership of the Property but not in excess of one year, in the name and at the expense of the Owner, for gas, electricity, water and such other services as are being currently furnished to the Property. All service contracts shall be negotiated and reviewed by the Agent and shall be written to include a thirty (30) day notice of cancellation by the Owner whenever possible. Agent shall notify the Owner and obtain its consent before entering into any contract with any person related to or affiliated with the Agent or any principals of the Agent. All contracts or purchase orders in excess of $10,000 entered into by the Agent on behalf of the Owner, whether for capital or operating expenses, shall be bid with at least two contractors whenever practicable (but no more frequently than every two years with respect to contracts for continuing work) and approved by the Owner. Competitive bidding shall not be required (i) for work requiring an expenditure of less than $10,000, (ii) work to be performed by engineers, architects, space planners, consultants and similar professionals, or (iii) work necessitated by the occurrence of an emergency or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty, if, under the relevant circumstances, the time required for competitive bidding would make competitive bidding impractical;

2.1.2.    At the expense of the Owner, and subject to the Owner's approval of any employees not reflected in the budget, to select, employ, pay, supervise, monitor the performance of and direct all employees necessary for the operation, maintenance and repair of

the Property, discharge any such employees, carry workers compensation insurance, as applicable (and, when required by law, compulsory non-occupational disability insurance) covering such employees, and to use reasonable care in the selection of such employees. The cost of any employee providing services to more than one property shall be allocated among such properties based on the proportion of time spent servicing each property. The Agent will be and will continue throughout the term of this Agreement to be an equal opportunity employer. All persons employed in connection with the operation and maintenance of the Property shall be employees of the Agent or of its independent contractors, unless the Owner shall otherwise consent. Upon the expiration or earlier termination of this Agreement, the Agent agrees unconditionally to the Owner's or successor managing agent's employment of all personnel employed by the Agent in connection with the operation or maintenance of the Property, should the Owner or successor managing agent elect in its sole discretion. On-site staffing shall not be hired for the Property without the prior approval of the Owner;

2.1.3. To keep the Property in a clean and sightly condition, to procure contractors or subcontractors for making all repairs, alterations, replacements and installations at the Property, decorate, purchase all supplies and perform all other acts necessary for the proper operation of the Property, the fulfillment of the Owner's obligations under any lease, building loan or mortgage agreement (relating to the operation, maintenance or leasing of the Property) and the compliance with all governmental and insurance requirements relating to the Property. The Agent shall prepare a plan, where necessary, with respect to the management, maintenance and operation of the Property and shall advise the Owner with respect to alternatives for renovating, rehabilitating, maintaining, altering, repairing and operating the Property; included in such plan shall be a comprehensive review of the Property's mechanical systems. The Owner shall receive the benefit of all discounts and rebates obtainable by the Agent in its operation of the Property. With the Owner's prior written consent, the Agent or general contractor working under the supervision of the Agent is authorized to make repairs and alterations and perform

other services to the Property at a tenant's request and at the tenant's sole expense (such work is hereinafter referred to as "Tenant Work"), and the Agent may collect from such tenant or such general contractor, for its sole account, commercially reasonable charges for performance of the work, for supervisory overhead on all such Tenant Work, and for other reasonable and customary charges, except that the Agent shall pay the Owner reasonable compensation for its use of any building personnel in performing any such Tenant Work during normal business hours.  The Agent, when acting for its own account as independent contractor and not acting on behalf of the Owner, shall hold the Owner harmless from any and all claims which may be advanced by any such tenant in connection with Tenant Work performed by the Agent or under the Agent's supervision.  Notwithstanding the foregoing, the Agent shall not be required to indemnify the Owner in connection with repairs and alterations undertaken on the Owner's behalf, at the Owner's direction, or in connection with the Agent's oversight of routine repairs and alterations performed by third party contractors on behalf of the Owner and in such events, the indemnity provisions in Section 3.2(a) shall control.

2.1.4.  To handle complaints and requests from tenants, to notify the Owner of any major complaint made by a tenant of which the Agent has actual knowledge, and to notify the Owner promptly (together with copies of supporting documentation) of any material defect in the Property or any other material condition or occurrence concerning the Property of which the Agent has actual knowledge.  The Agent shall also refer inquiries by members/partners in the Owner as directed by the Owner;

2.1.5.  To notify the Owner's general liability insurance carrier and the Owner promptly of any personal injury or property damage occurring to or claimed by any tenant or third party on or with respect to the Property of which the Agent has actual knowledge, and promptly to forward to the carrier, with copies of all such documents to the Owner, any summons, subpoena or other similar legal document served upon the Agent relating to actual or alleged potential liability of the Owner, the Agent or the Property;

2.1.6. To forward to the Owner, upon request, any certificates of insurance and renewals thereof, required to be furnished by tenants or contractors;

2.1.7. Unless the Owner elects otherwise, to calculate rental payments due from tenants, including but not limited to escalation payments, to render bills for the same on a timely basis and to receive and collect rent and all other monies payable to the Owner by all tenants, licensees and other persons using or occupying the Property and to deposit the same promptly in the bank named in <u>Exhibit A</u> (the "Bank") in an account of the Owner (the "Bank Account"), which account shall be used exclusively for such funds;

2.1.8. At the expense, and with the prior approval, of the Owner, to institute legal actions or proceedings for the collection of rent or other income for the Property, or the ousting or dispossessing of tenants or other persons therefrom, and all other matters requiring legal attention. The Owner reserves the right to designate counsel and to control litigation of any character affecting or arising out of the operation of the Property;

2.1.9. To bond by a fidelity bond, at the Agent's expense and with coverage terms and amounts reasonably acceptable to Owner, the Agent and all of the Agent's employees who may handle or be responsible for monies or property of the Owner;

2.1.10. To notify the Owner promptly (together with copies of supporting documentation) of: any notice of violation of any governmental requirements, including, but in no way limited to, violations existing relative to the leasing, use, repair and maintenance of the Property, under federal, state and municipal laws and ordinances, of which the Agent has actual knowledge; any lawsuits or threats thereof involving the Property of which the Agent has actual knowledge; any fire or other damage to the Property of which the Agent has actual knowledge and in connection therewith, to immediately telephone notice to the Owner's general insurance office (to be promptly followed up with written notice), in an effort to enable an insurance adjuster to view the damage before repairs are started and complete customary loss reports in connection with fire or other damage to the Property;

2.1.11.    To review all real estate tax assessments, and assist the Owner in trying to reduce real estate taxes;

2.1.12.    To prepare checks and make other arrangements to pay, on behalf of the Owner, all taxes, including sales tax, special assessments, ground rents, insurance premiums and mortgage payments and other payments required to be made by the Owner pursuant to agreements by which the Owner is bound or to which the Owner is a party (of which the Agent is aware), including but not limited to the Owner's joint venture/partnership/limited liability company agreement, mortgage and other similar agreements. The Agent shall also prepare checks for cash distributions to partners in accordance with the Owner's instructions. All checks over $10,000 shall be signed by two members/partners of the Owner in accordance with Section 7.1. hereof, except for checks in payment of budgeted and/or approved expenditures.

2.1.13.    To undertake work required to address emergencies or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty.

2.1.14.    Subject to the continuing control and approval of the Owner, to advertise the Property for lease, to prepare and secure signs, plans, circular matter and/or other forms of advertising, to investigate and develop offers and inquiries received by Agent or the Owner with respect to the leasing of any space in the Property and to solicit as exclusive broker the cooperation of other licensed real estate brokers to endeavor at all times to lease all space at the Property, provided, however, that Agent shall have no authority, and shall not hold itself out as having authority, to sign or bind the Owner to any lease or other agreements relating to the occupancy of space or any renewals, amendments or extensions thereof (collectively, "Lease Agreements"), the Owner expressly reserving all right and authority to execute or cause to be executed all Lease Agreements on its own behalf (through any two of its members/partners in accordance with Section 7.1. hereof, and sole right in its discretion to approve or disapprove proposed tenants or lease transactions. No Lease Agreement shall be treated as authorized unless it shall have been expressly approved in writing by a majority-in-

interest of the partners/members of the Owner.

2.2.    The Agent agrees to render monthly reports relating to the management and operation of the Property for the preceding calendar month, on or before the fifteenth (15th) day of each month, or as soon after the receipt and processing of all of the monthly bank statements, in form reasonably satisfactory to the Owner. The Agent agrees that the Owner shall have the right to require the transfer to the Owner at any time of any funds in the Bank Account considered by the Owner to be in excess of the amount reasonably required by the Agent for disbursement purposes in connection with the Property. No funds held or collected by the Agent in connection with the Property shall be commingled with any other funds of the Agent, including security deposits by tenants under leases. The Agent agrees to keep proper records with respect to the management and operation of the Property, including a general ledger, and to retain those records for periods specified by the Owner. Each partner/member of the Owner shall have the right to inspect and copy such records upon five (5) business days' written notice and audit the reports required by this Agreement for a period of two (2) years following the applicable year.

2.3.    The Agent agrees to render within (i) fifteen (15) days after the end of a particular month, (ii) thirty (30) days after the end of a particular quarter, and (iii) one hundred and twenty (120) days after the end of a particular year, the following reports:

2.3.1.    a statement of rents and other receipts collected for the preceding relevant calendar period (month, quarter or year) to date;

2.3.2.    a statement of disbursements for the preceding relevant calendar period (month, quarter or year) to date, together with reconciliation of such disbursements with the Owner's bank statements;

2.3.3.    a summary cash flow statement for the preceding relevant calendar period (month, quarter or year) to date showing beginning and ending cash balances;

2.3.4.    a monthly tenant arrears statement aging the balances as required;

2.3.5.    Quarterly rent roll and budget comparisons; and

2.3.6. a monthly building operating Status report summarizing major events affecting the Property.

2.4. The Agent shall ensure that such controls are maintained over accounting and financial transactions relating to the Property or the Agent's activities under this Agreement as are reasonably required to protect the Owner's assets from loss or diminution.

2.5. Commencing with respect to the calendar year 2003, the Agent shall prepare and submit to the Owner by October 31 of the previous calendar year a preliminary annual operating and capital budget for the promotion, operation, repair and maintenance of the Property. Such budgets shall be prepared on an accrual basis, showing a month-by-month projection of income and expense. With respect to calendar year 2002, the Agent shall prepare a budget as soon as is practicable. Such budgets shall be subject to the Owner's approval and shall be revised during the year, if appropriate. Until the Owner approves a new budget, the Agent shall operate the Property under the proposed budget, including non-discretionary items, such as real estate taxes and utilities, which shall be deemed approved by Owner.

2.6. Notwithstanding anything contained in this Agreement to the contrary, the Agent shall not, without the prior written approval of the Owner, make any expenditure or incur any obligation by or on behalf of the Owner involving a sum in excess of $10,000 for any transaction, except for (i) normal expenses incurred in the ordinary course under an Owner-approved operating or capital budget, (ii) obligations incurred pursuant to an Owner-approved contract or (iii) expenditures required to remedy a condition of an emergency nature as described in paragraph 2.1(a)(iii) hereof.

2.7. The Agent shall cooperate with the Owner's accountants, attorneys and other advisors in connection with annual reviews, audits or otherwise. In addition, the Agent shall attend periodic meetings with the Owner and its partners as may be reasonably required to advise the Owner of the status of operations in the Property. Owner's members/partners may participate personally or by conference call.

## ARTICLE 3.

## INSURANCE; INDEMNIFICATION

3.1.    The Owner shall carry casualty and liability insurance upon the Property and shall look solely to such insurance with respect to any loss or damage to the Property, except as provided herein. The Owner shall either obtain waivers by the insurer of rights of subrogation against the Agent under such policies or shall have such policies name the Agent as an additional insured.

3.2.    (a) The Owner shall indemnify and hold harmless the Agent, its affiliates and their respective officers, directors, shareholders, partners and employees from and against all claims, losses and liabilities occasioned by or in connection with or arising out of acts or omissions of the Agent arising in connection with this Agreement, except in cases of negligence, willful misconduct or bad faith. The foregoing indemnity and hold harmless provision shall include, but not be limited to, claims, losses, liabilities, costs and expenses arising directly or indirectly out of the Owner's failure to provide funds to enable the Agent to address any emergency, failure to comply with laws or legal requirements or work necessitated in connection therewith. The Owner shall also indemnify, defend and hold Agent and its shareholders, partners, directors, officers, employees and representatives harmless against any damage, loss or expense it actually suffers or incurs, including reasonable attorneys' fees, arising from (i) distributions made by Agent in accordance with instructions by the Owner or its representatives and (ii) the failure to make distributions if not authorized to do so by Owner or its representatives. Notice of the assertion of any such claim shall be promptly given to the Owner after the Agent obtains knowledge of such assertion. To the extent that Owner is the employer of persons involved with the operation and maintenance of the Property, Owner shall be responsible for, and shall indemnify Agent from and against claims made against Agent for, any sales or similar taxes that may be due with respect to such employees.

3.2.1. The Agent agrees to indemnify and hold the Owner and each partner, member, officer, employee, agent or other representative of the Owner harmless against any claims, losses and liabilities to the extent that they result from the Agent's negligence, willful misconduct or bad faith in connection with the Agent's performance of its duties under this Agreement.

3.3.    In the event a claim against the Agent arising out of or related to the Agent's conduct with respect to the Property to which the Agent is entitled to indemnification under Article 3 is brought by any third party against the Agent, the Owner shall pay the Agent's reasonable legal fees and expenses. Alternatively, the Owner may assume the defense of any claim against the Agent through counsel of Owner's choosing. Upon the rendering of a final, non-appealable judgment by a court or other authorized party that the damages, loss, costs or expense resulting from the claim was caused by Agent's negligence, willful misconduct or bad faith, then Agent shall reimburse the Owner for expenses so paid to the extent, but only to the extent, that the Court determines that the claim was attributable to such negligence, willful misconduct or bad faith.

3.4.    The provisions of this Article 3 shall survive the termination of this Agreement.

## ARTICLE 4.

## MANAGEMENT FEES

4.1.    For and in consideration of the services to be performed by the Agent pursuant to Article 2, the Owner agrees to pay the Agent a fee of 3.50% of the total income per year. The management fee shall be payable monthly prior to the last day of each such calendar month.

4.1.1. On a monthly basis, the Owner shall reimburse the Agent for: the cost of the Agent's personnel (viz. any building manager, assistant building manager, building

employees) who devote full time to the Property and who have been employed pursuant to an Owner-approved budget or otherwise with the Owner's approval, including payroll, insurance, taxes, vacation, sick leave, severance, retirement, pension, benefits and related expenses (collectively "Payroll Costs") (but excluding the Payroll Costs of the Agent's leasing brokers); an allocable portion of the Payroll Costs of the Agent's employees devoting a portion of their time to the Property; all taxes, assessments, levies and fees payable by the Agent in connection with the performance of its duties under this Agreement (other than income, gross receipts, franchise and other similar taxes payable by the Agent); out-of-pocket costs and expenses paid by the Agent in connection with advertising, monthly brokerage listing sheets and promotional events; maintaining an office at the Property and purchasing supplies therefore (but excluding costs incurred by the Agent with respect to its home office); fees and expenses paid to consultants for services rendered to the Agent in connection with the services provided hereunder (and to the extent that the Agent's off-site personnel devotes time to the Property in lieu of a third party consultant, then the Agent shall be reimbursed for such time spent).

      4.1.2.  In addition to fees payable to the Agent as provided above, the Agent shall be paid a full leasing commission as set forth in <u>Exhibit B</u> in connection with transactions consummated during the term of this Agreement for which the Agent is the effective procuring cause for a fully executed lease by a tenant approved by the Owner acting in its sole and absolute discretion, except that (i) the Agent shall be paid a commission equal to 50% of a full commission (computed on the basis that the original term of the lease included the renewal term) in connection with a tenant's renewal or extension of the term of a lease or the occupancy of replacement space, if pursuant to, or in satisfaction of, the exercise of a right or option in an existing agreement, (ii) the Agent shall be paid a commission equal to 75% of a full commission (computed as though the first year of the renewal period were the first year of the lease) in connection with lease renewals other than pursuant to, or in satisfaction of, an option contained in the lease, (iii) the Agent shall be paid a commission equal to 100% of a full commission in connection with a tenant's leasing additional space in the Property, whether pursuant to an option

or otherwise, (iv) the Agent shall be paid an override commission at one half the rate otherwise payable hereunder in the event a commission is payable to a third broker unaffiliated with the Agent in connection with a new lease, an expansion or an extension, and (v) no commission is payable in connection with any transaction for which a prior leasing agent for the Property is entitled to a commission. The Agent shall obtain written instructions or consent from the Owner for the payment of commissions to an unaffiliated third broker representing an existing tenant in the Property. The commission shall be earned, due and payable in three equal installments: one third upon the execution of the lease by the tenant and the Owner; one third upon the later of the commencement of the lease and actual occupancy of the leased premises by the tenant, and one third six (6) months after the tenant commences payment of rent, or at such other time(s) as Owner and Agent shall agree for any part of a commission if the tenant fails to take actual occupancy under the lease agreement. The Owner shall not be liable for any portion of the commission yet to be paid to the Agent if the tenant defaults in the payment of base rent for three (3) consecutive months and such default is not thereafter cured.

## ARTICLE 5.
## TERM/TERMINATION

5.1.    (a) This Agreement shall be in effect for the period from January 1, 2002 through December 31, 2006. If not otherwise earlier terminated as provided in this Agreement, this Agreement shall continue thereafter for additional periods of one year. The Owner and the Agent shall have the option, exercisable upon ninety (90) days' prior written notice, to terminate this Agreement for any reason effective as of December 31, 2006 and thereafter as to each annual extension, as of October 1 of each year.

5.1.1.    Notwithstanding anything herein to the contrary, this Agreement may be terminated by the Owner at any time during the term hereof upon five (5) business days' prior written notice "for cause" which shall include, but not be limited to the following: (i) if the

Agent shall fail to pay any sum of money due and payable by the Agent to the Owner or any third party (provided the Owner shall provide sufficient funds to the Agent therefore) within ten (10) days after notice from the Owner that any such sum is due and payable, or, in the case of a mortgage affecting the Property, if the Agent is required to make payments to the mortgagee (provided the Owner shall provide sufficient funds to the Agent therefore) and fails to make any required payments when due; or (ii) if the Agent shall fail to perform any of its other obligations under this Agreement within thirty (30) days after notice from the Owner, or within such longer period as may be reasonably required for such performance, provided that the Agent has commenced such cure within the above 30 day period and thereafter continuously and diligently prosecutes the same to completion.

The Agent shall not be in default under this Agreement if its performance of monetary (only if the Owner is obligated to provide funds but does not) or non-monetary obligations is prevented by circumstances beyond the Agent's reasonable control, including, without limitation, fire or other unavoidable casualty, national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, inability to obtain labor or materials, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

5.1.2. Either Agent or a majority interest in Owner shall have the option, exercisable upon written notice, to terminate this Agreement upon the sale of the Property to an unrelated third party, or a condemnation of all or substantially all of the Property.

5.1.3. Upon thirty (30) business days' prior written notice, the Agent shall have the right to terminate this Agreement "for cause," which shall include but not be limited to (i) failure by the Owner to pay to the Agent amounts due hereunder within thirty (30) days of receipt of written notice thereof or (ii) failure by the Owner to provide funds or otherwise enable the Agent to (A) operate the property in a first class and professional manner and undertake work in connection with an emergency, which failure is not cured by the Owner within thirty (30) days of receipt of written notice, or (B) to avoid civil or criminal liability or imposition of a fine or

other penalty.  The Owner shall not be in default under this Agreement if its performance of monetary or non-monetary obligations is prevented by circumstances beyond the Owner's reasonable control, including, without limitation, fire or other unavoidable casualty, national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

     5.2.    Upon termination of this Agreement for any reason, the Agent shall deliver, as soon as reasonably possible, but no later than the deadlines set forth below in this Section 5.2., the following to the Owner or the Owner's appointed agent:

     5.2.1.  upon termination and written directions concerning payment, all tenant security deposits held by the Agent with respect to the Property and ninety percent (90%) of any funds of the Owner held by Agent (provided that the Agent shall not be responsible for any delay by the depository institution or of any bank which issued a letter of credit);

     5.2.2.  Any balance of monies of the Owner or tenant security deposits, or both, held by the Agent with respect to the Property within thirty (30) days after termination with an adjustment upon delivery of the final accounting;

     5.2.3.  a final accounting, reflecting the balance of income and expenses for the Property as of the date of termination, within ninety (90) days after termination;

     5.2.4.  All books and records, contracts, leases, insurance policies, tenant files, receipts for deposits, unpaid bills, a summary of all leases in existence at the time of termination, and all other papers or documents in Agent's possession that pertain to the Property upon termination; and

     5.2.5.  a statement of all pending or completed negotiations and transactions as to which the Agent claims that a commission is or may be due, within thirty (30) days of termination.

     If the Agent fails to turn over any of the foregoing materials or monies when required, the Agent shall pay to the Owner upon demand liquidated damages of $25,000, it being agreed that the Owner will incur damages the exact amount of which cannot be ascertained.

5.3.    Upon termination of this Agreement, by sale or otherwise, the Owner promptly shall pay to the Agent all amounts due hereunder, except that commissions payable to the Agent as real estate broker hereunder shall be paid by the Owner (or by its assignee or transferee in the event of a sale of the Property) when the same would otherwise be due hereunder.

5.4.    Upon any termination of this Agreement, the Agent shall:

5.4.1.  assign, transfer or convey to the Owner or its designee all service contracts and personal property relating to or used in the operation and maintenance of the Property, except any personal property which was paid for and is owned by the Agent;

5.4.2.  remove all signs that the Agent may have placed on the Property indicating that the Agent is the manager of the Property, and replace and restore any damage resulting therefrom; and

5.4.3.  otherwise cooperate with the Owner or its designee in the transition to new management, including, without limitation, by making itself available to consult with and advise the Owner or its designee with respect to the operation and maintenance of the Property.

## ARTICLE 6.

## ARBITRATION

6.1.    <u>Arbitration</u>.

6.1.1.  For disputes and claims between the parties that are not resolved within ten (10) days after any party gives notice to the other party of its desire to arbitrate the dispute or claim, the dispute shall be settled by binding arbitration in accordance with the then-prevailing rules of the American Arbitration Association.  The arbitration panel shall consist of one arbiter.  Within twenty (20) days after the above notice is given, the parties shall mutually agree upon and appoint one arbiter, such person being a lawyer actively engaged in the practice of real estate law in New York City and having at least fifteen (15) years experience in the field, a judge, or a licensed New York real estate broker with at least fifteen (15) years experience in

commercial real estate. If the parties do not agree upon and appoint an arbiter within said twenty (20) days, any party may apply to the AAA for appointment of the arbiter.

      6.1.2.  The parties shall file with the arbiter, and exchange among counsel within ten (10) business days after the arbiter is appointed, opening briefs and proposed witness lists (including brief statements of the purpose for which each witness will be offered) and exhibits of all proposed documentary evidence (including brief statements of the purpose for which each document will be offered). At the same time, the parties shall provide the arbiter with a joint statement of any relevant facts upon which they are able to agree (or a joint statement that there are no relevant facts upon which they are able to agree). No witnesses or documents may be used at the hearing, except as disclosed in such lists, exhibits and statement, and then only to the extent not inconsistent with any applicable discovery responses.

      6.1.3.  The arbiter shall resolve any dispute submitted to the arbiter within forty-five (45) days of appointment. The decisions of the arbiter shall be final and binding and may not be appealed to the courts of any jurisdiction except upon claim of fraud or corruption. Both parties shall continue performing their lease obligations pending the award in the arbitration proceeding. Judgment upon the arbitration award may be entered in any court having jurisdiction. The arbiter shall award the prevailing party reasonable expenses and costs including reasonable attorneys' fees (to be conclusively determined by the arbiter) plus interest on any amount due at fifteen (15%) percent per annum or the maximum then allowed by applicable law, whichever is less. The losing party shall pay to the prevailing party the amount of the final arbitration award, and 100% of the costs and fees of the arbiter.

## ARTICLE 7.

## MISCELLANEOUS

      7.1.    Wherever in this Agreement reference is made to "the Owner's consent", "the Owner's approval", "the agreement of the Owner" or phrases to similar effect, such references shall be deemed to refer to and require the written approval of a majority-in-interest of

the partners/members of the Owner.

7.2    All approvals, notices, requests and demands to be made hereunder shall be given in the manner provided below at the addresses set forth on Exhibit A attached hereto. Any statement, notice, recommendation, request, demand, consent or approval under this Agreement shall be in writing and shall be deemed given when delivered personally with receipt acknowledged by an officer for the Agent or the Owner, as the case may be, or twenty-four hours after being sent by hand or Federal Express (or other nationally recognized overnight delivery service), or seventy-two hours after being sent by registered or certified mail, postage prepaid, return receipt requested. Either party may, by notice, designate a different address.

7.3.    This Agreement shall not be assignable by either party and cannot be changed orally, but only by a writing signed by both parties, except that the Owner may transfer all of its rights and obligations hereunder to a limited liability company of which at least a majority in interest of its members are members or partners of the Owner or immediate family members of the members/partners of the Owner. For the purposes of this provision, "immediate family members" shall mean the husband, wife, adult child, adult grandchild, father, mother, adult sister or adult brother of a member/partner, or a trust for the benefit of any of the foregoing individuals.

7.4.    No shareholder, officer or director of the Agent and no partner or member of the Owner shall have individual responsibility for the performance of any of the duties of the Agent or the Owner hereunder.

7.5.    All terms and words used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender, as the context may require.

7.6.    The Article headings herein contained are for purposes of identification only and shall not be considered in construing this Agreement.

7.7.    No remedy of either party is exclusive of any other remedy provided herein or at law, and all remedies available to either party shall be cumulative.

7.8.    The failure of either party to insist upon the strict performance of any obligation to be performed by the other party shall not be deemed to be a waiver thereof. No provision of this Agreement may be waived except by a writing signed by the party waiving any provision hereof. The waiver of any breach of this Agreement shall not be deemed a waiver of any subsequent breach of the same or any other obligation to be performed hereunder.

7.9.    This Agreement contains the entire Agreement of the parties with respect to the subject matter hereof, and all prior agreements or understandings, oral or written, are merged herein.

7.10.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

7.11.    This Agreement shall bind the parties hereto and their successors and assigns, and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

7.12.    The parties hereto hereby waive the right to trial by jury in any action or proceeding concerning the subject matter of this Agreement.

**HALSTEAD HARRISON AVENUE VENTURE**

BY:_____
　　　　　Marjorie Minskoff Schleifer
　　　　　Partner MLPIII

BY:_____
　　　　　Jean Minskoff Grant

BY:_____
　　　　　Carolyn Minskoff
　　　　　Estate of Myron A. Minskoff

**MINSKOFF GRANT REALTY & MANAGEMENT CORP., AS AGENT**

BY:_____
　　　　　Jean Minskoff Grant, President

<u>EXHIBIT A</u>

1. Owner's Address:

        Halstead Harrison Avenue Venture
        c/o Minskoff Grant Realty and Management Corp.
        1350 Avenue of the Americas
        32nd Floor
        New York, NY 10019

        with copies to:

        Marjorie Minskoff Schleifer
        Partner MLPIII
        c/o Minskoff Grant Realty & Management Corp.
        1350 Avenue of the Americas/32nd Floor
        New York, NY 10019

        and

        Jean Minskoff Grant
        c/o Minskoff Grant Realty & Management Corp.
        1350 Avenue of the Americas/32nd Floor
        New York, NY 10019

        and

        Carolyn Minskoff
        Estate of Myron A. Minskoff
        1350 Avenue of the Americas/23rd Floor
        New York, NY 10019

2. Agent's Address:

        Minskoff Grant Realty & Management Corp.
        1350 Avenue of the Americas
        32nd Floor
        New York, New York  10019

        Attention:  Jean Minskoff Grant

3. Name of Bank Account:

       Account No. 811550701

4. Name of Bank:         Sterling National Bank

5. Independent Auditors:    Altman & Dick
                              350 Broadway
                              New York, NY 10013

All designations in this <u>Exhibit A</u> may be changed at any time by the Owner.

<u>EXHIBIT B</u>

Leasing Commissions Schedule as per current published rates in the marketplace, to be updated accordingly.

First year or any fraction thereof ............................6%

Second & Third year.....................................6%

Fourth year up to and including the tenth year ........3%

The eleventh year and beyond ............................2%

The Commission shall be based upon the actual rentals payable by tenants under leases, excluding the following:

(a) charges, if any, for electric and steam to be supplied to Tenant;

(b) any payments to be made by tenant on account of increases in real estate taxes, labor costs or expenses of maintaining and operating the Building, escalation provisions, overage rents or any other payments made by Tenant during the term of said lease that are considered to be "additional rent";

(c) any payments to be made by Tenant on account of work, labor and materials to be furnished by Landlord;

(d) any lease takeover payments made by Landlord or costs and expenses assumed by Landlord in connection with tenant's lease obligations for space previously rented by it in premises other than the Building;

(e) rent concessions or other payments granted or paid to tenant, including work letters above the building standard maximum applicable to installation of new tenants, to be reviewed from time to time in light of existing market conditions.

Where the Owner has the sole right to cancel a lease at any time subsequent to the execution and delivery of the lease, Agent shall be paid a commission for the entire lease term as though such right to cancel did not exist. Where a tenant, or the Owner and tenant, have the right to cancel a lease at a time subsequent to the commencement of the term but prior to the expiration date set forth in the lease, Agent shall initially be paid a commission based on the rental set forth in the lease for the uncancellable portion of the term. If the lease shall be canceled by tenant pursuant to such option or other right, no commission shall be due or payable for the remainder of the term of such lease, unless the lease contains provisions obligating the tenant to pay or reimburse the Owner for the unamortized portion of the Agent's commission, in which event the entire commission shall be paid. If the lease is not so canceled by the tenant or the right of cancellation

is waived by the tenant, then, within thirty (30) days thereafter, Agent shall be paid the balance of the commission based on the rental for the remaining portion of the lease term.  A lease shall not be deemed canceled within the meaning of this paragraph unless the tenant vacates the Property.

REAL ESTATE MANAGEMENT AGREEMENT

FOR

77TH QUEENS ASSOCIATES

April 1, 2001

**TABLE OF CONTENTS**

ARTICLE 1   APPOINTMENT AND AUTHORITYOF THE AGENT; DEFINED TERMS          3

ARTICLE 2   THE AGENT'S AGREEMENTS          4

ARTICLE 3   INSURANCE; INDEMNIFICATION          11

ARTICLE 4   MANAGEMENT FEES          12

ARTICLE 5   TERM/TERMINATION          14

ARTICLE 6   ARBITRATION          17

ARTICLE 7   MISCELLANEOUS          19

# REAL ESTATE MANAGEMENT AGREEMENT

**THIS AGREEMENT**, made as of the 1st day of April, 2000, between **77th Queens Associates** (the "Owner"), having offices in care of Minskoff Grant Realty and Management Corp., 1350 Avenue of the Americas, 32nd Floor, New York, New York 10019, and **MINSKOFF GRANT REALTY & MANAGEMENT CORP.** (the "Agent"), a New York corporation having an office at 1350 Avenue of the Americas, 32nd Floor, New York, NY 10019.

## WITNESSETH:

**WHEREAS**, the Owner is the owner of certain real property located at 116-02/32 Queens Blvd., Forest Hills, NY 11375, County of Queens, State of New York (the "Property"); and

**WHEREAS**, the Owner and the Agent desire to enter into this Real Estate Management Agreement (this "Agreement");

**NOW, THEREFORE**, the parties hereto agree as follows:

## ARTICLE 1.
## APPOINTMENT AND AUTHORITY
## OF THE AGENT; DEFINED TERMS

1.1.    The Owner hereby appoints the Agent as the managing agent and the exclusive leasing agent for the Property, and hereby authorizes the Agent to exercise such powers with respect to the Property as may be necessary for the performance of the Agent's obligations under Article 2, and the Agent accepts such appointment on the terms and conditions hereinafter set forth.

3

**ARTICLE 2.**

**THE AGENT'S AGREEMENTS**

2.1.    Provided the Owner makes available the funds required therefor, including the payment of Agent's compensation, the Agent agrees to manage, lease, operate and maintain the Property, at the Owner's expense, in compliance with the Owner's instructions, and in connection therewith:

2.1.1.    To contract, for periods limited to the Owner's ownership of the Property but not in excess of one year, in the name and at the expense of the Owner, for gas, electricity, water and such other services as are being currently furnished to the Property. All service contracts shall be negotiated and reviewed by the Agent and shall be written to include a thirty (30) day notice of cancellation by the Owner whenever possible. Agent shall notify the Owner and obtain its consent before entering into any contract with any person related to or affiliated with the Agent or any principals of the Agent. All contracts or purchase orders in excess of $10,000 entered into by the Agent on behalf of the Owner, whether for capital or operating expenses, shall be bid with at least two contractors whenever practicable (but no more frequently than every two years with respect to contracts for continuing work) and approved by the Owner. Competitive bidding shall not be required (i) for work requiring an expenditure of less than $10,000, (ii) work to be performed by engineers, architects, space planners, consultants and similar professionals, or (iii) work necessitated by the occurrence of an emergency or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty, if, under the relevant circumstances, the time required for competitive bidding would make competitive bidding impractical;

2.1.2.    At the expense of the Owner, and subject to the Owner's approval of any employees not reflected in the budget, to select, employ, pay, supervise, monitor the performance of and direct all employees necessary for the operation, maintenance and repair of

4

the Property, discharge any such employees, carry workers compensation insurance, as applicable (and, when required by law, compulsory non-occupational disability insurance) covering such employees, and to use reasonable care in the selection of such employees. The cost of any employee providing services to more than one property shall be allocated among such properties based on the proportion of time spent servicing each property. The Agent will be and will continue throughout the term of this Agreement to be an equal opportunity employer. All persons employed in connection with the operation and maintenance of the Property shall be employees of the Agent or of its independent contractors, unless the Owner shall otherwise consent. Upon the expiration or earlier termination of this Agreement, the Agent agrees unconditionally to the Owner's or successor managing agent's employment of all personnel employed by the Agent in connection with the operation or maintenance of the Property, should the Owner or successor managing agent elect in its sole discretion. On-site staffing shall not be hired for the Property without the prior approval of the Owner;

       2.1.3.  To keep the Property in a clean and sightly condition, to procure contractors or subcontractors for making all repairs, alterations, replacements and installations at the Property, decorate, purchase all supplies and perform all other acts necessary for the proper operation of the Property, the fulfillment of the Owner's obligations under any lease, building loan or mortgage agreement (relating to the operation, maintenance or leasing of the Property) and the compliance with all governmental and insurance requirements relating to the Property. The Agent shall prepare a plan, where necessary, with respect to the management, maintenance and operation of the Property and shall advise the Owner with respect to alternatives for renovating, rehabilitating, maintaining, altering, repairing and operating the Property; included in such plan shall be a comprehensive review of the Property's mechanical systems. The Owner shall receive the benefit of all discounts and rebates obtainable by the Agent in its operation of the Property. With the Owner's prior written consent, the Agent or general contractor working under the supervision of the Agent is authorized to make repairs and alterations and perform

other services to the Property at a tenant's request and at the tenant's sole expense (such work is hereinafter referred to as "Tenant Work"), and the Agent may collect from such tenant or such general contractor, for its sole account, commercially reasonable charges for performance of the work, for supervisory overhead on all such Tenant Work, and for other reasonable and customary charges, except that the Agent shall pay the Owner reasonable compensation for its use of any building personnel in performing any such Tenant Work during normal business hours. The Agent, when acting for its own account as independent contractor and not acting on behalf of the Owner, shall hold the Owner harmless from any and all claims which may be advanced by any such tenant in connection with Tenant Work performed by the Agent or under the Agent's supervision. Notwithstanding the foregoing, the Agent shall not be required to indemnify the Owner in connection with repairs and alterations undertaken on the Owner's behalf, at the Owner's direction, or in connection with the Agent's oversight of routine repairs and alterations performed by third party contractors on behalf of the Owner and in such events, the indemnity provisions in Section 3.2(a) shall control.

   2.1.4. To handle complaints and requests from tenants, to notify the Owner of any major complaint made by a tenant of which the Agent has actual knowledge, and to notify the Owner promptly (together with copies of supporting documentation) of any material defect in the Property or any other material condition or occurrence concerning the Property of which the Agent has actual knowledge. The Agent shall also refer inquiries by members/partners in the Owner as directed by the Owner;

   2.1.5. To notify the Owner's general liability insurance carrier and the Owner promptly of any personal injury or property damage occurring to or claimed by any tenant or third party on or with respect to the Property of which the Agent has actual knowledge, and promptly to forward to the carrier, with copies of all such documents to the Owner, any summons, subpoena or other similar legal document served upon the Agent relating to actual or alleged potential liability of the Owner, the Agent or the Property;

6

2.1.6. To forward to the Owner, upon request, any certificates of insurance and renewals thereof, required to be furnished by tenants or contractors;

2.1.7. Unless the Owner elects otherwise, to calculate rental payments due from tenants, including but not limited to escalation payments, to render bills for the same on a timely basis and to receive and collect rent and all other monies payable to the Owner by all tenants, licensees and other persons using or occupying the Property and to deposit the same promptly in the bank named in Exhibit A (the "Bank") in an account of the Owner (the "Bank Account"), which account shall be used exclusively for such funds;

2.1.8. At the expense, and with the prior approval, of the Owner, to institute legal actions or proceedings for the collection of rent or other income for the Property, or the ousting or dispossessing of tenants or other persons therefrom, and all other matters requiring legal attention. The Owner reserves the right to designate counsel and to control litigation of any character affecting or arising out of the operation of the Property;

2.1.9. To bond by a fidelity bond, at the Agent's expense and with coverage terms and amounts reasonably acceptable to Owner, the Agent and all of the Agent's employees who may handle or be responsible for monies or property of the Owner;

2.1.10. To notify the Owner promptly (together with copies of supporting documentation) of: any notice of violation of any governmental requirements, including, but in no way limited to, violations existing relative to the leasing, use, repair and maintenance of the Property, under federal, state and municipal laws and ordinances, of which the Agent has actual knowledge; any lawsuits or threats thereof involving the Property of which the Agent has actual knowledge; any fire or other damage to the Property of which the Agent has actual knowledge and in connection therewith, to immediately telephone notice to the Owner's general insurance office (to be promptly followed up with written notice), in an effort to enable an insurance adjuster to view the damage before repairs are started and complete customary loss reports in connection with fire or other damage to the Property;

7

2.1.11.     To review all real estate tax assessments, and assist the Owner in trying to reduce real estate taxes;

2.1.12.     To prepare checks and make other arrangements to pay, on behalf of the Owner, all taxes, including sales tax, special assessments, ground rents, insurance premiums and mortgage payments and other payments required to be made by the Owner pursuant to agreements by which the Owner is bound or to which the Owner is a party (of which the Agent is aware), including but not limited to the Owner's joint venture/partnership/limited liability company agreement, mortgage and other similar agreements. The Agent shall also prepare checks for cash distributions to partners in accordance with the Owner's instructions. All checks over $5,000 shall be signed by two members/partners of the Owner in accordance with Section 7.1. hereof, except for checks in payment of budgeted expenditures.

2.1.13.     To undertake work required to address emergencies or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty.

2.1.14.     Subject to the continuing control and approval of the Owner, to advertise the Property for lease, to prepare and secure signs, plans, circular matter and/or other forms of advertising, to investigate and develop offers and inquiries received by Agent or the Owner with respect to the leasing of any space in the Property and to solicit as exclusive broker the cooperation of other licensed real estate brokers to endeavor at all times to lease all space at the Property, provided, however, that Agent shall have no authority, and shall not hold itself out as having authority, to sign or bind the Owner to any lease or other agreements relating to the occupancy of space or any renewals, amendments or extensions thereof (collectively, "Lease Agreements"), the Owner expressly reserving all right and authority to execute or cause to be executed all Lease Agreements on its own behalf (through any two of its members/partners in accordance with Section 7.1. hereof) and sole right in its discretion to approve or disapprove proposed tenants or lease transactions. No Lease Agreement shall be treated as authorized unless it shall have been expressly approved in writing by a majority-in-

8

interest of the partners/members of the Owner and executed by two (2) partners/members of the Owner in accordance with <u>Section 7.1.</u> hereof.

2.2.    The Agent agrees to render monthly reports relating to the management and operation of the Property for the preceding calendar month, on or before the fifteenth (15th) day of each month, or as soon after the receipt all of the monthly bank statements, in form reasonably satisfactory to the Owner.  The Agent agrees that the Owner shall have the right to require the transfer to the Owner at any time of any funds in the Bank Account considered by the Owner to be in excess of the amount reasonably required by the Agent for disbursement purposes in connection with the Property.  No funds held or collected by the Agent in connection with the Property shall be commingled with any other funds of the Agent, including security deposits by tenants under leases.  The Agent agrees to keep proper records with respect to the management and operation of the Property, including a general ledger, and to retain those records for periods specified by the Owner.  Each partner/member of the Owner shall have the right to inspect and copy such records upon five (5) business days' written notice and audit the reports required by this Agreement for a period of two (2) years following the applicable year.

2.3.    The Agent agrees to render within (i) fifteen (15) days after the end of a particular month, (ii) thirty (30) days after the end of a particular quarter, and (iii) one hundred and twenty (120) days after the end of a particular year, the following reports:

2.3.1.    a statement of rents and other receipts collected for the preceding relevant calendar period (month, quarter or year) to date;

2.3.2.    a statement of disbursements for the preceding relevant calendar period (month, quarter or year) to date, together with reconciliation of such disbursements with the Owner's bank statements;

2.3.3.    a summary cash flow statement for the preceding relevant calendar period (month, quarter or year) to date showing beginning and ending cash balances;

2.3.4.    a monthly tenant arrears statement aging the balances as required;

2.3.5.    Quarterly rent roll and budget comparisons; and

2.3.6. a monthly building operating Status report summarizing major events affecting the Property.

2.4.    The Agent shall ensure that such controls are maintained over accounting and financial transactions relating to the Property or the Agent's activities under this Agreement as are reasonably required to protect the Owner's assets from loss or diminution.

2.5.    Commencing with respect to the calendar year 2001, the Agent shall prepare and submit to the Owner by October 31 of the previous calendar year a preliminary annual operating and capital budget for the promotion, operation, repair and maintenance of the Property.    Such budgets shall be prepared on an accrual basis, showing a month-by-month projection of income and expense.    With respect to calendar year 2000, the Agent shall prepare a budget as soon as is practicable. Such budgets shall be subject to the Owner's approval and shall be revised during the year, if appropriate.    Until the Owner approves a new budget, the Agent shall operate the Property under the existing budget, except for non-discretionary items, such as real estate taxes and utilities, which shall be deemed approved by Owner.

2.6.    Notwithstanding anything contained in this Agreement to the contrary, the Agent shall not, without the prior written approval of the Owner, make any expenditure or incur any obligation by or on behalf of the Owner involving a sum in excess of $10,000 for any transaction, except for (i) normal expenses incurred in the ordinary course under an Owner-approved operating or capital budget, (ii) obligations incurred pursuant to an Owner-approved contract or (iii) expenditures required to remedy a condition of an emergency nature as described in paragraph 2.1.1.(iii) hereof.

2.7.    The Agent shall cooperate with the Owner's accountants, attorneys and other advisors in connection with annual reviews, audits or otherwise.    In addition, the Agent shall attend periodic meetings with the Owner and its partners as may be reasonably required to advise the Owner of the status of operations in the Property.    Owner's members/partners may participate personally or by conference call.

10

# ARTICLE 3.

## INSURANCE; INDEMNIFICATION

3.1.    The Owner shall carry casualty and liability insurance upon the Property and shall look solely to such insurance with respect to any loss or damage to the Property, except as provided herein. The Owner shall either obtain waivers by the insurer of rights of subrogation against the Agent under such policies or shall have such policies name the Agent as an additional insured.

3.2.    (a) The Owner shall indemnify and hold harmless the Agent, its affiliates and their respective officers, directors, shareholders, partners and employees from and against all claims, losses and liabilities occasioned by or in connection with or arising out of acts or omissions of the Agent arising in connection with this Agreement, except in cases of negligence, willful misconduct or bad faith.  The foregoing indemnity and hold harmless provision shall include, but not be limited to, claims, losses, liabilities, costs and expenses arising directly or indirectly out of the Owner's failure to provide funds to enable the Agent to address any emergency, failure to comply with laws or legal requirements or work necessitated in connection therewith.  The Owner shall also indemnify, defend and hold Agent and its shareholders, partners, directors, officers, employees and representatives harmless against any damage, loss or expense it actually suffers or incurs, including reasonable attorneys' fees, arising from (i) distributions made by Agent in accordance with instructions by the Owner or its representatives and (ii) the failure to make distributions if not authorized to do so by Owner or its representatives.  Notice of the assertion of any such claim shall be promptly given to the Owner after the Agent obtains knowledge of such assertion.  To the extent that Owner is the employer of persons involved with the operation and maintenance of the Property, Owner shall be responsible for, and shall indemnify Agent from and against claims made against Agent for, any sales or similar taxes that may be due with respect to such employees.

11

3.2.1. The Agent agrees to indemnify and hold the Owner and each partner, member, officer, employee, agent or other representative of the Owner harmless against any claims, losses and liabilities to the extent that they result from the Agent's negligence, willful misconduct or bad faith in connection with the Agent's performance of its duties under this Agreement.

3.3.    In the event a claim against the Agent arising out of or related to the Agent's conduct with respect to the Property to which the Agent is entitled to indemnification under Article 3 is brought by any third party against the Agent, the Owner shall pay the Agent's reasonable legal fees and expenses. Alternatively, the Owner may assume the defense of any claim against the Agent through counsel of Owner's choosing. Upon the rendering of a final, non-appealable judgment by a court or other authorized party that the damages, loss, costs or expense resulting from the claim was caused by Agent's negligence, willful misconduct or bad faith, then Agent shall reimburse the Owner for expenses so paid to the extent, but only to the extent, that the Court determines that the claim was attributable to such negligence, willful misconduct or bad faith.

3.4.    The provisions of this Article 3 shall survive the termination of this Agreement.

## ARTICLE 4.

## MANAGEMENT FEES

4.1.    For and in consideration of the services to be performed by the Agent pursuant to Article 2, the Owner agrees to pay the Agent a fee of 3.5% (of total income) per year for the first year of the term. Thereafter, the fee for each year this Agreement remains in effect shall increase by five (5%) percent of the fee for the immediately preceding year. The management fee shall be payable monthly prior to the last day of each such calendar month.

4.1.1. On a monthly basis, the Owner shall reimburse the Agent for: the cost of the Agent's personnel (viz. any building manager, assistant building manager, building

employees) who devote full time to the Property and who have been employed pursuant to an Owner-approved budget or otherwise with the Owner's approval, including payroll, insurance, taxes, vacation, sick leave, severance, retirement, pension, benefits and related expenses (collectively "Payroll Costs") (but excluding the Payroll Costs of the Agent's leasing brokers); an allocable portion of the Payroll Costs of the Agent's employees devoting a portion of their time to the Property; all taxes, assessments, levies and fees payable by the Agent in connection with the performance of its duties under this Agreement (other than income, gross receipts, franchise and other similar taxes payable by the Agent); out-of-pocket costs and expenses paid by the Agent in connection with advertising, monthly brokerage listing sheets and promotional events; maintaining an office at the Property and purchasing supplies therefor (but excluding costs incurred by the Agent with respect to its home office); fees and expenses paid to consultants for services rendered to the Agent in connection with the services provided hereunder (and to the extent that the Agent's off-site personnel devotes time to the Property in lieu of a third party consultant, then the Agent shall be reimbursed for such time spent).

4.1.2. In addition to fees payable to the Agent as provided above, the Agent shall be paid a full leasing commission as set forth in <u>Exhibit B</u> in connection with transactions consummated during the term of this Agreement for which the Agent is the effective procuring cause for a fully executed lease by a tenant approved by the Owner acting in its sole and absolute discretion, except that (i) the Agent shall be paid a commission equal to 75% of a full commission (computed on the basis that the original term of the lease included the renewal term) in connection with a tenant's renewal or extension of the term of a lease or the occupancy of replacement space, if pursuant to, or in satisfaction of, the exercise of a right or option in an existing agreement, (ii) the Agent shall be paid a commission equal to 50% of a full commission (computed as though the first year of the renewal period were the first year of the lease) in connection with lease renewals other than pursuant to, or in satisfaction of, an option contained in the lease, (iii) the Agent shall be paid a commission equal to 100% of a full commission in connection with a tenant's leasing additional space in the Property, whether pursuant to an option

13

or otherwise, (iv) the Agent shall be paid an override commission at one half the rate otherwise payable hereunder in the event a commission is payable to a third broker unaffiliated with the Agent in connection with a new lease, an expansion or an extension, and (v) no commission is payable in connection with any transaction for which a prior leasing agent for the Property is entitled to a commission. The Agent shall obtain written instructions or consent from the Owner for the payment of commissions to an unaffiliated third broker representing an existing tenant in the Property. The commission shall be earned, due and payable in three equal installments: one third upon the execution of the lease by the tenant and the Owner; one third upon the later of the commencement of the lease and actual occupancy of the leased premises by the tenant, and one third six (6) months after the tenant commences payment of rent, or at such other time(s) as Owner and Agent shall agree for any part of a commission if the tenant fails to take actual occupancy under the lease agreement. The Owner shall not be liable for any portion of the commission yet to be paid to the Agent if the tenant defaults in the payment of base rent for three (3) consecutive months and such default is not thereafter cured.

## ARTICLE 5.
## TERM/TERMINATION

5.1.    (a) This Agreement shall be in effect for the period from April 1, 2000 through March 31, 2005. If not otherwise earlier terminated as provided in this Agreement, this Agreement shall continue thereafter for additional periods of one year. The Owner and the Agent shall have the option, exercisable upon ninety (90) days' prior written notice, to terminate this Agreement for any reason effective as of March 31, 2005 and thereafter as to each annual extension, as of January 1 of each year.

5.1.1. Notwithstanding anything herein to the contrary, this Agreement may be terminated by the Owner at any time during the term hereof upon five (5) business days' prior written notice "for cause" which shall include, but not be limited to the following: (i) if the

Agent shall fail to pay any sum of money due and payable by the Agent to the Owner or any third party (provided the Owner shall provide sufficient funds to the Agent therefore) within ten (10) days after notice from the Owner that any such sum is due and payable, or, in the case of a mortgage affecting the Property, if the Agent is required to make payments to the mortgagee (provided the Owner shall provide sufficient funds to the Agent therefore) and fails to make any required payments when due; or (ii) if the Agent shall fail to perform any of its other obligations under this Agreement within thirty (30) days after notice from the Owner, or within such longer period as may be reasonably required for such performance, provided that the Agent has commenced such cure within the above 30 day period and thereafter continuously and diligently prosecutes the same to completion.

The Agent shall not be in default under this Agreement if its performance of monetary (only if the Owner is obligated to provide funds but does not) or non-monetary obligations is prevented by circumstances beyond the Agent's reasonable control, including, without limitation, fire or other unavoidable casualty,  national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, inability to obtain labor or materials, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

5.1.2.  Either Agent or a majority interest in Owner shall have the option, exercisable upon written notice to the other party, to terminate this Agreement upon the sale of the Property to an unrelated third party, or a condemnation of all or substantially all of the Property.

5.1.3.  Upon thirty (30) business days' prior written notice, the Agent shall have the right to terminate this Agreement "for cause," which shall include but not be limited to (i) failure by the Owner to pay to the Agent amounts due hereunder within thirty (30) days of receipt of written notice thereof or (ii) failure by the Owner to provide funds or otherwise enable the Agent to (A) operate the property in a first class and professional manner and undertake work in connection with an emergency, which failure is not cured by the Owner within thirty (30) days of receipt of written notice, or (B) to avoid civil or criminal liability or imposition of a fine or

15

other penalty. The Owner shall not be in default under this Agreement if its performance of monetary or non-monetary obligations is prevented by circumstances beyond the Owner's reasonable control, including, without limitation, fire or other unavoidable casualty, national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

    5.2.    Upon termination of this Agreement for any reason, the Agent shall deliver, as soon as reasonably possible, but no later than the deadlines set forth below in this Section 5.2, the following to the Owner or the Owner's appointed agent:

    5.2.1.  upon termination and written directions concerning payment, all tenant security deposits held by the Agent with respect to the Property and ninety percent (90%) of any funds of the Owner held by Agent (provided that the Agent shall not be responsible for any delay by the depository institution or of any bank which issued a letter of credit);

    5.2.2.  Any balance of monies of the Owner or tenant security deposits, or both, held by the Agent with respect to the Property within thirty (30) days after termination with an adjustment upon delivery of the final accounting;

    5.2.3.  a final accounting, reflecting the balance of income and expenses for the Property as of the date of termination, within ninety (90) days after termination;

    5.2.4.  All books and records, contracts, leases, insurance policies, tenant files, receipts for deposits, unpaid bills, a summary of all leases in existence at the time of termination, and all other papers or documents in Agent's possession that pertain to the Property upon termination; and

    5.2.5.  a statement of all pending or completed negotiations and transactions as to which the Agent claims that a commission is or may be due, within thirty (30) days of termination.

    If the Agent fails to turn over any of the foregoing materials or monies when required, the Agent shall pay to the Owner upon demand liquidated damages of $25,000, it being agreed that the Owner will incur damages the exact amount of which cannot be ascertained.

5.3.    Upon termination of this Agreement, by sale or otherwise, the Owner promptly shall pay to the Agent all amounts due hereunder, except that commissions payable to the Agent as real estate broker hereunder shall be paid by the Owner (or by its assignee or transferee in the event of a sale of the Property) when the same would otherwise be due hereunder.

5.4.    Upon any termination of this Agreement, the Agent shall:

5.4.1.  assign, transfer or convey to the Owner or its designee all service contracts and personal property relating to or used in the operation and maintenance of the Property, except any personal property which was paid for and is owned by the Agent;

5.4.2.  remove all signs that the Agent may have placed on the Property indicating that the Agent is the manager of the Property, and replace and restore any damage resulting therefrom; and

5.4.3.  otherwise cooperate with the Owner or its designee in the transition to new management, including, without limitation, by making itself available to consult with and advise the Owner or its designee with respect to the operation and maintenance of the Property.

## ARTICLE 6.
## ARBITRATION

6.1.    Arbitration.

6.1.1.  For disputes and claims between the parties that are not resolved within ten (10) days after any party gives notice to the other party of its desire to arbitrate the dispute or claim, the dispute shall be settled by binding arbitration in accordance with the then-prevailing rules of the American Arbitration Association.  The arbitration panel shall consist of one arbiter.  Within twenty (20) days after the above notice is given, the parties shall mutually

agree upon and appoint one arbiter, such person being a lawyer actively engaged in the practice of real estate law in New York City and having at least fifteen (15) years experience in the field, a judge, or a licensed New York real estate broker with at least fifteen (15) years experience in commercial real estate. If the parties do not agree upon and appoint an arbiter within said twenty (20) days, any party may apply to the AAA for appointment of the arbiter.

   6.1.2. The parties shall file with the arbiter, and exchange among counsel within ten (10) business days after the arbiter is appointed, opening briefs and proposed witness lists (including brief statements of the purpose for which each witness will be offered) and exhibits of all proposed documentary evidence (including brief statements of the purpose for which each document will be offered). At the same time, the parties shall provide the arbiter with a joint statement of any relevant facts upon which they are able to agree (or a joint statement that there are no relevant facts upon which they are able to agree). No witnesses or documents may be used at the hearing, except as disclosed in such lists, exhibits and statement, and then only to the extent not inconsistent with any applicable discovery responses.

   6.1.3. The arbiter shall resolve any dispute submitted to the arbiter within forty-five (45) days of appointment. The decisions of the arbiter shall be final and binding and may not be appealed to the courts of any jurisdiction except upon claim of fraud or corruption. Both parties shall continue performing their lease obligations pending the award in the arbitration proceeding. Judgment upon the arbitration award may be entered in any court having jurisdiction. The arbiter shall award the prevailing party reasonable expenses and costs including reasonable attorneys' fees (to be conclusively determined by the arbiter) plus interest on any amount due at fifteen (15%) percent per annum or the maximum then allowed by applicable law, whichever is less. The losing party shall pay to the prevailing party the amount of the final arbitration award, and 100% of the costs and fees of the arbiter.

## ARTICLE 7.

## MISCELLANEOUS

7.1.    Wherever in this Agreement reference is made to "the Owner's consent", "the Owner's approval", "the agreement of the Owner" or phrases to similar effect, such references shall be deemed to refer to and require the written approval of a majority-in-interest of the partners/members of the Owner.  The requirements in Sections 2.1.12. and 2.1.14. of this Agreement that two (2) members/partners sign checks and leases shall be deemed to require signatures of (a) one Group A Partner and one Group B Partner, (b) one Group A Partner and one Group C Partner, or (c) one Group B Partner and one Group C Partner.  "Group A Partner" means Myron A. Minskoff, his successors and assigns; "Group B Partner" means Marjorie Minskoff Schleiffer, her successors and assigns, and "Group C Partner" means an executor of the Estate of Jerome Minskoff and the successors and assigns of the executors or, after settlement of the Estate, the beneficiary who succeeds to the Estate's interest in the Owner (or its legal representatives) or the successors or assigns thereof.

7.2.    All approvals, notices, requests and demands to be made hereunder shall be given in the manner provided below at the addresses set forth on Exhibit A attached hereto. Any statement, notice, recommendation, request, demand, consent or approval under this Agreement shall be in writing and shall be deemed given when delivered personally with receipt acknowledged by an officer for the Agent or the Owner, as the case may be, or twenty-four hours after being sent by hand or Federal Express (or other nationally recognized overnight delivery service), or seventy-two hours after being sent by registered or certified mail, postage prepaid, return receipt requested.  Either party may, by notice, designate a different address.

7.3.    This Agreement shall not be assignable by either party and cannot be changed orally, but only by a writing signed by both parties, except that the Owner may transfer all of its rights and obligations hereunder to a limited liability company of which at least a majority in interest of its members are members or partners of the Owner or immediate family members of the members/partners of the Owner.  For the purposes of this provision, "immediate

19

family members" shall mean the husband, wife, adult child, adult grandchild, father, mother, adult sister or adult brother of a member/partner, or a trust for the benefit of any of the foregoing individuals.

7.4.    No shareholder, officer or director of the Agent and no partner or member of the Owner shall have individual responsibility for the performance of any of the duties of the Agent or the Owner hereunder.

7.5.    All terms and words used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender, as the context may require.

7.6.    The Article headings herein contained are for purposes of identification only and shall not be considered in construing this Agreement.

7.7.    No remedy of either party is exclusive of any other remedy provided herein or at law, and all remedies available to either party shall be cumulative.

7.8.    The failure of either party to insist upon the strict performance of any obligation to be performed by the other party shall not be deemed to be a waiver thereof.  No provision of this Agreement may be waived except by a writing signed by the party waiving any provision hereof.  The waiver of any breach of this Agreement shall not be deemed a waiver of any subsequent breach of the same or any other obligation to be performed hereunder.

7.9.    This Agreement contains the entire Agreement of the parties with respect to the subject matter hereof, and all prior agreements or understandings, oral or written, are merged herein.

7.10.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

7.11.    This Agreement shall bind the parties hereto and their successors and assigns, and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

7.12.   The parties hereto hereby waive the right to trial by jury in any action or proceeding concerning the subject matter of this Agreement.

77TH QUEENS ASSOCIATES

BY:_____
Myron A. Minskoff

BY:_____
Marjorie Minskoff Schleifer

Estate of Jerome Minskoff

BY:_____
Patricia Minskoff, Co-Executor

BY:_____
United States Trust Company
Of New York, as Co-Executor

**MINSKOFF GRANT REALTY & MANAGEMENT CORP., AGENT**

BY: _____
Jean Minskoff Grant, President

21

<u>EXHIBIT A</u>

1. Owner's Address:

        77th Queens Associates
        c/o Minskoff Grant Realty and Management Corp.
        1350 Avenue of the Americas
        32nd Floor
        New York, NY 10019

        with copies to:

        Ms. Trish Minskoff        Ms. Trish Minskoff
        435 Lower County Road     400 East 54th Street, #30H
        Harwichport, MA 02646     New York, NY 10022

        and

        Myron A. Minskoff
        Myron A. Minskoff Inc.
        1350 Avenue of the Americas/23rd Floor
        New York, NY 10019

        and

        Marjorie Minskoff Schleifer
        Minskoff Grant Realty & Management Corp.
        1350 Avenue of the Americas/32nd Floor
        New York, NY 10019

2. Agent's Address:

        Minskoff Grant Realty and Management Corp.
        1350 Avenue of the Americas
        32nd Floor
        New York, New York  10019

        Attention:  Jean Minskoff Grant

3. Name of Bank Account:

   Account No. 251001681


4. Name of Bank:          Chase


5. Independent Auditors:




All designations in this <u>Exhibit A</u> may be changed at any time by the Owner.

EXHIBIT B
*Revised for 77th Queens*
*April 1, 2001*

Leasing Commissions Schedule

First year or any fraction thereof .............................5%

Second and Third Year  ...........................................4%

Fourth Year ............................................... 3-1/2%

Fifth year ...................…...................................3%

Sixth year up to and including the 10th year................2-1/2%

Eleventh year up to and including the 20th year................2%

Twenty-first year and beyond....................................1%

The Commission shall be based upon the actual rentals payable by tenants under leases, excluding the following:

  (a)  charges, if any, for electric and steam to be supplied to Tenant;

  (b)  any payments to be made by tenant on account of increases in real estate taxes, labor costs or expenses of maintaining and operating the Building, escalation provisions, overage rents or any other payments made by Tenant during the term of said lease that are considered to be "additional rent";

  (c)  any payments to be made by Tenant on account of work, labor and materials to be furnished by Landlord;

  (d)  any lease takeover payments made by Landlord or costs and expenses assumed by Landlord in connection with tenant's lease obligations for space previously rented by it in premises other than the Building;

  (e)  rent concessions or other payments granted or paid to tenant, including work letters above the building standard maximum of $25 per square foot applicable to installation of new tenants, to be reviewed from time to time in light of existing market conditions.

Where the Owner has the sole right to cancel a lease at any time subsequent to the execution and delivery of the lease, Agent shall be paid a commission for the entire lease term as though  such right to cancel did not exist.  Where a tenant, or the Owner and tenant, have the right to cancel a

24

lease at a time subsequent to the commencement of the term but prior to the expiration date set forth in the lease, Agent shall initially be paid a commission based on the rental set forth in the lease for the uncancellable portion of the term. If the lease shall be canceled by tenant pursuant to such option or other right, no commission shall be due or payable for the remainder of the term of such lease, unless the lease contains provisions obligating the tenant to pay or reimburse the Owner for the unamortized portion of the Agent's commission, in which event the entire commission shall be paid. If the lease is not so canceled by the tenant or the right of cancellation is waived by the tenant, then, within thirty (30) days thereafter, Agent shall be paid the balance of the commission based on the rental for the remaining portion of the lease term. A lease shall not be deemed canceled within the meaning of this paragraph unless the tenant vacates the Property.

# MGRMC
# Quarterly Reports
# Fourth Quarter
# 2007

C:\Jeansgraphics

# MGRMC
# Quarterly Reports
# Fourth Quarter
# 2007
# Halstead & Harrison

**HALSTEAD HARRISON ASSOCIATES (12)**
**270-278 Halstead Avenue**
**Harrison, NY 10528**
**(13,450 Sq. Ft.)**
**(48 Spaces)**

Building Status Report
December 2007

## GENERAL:

1.    In that the lease with CVS Hampton Bays LLC Store #8317[*CVS3* spaces "01, 02"] is now fully executed as of January 31, 2005 (see below), a capital call of $50,000 for leasing commissions was made to the owners and all funds have been received. The entire call was presented as a staged call so that the funds are made available, as they are required. If *CVS3* is successful in buying out the current tenant, Family Discount Center [*Family,* Space "01"], then the time line presented will be adjusted accordingly. We have been informed that *CVS3* is not going to approach the current tenant in regards to giving up their lease early until *CVS3* has obtained all their permit approvals. No plans have been submitted to our office from *CVS3* as yet. We will follow-up with our contact again in September.

**October / November /December 2005 Update:** *CVS3* will be submitting site plans and elevation drawings. They will be ready to file shortly after the Owner's approval of plans. An Architect for *CVS3* visited the property for a site visit to review plans. They are not having trouble gaining the mayor's approval. Plans will be forthcoming soon; we will forward to the Owners as soon as they are received.

**February 2006 Update:** *CVS3* is working on City approval for the site plan. A town meeting was held on February 28, 2006 at the municipal hall.

**March 2006 Update:** Another town meeting is scheduled for April 25th, 2006.

**April 2006 Update:** They will be reviewing the Architectural Plans at the town meeting and will need five of nine board members to give approval. In May they will review the Traffic report and in June should gain approval, with reporting out in July or August.

**May 2006 Update:** Town is requesting $25,000 from *CVS3* for reviewing *CVS3*'s plans, which we are told happens in smaller municipalities about 5-15% of the time.

**June 2006 Update**: There was an environmental company taking boring tests in the parking lot for *CVS3*. *CVS3* expeditor expects the building permits from the Town of Harrison around October 1, 2006. The request from the Town has increased to $40,000, which *CVS3* has agreed to pay.

Halstead Harrison Associates (12)
Building Status Report
December 2007
Page 2

**GENERAL CONT'D.:**

**July / August/ September 2006 Update**: T has spoken with the expeditor for this project for *CVS3*. The expeditor expects the approvals either at a meeting on September 26, or in late October. The money *CVS3* paid was for a local architect, who will review/comment on the *CVS3* plans. We hope *CVS3* will be able to go ahead upon the expiration of the Family Discount lease on 12/31/2006.

**October 2006 Update:** The Town of Harrison is requiring the building structure have a 2nd story floor however this is to be used more like a "movie set" and they will not authorize a usable 2nd story. *CVS3* is working through the town requirements.

**November /December 2006 Update:** The revised plans will be sent for Owner's approval in a few weeks, and he hopes to have Town Board approvals at either the December or January town meeting.

**February 2007 Update:** We have been calling in to the monthly "Tracking meetings" arranged by *CVS3*'s management team. They are still configuring the drawing and waiting for approval on their end before showing to the Town of Harrison for approval.

**March / April 2007 Update:** The Architect met with the Mayor and received a verbal agreement from him for *CVS3*'s $2.5 Million dollar plan. He is making the final payment of $12,500 for Harrison's architect to review the plans. This is the final payment for the 3rd party review which will prompt the Town's Architect to review the plans after the payment is received. Tentatively, *CVS3* believes that they will have site plan approval in May or June 2007 and Building Approval somewhere between August and October 2007.

**May & June July 2007:** No word as yet, tenant has the keys and is paying rent and CAM/RE taxes.

**July 2007 Update:** The Property Manager and Superintendent visited this site to review the CIMA report in regard to the flooding of the back yard and parking lot on the property. It is the opinion of the Property Manager that we wait until we receive additional information from CVS in regard to their build out prior to investigating this matter further.

**August 2007 Update:** AVA has removed all debris, plywood, and concrete block from the rear parking lot.

*CVS3* is in final stage of negotiations with the Town of Harrison and should be done very soon with proposal process.

**September October 2007 Update:** Josh Kimmerling of Cuddy Feder feels that the rash of violations received is all relative to the Town wanting to pressure *CVS3* into doing what the town wants it to do. A meeting is scheduled for October and we will get back to you with the information as soon as we have it. It is a good choice to use Josh here as his firm represents *CVS3*.

Halstead Harrison Associates (12)
Building Status Report
December 2007
Page 3

## GENERAL CONT'D.:

**November 2007 Update:** See information posted to "Violations/Notices" below.
We have been provided renderings of the proposed alterations by *CVS3* as they have been submitted to the Town of Harrison for approval. We have also been advised that *CVS3* is considering a complete demolition of the existing structure. *(Copies of the renderings as supplied by CVS3 were attached to the November report)*

**Follow-Up:**

1. **Summer/Fall Flooding at the Property/ Ben-Lee Distributors d/b/a Family Discount Center vs. Minskoff Grant Realty & Management Corp. claim # 4IIN060** (see September, October, November, and December 2004, April 2005, March 2006 and December 2006 for all information). We have received a notice of Discovery from our Lawyers. We have forwarded the information requested to the best of our ability. The Plaintiff's deposition is scheduled for June 4, 2007.

   **September 2007 Update:** Michael Shay from Shay and Maguire LLP visited with Jeanne Minskoff Grant and Superintendent Kevin Calcagni on September 11, 2007 for preliminary discussions in regard to this claim. Kevin Calcagni is scheduled for a deposition on October 23, 2007.

   **September 2007 Update:** Josh Kimmerling from Cuddy Feder who handled the legal issues with Family Discount will be notifying the Insurer that ownership has a judgment against this former tenant so proceeds if any will come to the partnership up to the amount of the judgment.

   **October 2007 Update:** We have prepared and served EMR with the attached restraining notice and served the insurance company and its lawyers as well. *(A copy of the Restraining Notice - Halstead Harrison Associates against E.M.R. Management Corp was attached to the October 2007 report)*

2. **2007 Roof Assessment and Recommendations**: (See November 2007 Report).

## TENANT ACTIVITY:

1. Property 100% leased currently to *CVS3* as of January 16, 2007, however they haven't occupied the space yet. See above in General notes for updates.

L:\MGRMC\HALSTEAD..12\Report 2007\12STAT1207.doc

Halstead Harrison Associates (12)
Building Status Report
December 2007
Page 4

## CONSTRUCTION/REPAIRS/TENANT BUILD OUT:

1.  Some of the work completed by the Superintendent and staff this month includes cleaning the drains/ sump pumps regularly, keeping the parking area free of cars.

    **June 2007 Update:** Superintendent continues to monitor this area, AVA designs contacted to remove cinderblock from the rear parking lot.

    **July 2007 Update:** The Superintendent and his staff continue to monitor and maintain the parking lot area.

    **August 2007 Update:** The Superintendent and his staff continue to monitor and maintain the parking lot area. This will now be easier as all the debris in the lot has been removed.

    **September 2007 Update:** The Superintendent and his staff continue to monitor and maintain the parking lot area. On September 19, 2007 the Superintendent responded to an emergency call in regard to an alarm ringing at the building. The Superintendent turned off the alarm and secured the building.

    **November 2007 Update:** The Superintendent and his staff continue to maintenance the parking lot area. Work done this month includes the cleanup of leaves, debris, etc.

    **December 2007 Update:** The Superintendent and his staff continue to monitor and maintain the parking lot area.

## VIOLATIONS/NOTICES:

1.  Violations were issued by the Town of Harrison Department of Buildings on September 7, 2007 and September 25, 2007. *Copies were attached to the third quarter report* These violations were forwarded to *CVS3* as they were received. On September 11, 2007 the Property Manager met with William J. Gerety from the Town of Harrison on site to discuss the violations issued on September 7, 2007. Mr. Gerety indicated at that time a desire to perform further inspections on the inside of the building. Mr. Gerety was notified that the space is currently leased to CVS and that the inside of the building was now *CVS3*'s demised space. CVS was contacted in regard to Mr. Gerety's request for an inspection; Mr. Gerety was also provided contact information for *CVS3*. We have been advised by Josh Kimmerling from Cuddy & Feder, LLP that the hearings for these violations have been postponed until October 23, 2007.

    **October 2007 Update:** We have been advised by Josh Kimmerling from Cuddy & Feder, LLP that a hearing will be held on November 2, 2007. The Property Manager and representatives from *CVS3* will attend this hearing.

Halstead Harrison Associates (12)
Building Status Report
December 2007
Page 5

## VIOLATIONS/NOTICES CONT'D.:

**November  2007 Update:** Anthony B. Gioffre III from Cuddy & Fedder, LLP and  the Property Manager attended the hearing on November 2, 2007. A new hearing date has been set for December 4, 2007. At the hearing the judge requested that cosmetic improvements be made to the exterior of the building. *CVS3* has sent their contractor to address these issues. *(Photographs of the property taken after the repairs were completed by CVS in November 2007 were attached to the November 2007 report).*

**December 2007 Update:** We have been advised by Josh Kimmerling that this mater has been adjourned to January 15, 2008. Additionally, we have been advised that the town attorney is seeking fines of $20,000.00, this will be negotiated. We will also look to *CVS3* for reimbursement for any fines occurred.

## ARREARS:

1.      There are no arrears for the end of December 2007.

2.      See attached report - "Aged Receivables Summary."

## OTHER:

1.      None

Minskoff Grant Realty and Mgmt. Corp.
**Management Report**
December 2007

**Halstead Harrison Avenue Venture ( 12)**

*STERLING BANK*

| DETAILS: | FIGURES: |
|---|---|
| Cash Balance - December 1, 2007 | $85,458.53 |
| Cash Receipts:<br>(See deposit register) | $28,853.33 |
| Cash Disbursements:<br>(See check register) | ($69,024.83) |
| Net Cash: | ($40,171.50) |
| Cash Balance - December 31, 2007 | $45,287.03 |

**Bank Account Balance**
**HHA - Checking**
**Closing Date 12/31/07**

---

Account Information

---

| | | |
|---|---|---|
| Code | HHA | |
| Description | Checking | |
| Acct # | 811550701 | |
| Stmt Date | 12/31/07 | |
| Stmt Balance | 45,855.03 | |

---

Property Funds Detail

---

| 12 - Halstead-Harrison Ave {13,45 | 55,909.26 | 1020 - Cash-Operating |
|---|---|---|
| Total Funds | 55,909.26 | |

---

Unreconciled Items

---

Unreconciled Checks

| 4334 | 12/26/07 | Goldfarb & Fleece | 568.00 |
|---|---|---|---|

---

Summary

---

| | |
|---|---|
| G/L Balance as of 01/08 | 55,909.26 |
| Checks after 12/31/07 | 18,231.10 |
| Deposits after 12/31/07 | -28,853.33 |
| Receipts after 12/31/07 | 0.00 |
| Adjustments after 12/31/07 | 0.00 |
| Checkbook Balance as of 12/31/07 | 45,287.03 |
| + Unreconciled checks | 568.00 |
| - Unreconciled deposits | 0.00 |
| - Undeposited receipts | 0.00 |
| + Unreconciled adjustments | 0.00 |
| Adjusted Checkbook Balance | 45,855.03 |

Matches statement balance

**Deposit Register**
**HHA - Checking**
**Halstead-Harrison Ave {13,450} - (12)**

| Number | Date | Memo | Amount |
|--------|------|------|--------|
| 392 X | 12/03/07 | (Ctrl# 11767) | 28,253.33 |

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | Amount |
|-------|-------|-------|--|--------|-------|-------|--------|
| 20587 | 01,02 | CVS3 | CVS Hampton Bays LLC Store # | Chk # 616367 | 12/03/07 | Base Rent (12/07) | 28,253.33 |
| | | 12 - Halstead-Harrison Ave {13,4 | 3010 - Base Rents | | | 23,833.33  Chg#24339 | |
| | | 12 - Halstead-Harrison Ave {13,4 | 3040 - CAM & Added Services | | | 4,420.00  Chg#24340 | |

| Number | Date | Memo | Amount |
|--------|------|------|--------|
| 393 X | 12/11/07 | (Ctrl# 11811) | 600.00 |

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | Amount |
|-------|-------|-------|--|--------|-------|-------|--------|
| 20698 | PARK:1 | MailPark | Postal Service | Chk # 025870 | 12/11/07 | Base Rent (12/07) | 600.00 |
| | | 12 - Halstead-Harrison Ave {13,4 | 3010 - Base Rents | | | 600.00  Chg#24341 | |

Total Deposits        28,853.33

**Check Register**
HHA - Checking
Halstead-Harrison Ave {13,450} - (12)

| Check# | Paid<br>Invoice# | Post | Payee | Name<br>Inv Date/Notes | Amount | Ctrl# | Note |
|--------|------|------|-------|------------------------|--------|-------|------|
| 4323 X 12/01/07 | | 12/07 | 55chllc | 55 Church WP LLC | 997.00 | 28758 | |
| | Inv # Payroll-30715 | | | 12/01/07 2007 Monthly Payroll Reimb. | 787.00 | 30715 | |
| | 12 - Halstead-Harrison Ave {13,450 4610 - Gross Wages | | | | 787.00 | | |
| | Inv # auto-30753 | | | 12/01/07 Auto Exp. Reimbursement | 210.00 | 30753 | |
| | 12 - Halstead-Harrison Ave {13,450 4896 - Vehicle Expenses | | | | 210.00 | | |
| 4324 X 12/01/07 | | 12/07 | A&RMinsk | Alan & Royanne Minskoff | 457.61 | 28759 | |
| | Inv # Mort-30650 | | | 12/01/07 Mortgage interest monthly | 457.61 | 30650 | |
| | 12 - Halstead-Harrison Ave {13,450 6210 - Interest Expense | | | | 457.61 | | |
| 4325 X 12/01/07 | | 12/07 | jmg | Jean Minskoff Grant | 457.61 | 28760 | |
| | Inv # Mort-30654 | | | 12/01/07 Mortgage interest monthly | 457.61 | 30654 | |
| | 12 - Halstead-Harrison Ave {13,450 6210 - Interest Expense | | | | 457.61 | | |
| 4326 X 12/01/07 | | 12/07 | MGRMC | Minskoff Grant Realty & Mgmt. | 65,261.00 | 28761 | |
| | Inv # MGMT-30658 | | | 12/01/07 Monthly Mgmt. fee-2007 | 960.00 | 30658 | |
| | 12 - Halstead-Harrison Ave {13,450 5150 - Management Fees | | | | 960.00 | | |
| | Inv # MiscOper-30733 | | | 12/01/07 Misc. Operating Exps. | 50.00 | 30733 | |
| | 12 - Halstead-Harrison Ave {13,450 4590 - Misc Operating Expenses | | | | 50.00 | | |
| | Inv # Comm120107- | | | 12/01/07 Comm: CVS-pyt 3 of 3 | 64,251.00 | 30763 | |
| | 12 - Halstead-Harrison Ave {13,450 6720 - Leasing Costs & Commissi | | | | 64,251.00 | | |
| 4327 X 12/01/07 | | 12/07 | MYCALLC | MYCA LLC c/o Sara Minskoff Allan | 457.61 | 28762 | |
| | Inv # Mort-30649 | | | 12/01/07 Mortgage interest monthly | 457.61 | 30649 | |
| | 12 - Halstead-Harrison Ave {13,450 6210 - Interest Expense | | | | 457.61 | | |
| 4330 X 12/07/07 | | 12/07 | coned | Con Edison | 210.77 | 29001 | |
| | Inv # 555619048705012-1 | | | 11/21/07 55-5619-0487-0501-2: 11/21/07 | 210.77 | 30979 | |
| | 12 - Halstead-Harrison Ave {13,450 4820 - Electric | | | | 210.77 | | |
| 4331 X 12/07/07 | | 12/07 | DeWit | DeWitt Stern Group, Inc. | 391.00 | 29002 | |
| | Inv # 491139G | | | 10/15/07 CommProp: 10/15/07 Addt'l. | 391.00 | 30924 | |
| | 12 - Halstead-Harrison Ave {13,450 4140 - Insurance | | | | 391.00 | | |
| 4332 X 12/07/07 | | 12/07 | gold | Goldfarb & Fleece | 106.50 | 29003 | |
| | Inv # 79743 | | | 10/30/07 Family Disc. Lawsuit: 10/22/07 | 106.50 | 30678 | |
| | 12 - Halstead-Harrison Ave {13,450 5170 - Legal | | | | 106.50 | | |
| 4333 X 12/26/07 | | 12/07 | 55chllc | 55 Church WP LLC | 117.73 | 29125 | |

## Check Register
### HHA - Checking
### Halstead-Harrison Ave {13,450} - (12)

| Check# | Paid Post Payee<br>Invoice# | Name<br>Inv Date/Notes | Amount | Ctrl# | Note |
|---|---|---|---|---|---|
| | Inv # 123107-12 | 12/31/07 Reimb: Uniforms-4Qt07-Cintas | 47.63 | 31117 | |
| | 12 - Halstead-Harrison Ave {13,450 4450 - Supplies | | 47.63 | | |
| | Inv # 123107-12. | 12/31/07 Reimb: Supplies-4Qt07-Burke | 70.10 | 31145 | |
| | 12 - Halstead-Harrison Ave {13,450 4450 - Supplies | | 70.10 | | |
| 4334 | 12/26/07 12/07 gold | Goldfarb & Fleece | 568.00 | 29126 | |
| | Inv # 80213 | 11/03/07 Rolan: Lawsuit-11/26-27/07 | 319.50 | 31126 | |
| | 12 - Halstead-Harrison Ave {13,450 5170 - Legal | | 319.50 | | |
| | Inv # 80213A | 11/03/07 CVS-Violations-11/1-5/07 | 248.50 | 31127 | |
| | 12 - Halstead-Harrison Ave {13,450 5170 - Legal | | 248.50 | | |

Total Checks                    69,024.83

.

# Aged Receivables Summary
## Halstead-Harrison Ave {13,450} (12)
### As of Date: 12/31/07

| Code | Name | Space | Amount Receivable | Not Yet Du | 0-30 Days | 30-60 Days | 60-90 Days | Over 90 Days | Available Prepay |
|---|---|---|---|---|---|---|---|---|---|
| CVS3 | CVS Hampton Bays LLC St | 01,02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MailPark | Postal Service | PARK:1- | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

# Rent Roll
## Halstead-Harrison Ave {13,450} (12)
### As of 12/31/07

| Property | Space | Code | Name | Sq.Ft. | Rent Potential | Rent Actual | Rent/sq | Deposit | Lease From | Leased To |
|----------|-------|------|------|--------|----------------|-------------|---------|---------|------------|-----------|
| 12 | 01,02 | CVS3 | CVS Hampton Bays LLC St | 13,450 | 23,833.33 | 23,833.33 | 21.26 | 0.00 | 01/16/07 | 05/31/27 |
| 12 | PARK:1-5 | MailPark | Postal Service | 0 | 600.00 | 600.00 | | 0.00 | 12/01/98 | |
| | 2 | | Total - Less Excluded Units | 13,450 | 24,433.33 | 24,433.33 | 21.80 | 0.00 | | |
| | 2 | | Total Occupied | 13,450 | 24,433.33 | 24,433.33 | 21.80 | | | |
| | 100.00 | | % Occupied | 100.00 | 100.00 | 100.00 | | | | |
| | 0 | | Total Vacant | 0 | 0.00 | | | | | |
| | 0.00 | | % Vacant | 0.00 | 0.00 | | | | | |

**Balance Sheet (Accrual)**
**Halstead-Harrison Ave {13,450} - (12)**
**Dec 07**

Page 1
2003
2/4/2008
02:45 PM

Prepared For:
All Owners

Prepared By:
Minskoff Grant Realty & Mgmt.
1350 Avenue of the  Americas
32nd Floor
New York, NY 10019-4702

## ASSETS
CASH

| | |
|---|---:|
| Cash-Operating | 45,287.03 |
| TOTAL CASH | 45,287.03 |

CURRENT ASSETS

PREPAID EXPENSES

| | |
|---|---:|
| Prepaid Insurance | 9,779.52 |
| TOTAL CURRENT ASSETS | 9,779.52 |

FIXED ASSETS

| | |
|---|---:|
| Land | 69,055.00 |
| Building | 54,326.00 |
| Accum Dep Building | -54,326.00 |
| Building Improvements | 118,122.00 |
| Accum Dep Bldg Improvements | -47,336.00 |
| Tenant Improvements | 7,351.20 |
| Accum Amort Tenant Improvement | -7,351.20 |
| TOTAL FIXED ASSETS | 139,841.00 |

OTHER ASSETS

| | |
|---|---:|
| Unamoritized Leasing Costs | 79,878.47 |
| Additional Sec. 754 basis | 239,606.00 |
| Accum. Deprec. Sec 754 | -33,943.00 |
| TOTAL OTHER ASSETS | 285,541.47 |
| **TOTAL ASSETS** | 480,449.02 |

## LIABILITY & OWNERS EQUITY

LIABILITIES

| | |
|---|---:|
| Accrued Expenses Payable | 3,150.00 |
| Accounts Payable | 271.72 |
| Mortgage Amort. Payable | 122,028.70 |
| TOTAL LIABILITY | 125,450.42 |

EQUITY

| | |
|---|---:|
| Partners Equity | 78,888.14 |
| Additional basis- Sec 754 | 239,606.00 |
| Partners Contribution | 50,000.01 |
| Retained Earnings | -13,495.55 |
| TOTAL EQUITY | 354,998.60 |
| **TOTAL LIABILITY & EQUITY** | 480,449.02 |

Page 1
2003
2/4/2008
02:55 PM

# Budget Comparison (Accrual)
## Halstead-Harrison Ave {13,450} - (12)
### Oct 07 - Dec 07

Prepared For:
All Owners

Prepared By:
Minskoff Grant Realty & Mgmt.
1350 Avenue of the Americas
32nd Floor
New York, NY 10019-4702

| | MTD Actual | MTD Budget | $ Var. | % Var. | YTD Actual | YTD Budget | $ Var. | % Var. | Annual |
|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | |
| | | | | | | | | | |
| OPERATING INCOME | | | | | | | | | |
| Base Rents | 73,299.99 | 73,299.00 | 0.99 | 0.00 | 282,077.74 | 293,196.00 | -11,118.26 | -3.79 | 293,196.00 |
| Concession-Free Rent | 0.00 | 0.00 | 0.00 | 0 | -119,166.65 | -119,165.00 | -1.65 | 0.00 | -119,165.00 |
| CAM & Added Services | 13,260.00 | 7,200.00 | 6,060.00 | 84.17 | 50,491.25 | 28,800.00 | 21,691.25 | 75.32 | 28,800.00 |
| Income-Money Market Interest | 0.00 | 0.00 | 0.00 | 0 | 203.96 | 0.00 | 203.96 | 0 | 0.00 |
| TOTAL OPERATING INCOME | 86,559.99 | 80,499.00 | 6,060.99 | 7.53 | 213,606.30 | 202,831.00 | 10,775.30 | 5.31 | 202,831.00 |
| | | | | | | | | | |
| REIMBURSEMENT INCOME | | | | | | | | | |
| Real Estate Tax Passthru | 0.00 | 0.00 | 0.00 | 0 | 51,019.88 | 53,247.00 | -2,227.12 | -4.18 | 53,247.00 |
| TOTAL REIMBURSEMENT INC | 0.00 | 0.00 | 0.00 | 0 | 51,019.88 | 53,247.00 | -2,227.12 | -4.18 | 53,247.00 |
| | | | | | | | | | |
| NON-OPERATING INCOME | | | | | | | | | |
| TOTAL NON-OPERATING INC | 0.00 | 0.00 | 0.00 | 0 | 51,019.88 | 53,247.00 | -2,227.12 | -4.18 | 53,247.00 |
| | | | | | | | | | |
| **TOTAL INCOME** | 86,559.99 | 80,499.00 | 6,060.99 | 7.53 | 264,626.18 | 256,078.00 | 8,548.18 | 3.34 | 256,078.00 |
| **EXPENSES** | | | | | | | | | |
| | | | | | | | | | |
| OPERATING EXPENSES | | | | | | | | | |
| Real Estate Taxes | 0.00 | 0.00 | 0.00 | 0 | 53,195.49 | 53,247.00 | 51.51 | 0.10 | 53,247.00 |
| Insurance | 11,967.07 | 12,664.00 | 696.93 | 5.50 | 17,627.07 | 17,926.00 | 298.93 | 1.67 | 17,926.00 |
| Gardening & Grounds Maint | 0.00 | 0.00 | 0.00 | 0 | 0.00 | 400.00 | 400.00 | 100.00 | 400.00 |
| Supplies | 117.73 | 0.00 | -117.73 | 0 | 566.72 | 0.00 | -566.72 | 0 | 0.00 |
| Gas-Electric R&M | 860.00 | 0.00 | -860.00 | 0 | 860.00 | 0.00 | -860.00 | 0 | 0.00 |
| Plumbing- R & M | 0.00 | 510.00 | 510.00 | 100.00 | 0.00 | 3,730.00 | 3,730.00 | 100.00 | 3,730.00 |
| Roof Maint & Repair | 375.81 | 0.00 | -375.81 | 0 | 375.81 | 0.00 | -375.81 | 0 | 0.00 |
| Misc Operating Expenses | 150.00 | 150.00 | 0.00 | 0 | 600.00 | 600.00 | 0.00 | 0 | 600.00 |
| Gross Wages | 2,361.00 | 2,361.00 | 0.00 | 0 | 9,182.00 | 9,444.00 | 262.00 | 2.77 | 9,444.00 |
| Electric | 1,039.86 | 0.00 | -1,039.86 | 0 | 6,327.72 | 0.00 | -6,327.72 | 0 | 0.00 |
| Water & Treatment Supplies | 291.14 | 0.00 | -291.14 | 0 | 242.96 | 0.00 | -242.96 | 0 | 0.00 |
| Garbage Removal | 0.00 | 0.00 | 0.00 | 0 | 9,322.44 | 0.00 | -9,322.44 | 0 | 0.00 |
| Gas | 0.00 | 0.00 | 0.00 | 0 | 1,987.08 | 0.00 | -1,987.08 | 0 | 0.00 |
| Vehicle Expenses | 210.00 | 210.00 | 0.00 | 0.00 | 810.00 | 810.00 | 0.00 | 0.00 | 810.00 |
| Management Fees | 2,880.00 | 2,880.00 | 0.00 | 0 | 11,520.00 | 11,520.00 | 0.00 | 0 | 11,520.00 |
| Accounting | 0.00 | 0.00 | 0.00 | 0 | 3,150.00 | 3,150.00 | 0.00 | 0 | 3,150.00 |
| Legal | 2,572.41 | 4,000.00 | 1,427.59 | 35.69 | 17,365.44 | 5,000.00 | -12,365.44 | -247.3 | 5,000.00 |
| Bank Fees | 0.00 | 0.00 | 0.00 | 0 | 14.04 | 0.00 | -14.04 | 0 | 0.00 |
| TOTAL OPERATING EXPENSE | 22,825.02 | 22,775.00 | -50.02 | -0.22 | 133,146.77 | 105,827.00 | -27,319.77 | -25.82 | 105,827.00 |
| | | | | | | | | | |
| NON-OPERATING EXPENSES | | | | | | | | | |
| Interest Expense | 4,118.49 | 4,119.00 | 0.51 | 0.01 | 16,473.96 | 16,476.00 | 2.04 | 0.01 | 16,476.00 |
| Leasing Costs & Commissions | 64,251.00 | 64,250.00 | -1.00 | 0.00 | 128,501.00 | 128,500.00 | -1.00 | 0.00 | 128,500.00 |
| TOTAL NON-OPERATING EXPE | 68,369.49 | 68,369.00 | -0.49 | 0.00 | 144,974.96 | 144,976.00 | 1.04 | 0.00 | 144,976.00 |
| | | | | | | | | | |
| DEPRECIATION & AMORTIZATION | | | | | | | | | |
| | | | | | | | | | |
| **TOTAL EXPENSES** | 91,194.51 | 91,144.00 | -50.51 | -0.06 | 278,121.73 | 250,803.00 | -27,318.73 | -10.89 | 250,803.00 |
| | | | | | | | | | |
| **NET INCOME** | -4,634.52 | -10,645.00 | 6,010.48 | -56.46 | -13,495.55 | 5,275.00 | -18,770.55 | -355.8 | 5,275.00 |

# Income Statement and Cash Flow
## Halstead-Harrison Ave {13,450} - (12)
### Oct 07 - Dec 07

Page 1
2003
2/4/2008
03:05 PM

Prepared For:
All Owners

Prepared By:
Minskoff Grant Realty & Mgmt.
1350 Avenue of the  Americas
32nd Floor
New York, NY 10019-4702

|  | Quarter to Date | % | Year to Date | % |
|---|---|---|---|---|
| **INCOME** | | | | |
| OPERATING INCOME | | | | |
| Base Rents | 73,299.99 | 84.68 | 282,077.74 | 106.59 |
| Concession-Free Rent | 0.00 | 0.00 | -119,166.65 | -45.03 |
| CAM & Added Services | 13,260.00 | 15.32 | 50,491.25 | 19.08 |
| Income-Money Market Interest | 0.00 | 0.00 | 203.96 | 0.08 |
| TOTAL OPERATING INCOME | 86,559.99 | 100.00 | 213,606.30 | 80.72 |
| REIMBURSEMENT INCOME | | | | |
| Real Estate Tax Passthru | 0.00 | 0.00 | 51,019.88 | 19.28 |
| TOTAL REIMBURSEMENT INC | 0.00 | 0.00 | 51,019.88 | 19.28 |
| NON-OPERATING INCOME | | | | |
| TOTAL NON-OPERATING INC | 0.00 | 0.00 | 51,019.88 | 19.28 |
| **TOTAL INCOME** | 86,559.99 | 100.00 | 264,626.18 | 100.00 |
| **EXPENSES** | | | | |
| OPERATING EXPENSES | | | | |
| Real Estate Taxes | 0.00 | 0.00 | 53,195.49 | 20.10 |
| Insurance | 11,967.07 | 13.83 | 17,627.07 | 6.66 |
| Supplies | 117.73 | 0.14 | 566.72 | 0.21 |
| Gas-Electric R&M | 860.00 | 0.99 | 860.00 | 0.32 |
| Roof Maint & Repair | 375.81 | 0.43 | 375.81 | 0.14 |
| Misc Operating Expenses | 150.00 | 0.17 | 600.00 | 0.23 |
| Gross Wages | 2,361.00 | 2.73 | 9,180.00 | 3.47 |
| Electric | 1,039.86 | 1.20 | 6,327.72 | 2.39 |
| Water & Treatment Supplies | 291.14 | 0.34 | 242.96 | 0.09 |
| Garbage Removal | 0.00 | 0.00 | 9,322.44 | 3.52 |
| Gas | 0.00 | 0.00 | 1,987.08 | 0.75 |
| Vehicle Expenses | 210.00 | 0.24 | 810.00 | 0.31 |
| Management Fees | 2,880.00 | 3.33 | 11,520.00 | 4.35 |
| Accounting | 0.00 | 0.00 | 3,150.00 | 1.19 |
| Legal | 2,572.41 | 2.97 | 17,365.44 | 6.56 |
| Bank Fees | 0.00 | 0.00 | 14.04 | 0.01 |
| TOTAL OPERATING EXPENSES | 22,825.02 | 26.37 | 133,146.77 | 50.32 |
| **NON-OPERATING EXPENSES** | | | | |
| Interest Expense | 4,118.49 | 4.76 | 16,473.96 | 6.23 |
| Leasing Costs & Commissions | 64,251.00 | 74.23 | 128,501.00 | 48.56 |
| TOTAL NON-OPERATING EXPENSE | 68,369.49 | 78.99 | 144,974.96 | 54.78 |
| **DEPRECIATION & AMORTIZATION** | | | | |
| **TOTAL EXPENSES** | 91,194.51 | 105.35 | 278,121.73 | 105.10 |

# Income Statement and Cash Flow
## Halstead-Harrison Ave {13,450} - (12)
### Oct 07 - Dec 07

| | Quarter to Date | % | Year to Date | % |
|---|---|---|---|---|
| **NET INCOME** | -4,634.52 | -5.35 | -13,495.55 | -5.10 |
| | | | | |
| ADJUSTMENTS | | | | |
| **ASSETS** | | | | |
| Accounts Receivable | 14,242.56 | | 0.00 | |
| Accounts Receivable - Other | 0.00 | | 660.67 | |
| Prepaid Insurance | 2,087.07 | | 2,087.07 | |
| Accrued Expenses Payable | 0.00 | | -1,104.83 | |
| Accounts Payable | 392.68 | | 271.72 | |
| TOTAL ADJUSTMENTS | 16,722.31 | | 1,914.63 | |
| | | | | |
| CASH FLOW | 12,087.79 | | -11,580.92 | |
| | | | | |
| Beginning Cash | 33,199.24 | | | |
| Ending Balance | 45,287.03 | | | |

```
                                        Date 12/31/07              Page    1
                                        Account Number    @XXXXXXXXXXXXXXX@
                                        Enclosures                         9


        HALSTEAD HARRISON ASSOCIATES            Your Relationship Manager is:
        C/O MINSKOFF GRANT REALTY & MGMT             Anthony M. Grosso
        CORP.                               (212)935-4166; Cell (516)316-3862
        1350 AVENUE OF THE AMERICAS               anthony.grosso@
        NEW YORK NY 10019-4702                    sterlingbancorp.com




                            CHECKING ACCOUNT

            Account Title: HALSTEAD HARRISON ASSOCIATES
                           C/O MINSKOFF GRANT REALTY & MGMT
                           CORP.

CHECKING                              Number of Enclosures              9
Account Number      @XXXXXXXXXXXXXX@  Statement Dates  12/03/07 thru 12/31/07
Previous Balance          85,458.53   Days in the statement period      29
      2 Deposits/Credits  28,853.33   Average Ledger               47,803.35
      9 Checks/Debits      68,456.83  Average Collected            46,808.40


New Balance               45,855.03

****************************************************************************

Activity in Date Order                     Checks/    Deposits/
Date      Description                       Debits     Credits    Daily Balance
12/04 DEPOSIT                                          28,253.33   113,711.86
12/04 CHECK             4326      65,261.00                         48,450.86
12/04 CHECK             4323         997.00                         47,453.86
12/06 CHECK             4325         457.61                         46,996.25
12/11 DEPOSIT                                             600.00    47,596.25
12/12 CHECK             4327         457.61                         47,138.64
12/13 CHECK             4331         391.00                         46,747.64
12/13 CHECK             4330         210.77                         46,536.87
12/13 CHECK             4332         106.50                         46,430.37
12/20 CHECK             4324         457.61                         45,972.76
12/28 CHECK             4333         117.73                         45,855.03


****************************************************************************
```

```
                                    Date 12/31/07              Page    2
                                    Account Number    @XXXXXXXXXXXXXX@
                                    Enclosures                       9
```

```
        HALSTEAD HARRISON ASSOCIATES
        C/O MINSKOFF GRANT REALTY & MGMT
        CORP.
        1350 AVENUE OF THE AMERICAS
        NEW YORK NY 10019-4702
```

CHECKING                         @XXXXXXXXXXXXXX@   (Continued)

--- CHECKS IN NUMBER ORDER ---

| Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|
| 12/04 | 4323 | 997.00 | 12/13 | 4330* | 210.77 |
| 12/20 | 4324 | 457.61 | 12/13 | 4331 | 391.00 |
| 12/06 | 4325 | 457.61 | 12/13 | 4332 | 106.50 |
| 12/04 | 4326 | 65,261.00 | 12/28 | 4333 | 117.73 |
| 12/12 | 4327 | 457.61 | | | |

* Denotes missing check numbers

* * *   E N D   O F   S T A T E M E N T   * * *

# MGRMC
# Quarterly Reports
# Fourth Quarter
# 2007
# 82nd-83rd St. Venture

**82ND-83RD STREET VENTURE (11)**
**39-55 Court Street and**
**167-183 Martine Avenue**
**White Plains, NY 10601**
**(15,101 Sq. Ft.)**

<u>Building Status Report</u>
<u>December 2007</u>

**GENERAL:**

1.     None

**Follow-Up:**

1.     2007 Roof Assessment and Recommendations: (See November 2007)

**TENANT ACTIVITY:**

1.     Property is 85% leased when we consider Chippy's Bagels Inc. [*BagelEmp*, Space "04''] as vacant.

2.     Chippy's Bagels Inc. [*BagelEmp*, Space "04''] has vacated his space. The superintendent has advised us that fixtures from his space were sold at auction. A sign has been placed in the window "Closed for Renovations", however tenants from neighboring spaces have advised us that he will not return.  David Olasov has been contacted to move forward with legal proceedings. *(Photographs were attached to the August 2007 report).*

       **September 2007 Update:** The Superintendent and AVA Design and Const. Inc. have cleaned out the space.

       **October 2007 Update:**  Both Dunkin Donuts and T-Mobile are interested in this space. No signed proposal as yet.

3.     Renee Smith [*RSmith*, Space "01A"] has requested six months to find a buyer for her space. She feels she can not make a functional business, therefore she will be moving out.

       **November 2007 Update:** *(A copy of the proposed payment schedule was attached to the November report)*

82nd-83rd Street Venture (11)
Building Status Report
December 2007
Page 2

## CONSTRUCTION/REPAIRS/TENANT BUILD OUT:

1.  Our Superintendent has been vigorous in repairing the sidewalk area surrounding the drains that empty onto the street. This is constantly damaged due to the bus and truck traffic that accidentally drives onto the curbs and dislodging the drain covers from the cement. The repairs relative to the roof drains which freeze this repair will need to be done before winter 2007.

    **July 2007 Update:** The Property Manager and Superintendent inspected the property including a detailed inspection in regard to the AVA Designs for correcting this issue. A jobsite meeting with Alfredo from AVA will be scheduled to further investigate this issue.

    **August 2007 Update:** The Property Manager has requested that AVA provide an estimate for fees in regard to filing this work with the City of White Plains. We have also requested additional copies of the plans for this work so that they may be submitted to contractors for competitive bidding.

    **September 2007 Update:** AVA Designs has started the process of filing for the approval of this work. Copies of plans have been submitted to the Property Manager for distribution. The Property Manager is meeting with contractors to obtain proposals for this work.

    **October 2007 Update:** The Property Manager has determined that the City of White Plains has placed a moratorium on all non emergency projects that require the excavation of the street from November until January of 2008. This project has been added to Capital Budget for 2008.

2.  We received a letter from the neighboring owners, Silverman Realty that they will fill in the holes and repair any damage caused by the installation of a temporary oil tank to our adjoining wall. Their structural engineer verified that the dunnage on the roof connected to our shared parapet wall will not compromise the wall. We will make sure to have the Roofing contractor confirm this in the annual report.

    **September 2007 Update:** The Property Manager contacted Joe Zuzzola from NYCT Development Corp., the contractor for Silverman Realty. Mr. Zuzzola has assured us that these issues will be addressed.

    **November 2007 Update:** During a recent inspection of the property by Jean Minskoff Grant and T Grant it was noted that Silverman has completed their build out of the CVS. This CVS goes through from Mamaroneck Ave. to Court St., this has greatly improved the appearance of Court St.

    **December 2007 Update:** All required repairs have been made by Silverman Realty in regard to the roof.

82nd-83rd Street Venture (11)
Building Status Report
December 2007
Page 3

**Follow-Up:**

1.     Vault Area/ Beam Decay: (See November 2006).

**VIOLATIONS/NOTICES:**

1.     None

**ARREARS:**

1.     The arrears at the end of the month of December 2007 relate to Renee Smith [*RSmith*, Space "01A"] who is currently only paying on account for base rent CAM and/or Real Estate Taxes. Weisse d/b/a Brooklyn's Famous [*Asteri,* Space "02, 03"] owes base rent and CAM.   Chippy's Bagels Inc. [*BagelEmp*, Space "04"] owes base rent, CAM, and Real Estate Tax Escalations as holdover rent. All others owe for recently billed Real Estate Taxes and CAM.

2.     Please see attached report - "Aged Receivables Summary."

**OTHER:**

**Follow-Up:**

1.     Protest Tax Assessments 2006: (See May 2006) The Building's lawyer has relayed that the judge originally assigned to our case has been promoted to a higher court and we have been re-assigned to a new judge.  The new calendar date is for the first conference is June 19th 2007, but this may be delayed due to the circumstances. The protest tax assessment for 2007 has been filed with the court and served to the Assessment Review Board.

**82ND-83RD STREET VENTURE (11)**
**39-55 Court Street and**
**167-183 Martine Avenue**
**White Plains, NY 10601**
**(15,101 Sq. Ft.)**

<u>Building Status Report</u>
<u>December 2007</u>

## GENERAL:

1.    None

**Follow-Up:**

1.    2007 Roof Assessment and Recommendations: (See November 2007)

## TENANT ACTIVITY:

1.    Property is 85% leased when we consider Chippy's Bagels Inc. [*BagelEmp,* Space "04''] as vacant.

2.    Chippy's Bagels Inc. [*BagelEmp,* Space "04''] has vacated his space. The superintendent has advised us that fixtures from his space were sold at auction. A sign has been placed in the window "Closed for Renovations", however tenants from neighboring spaces have advised us that he will not return.  David Olasov has been contacted to move forward with legal proceedings. *(Photographs were attached to the August 2007 report).*

   **September 2007 Update:** The Superintendent and AVA Design and Const. Inc. have cleaned out the space.

   **October 2007 Update:**  Both Dunkin Donuts and T-Mobile are interested in this space. No signed proposal as yet.

3.    Renee Smith [*RSmith*, Space "01A"] has requested six months to find a buyer for her space. She feels she can not make a functional business, therefore she will be moving out.

   **November 2007 Update:** *(A copy of the proposed payment schedule was attached to the November report)*

82nd-83rd Street Venture (11)
Building Status Report
December 2007
Page 2

## CONSTRUCTION/REPAIRS/TENANT BUILD OUT:

1.  Our Superintendent has been vigorous in repairing the sidewalk area surrounding the drains that empty onto the street. This is constantly damaged due to the bus and truck traffic that accidentally drives onto the curbs and dislodging the drain covers from the cement. The repairs relative to the roof drains which freeze this repair will need to be done before winter 2007.

    **July 2007 Update:** The Property Manager and Superintendent inspected the property including a detailed inspection in regard to the AVA Designs for correcting this issue. A jobsite meeting with Alfredo from AVA will be scheduled to further investigate this issue.

    **August 2007 Update:** The Property Manager has requested that AVA provide an estimate for fees in regard to filing this work with the City of White Plains. We have also requested additional copies of the plans for this work so that they may be submitted to contractors for competitive bidding.

    **September 2007 Update:** AVA Designs has started the process of filing for the approval of this work. Copies of plans have been submitted to the Property Manager for distribution. The Property Manager is meeting with contractors to obtain proposals for this work.

    **October 2007 Update:** The Property Manager has determined that the City of White Plains has placed a moratorium on all non emergency projects that require the excavation of the street from November until January of 2008. This project has been added to Capital Budget for 2008.

2.  We received a letter from the neighboring owners, Silverman Realty that they will fill in the holes and repair any damage caused by the installation of a temporary oil tank to our adjoining wall. Their structural engineer verified that the dunnage on the roof connected to our shared parapet wall will not compromise the wall. We will make sure to have the Roofing contractor confirm this in the annual report.

    **September 2007 Update:** The Property Manager contacted Joe Zuzzola from NYCT Development Corp., the contractor for Silverman Realty. Mr. Zuzzola has assured us that these issues will be addressed.

    **November 2007 Update:** During a recent inspection of the property by Jean Minskoff Grant and T Grant it was noted that Silverman has completed their build out of the CVS. This CVS goes through from Mamaroneck Ave. to Court St., this has greatly improved the appearance of Court St.

    **December 2007 Update:** All required repairs have been made by Silverman Realty in regard to the roof.

L:\MGRMC\82ND-83RD..11\Report 2007\11STAT1207.doc

82nd-83rd Street Venture (11)
Building Status Report
December 2007
Page 3

**Follow-Up:**

1.    Vault Area/ Beam Decay: (See November 2006).


**VIOLATIONS/NOTICES:**

1.    None


**ARREARS:**

1.    The arrears at the end of the month of December 2007 relate to Renee Smith [*RSmith,* Space "01A"] who is currently only paying on account for base rent CAM and/or Real Estate Taxes. Weisse d/b/a Brooklyn's Famous [*Asteri,* Space "02, 03"] owes base rent and CAM.   Chippy's Bagels Inc. [*BagelEmp,* Space "04"] owes base rent, CAM, and Real Estate Tax Escalations as holdover rent. All others owe for recently billed Real Estate Taxes and CAM.

2.    Please see attached report - "Aged Receivables Summary."


**OTHER:**

**Follow-Up:**

1.    Protest Tax Assessments 2006: (See May 2006) The Building's lawyer has relayed that the judge originally assigned to our case has been promoted to a higher court and we have been re-assigned to a new judge.  The new calendar date is for the first conference is June 19th 2007, but this may be delayed due to the circumstances. The protest tax assessment for 2007 has been filed with the court and served to the Assessment Review Board.

Minskoff Grant Realty and Mgmt. Corp.
**Management Report**
December 2007

**82nd - 83rd Street Venture (11)**

*STERLING BANK*

| DETAILS: | FIGURES: | |
|---|---|---|
| Cash Balance - December 1, 2007 | $84,345.65 | |
| Cash Receipts:<br>(See deposit register) | $42,022.17 | |
| Cash Disbursements:<br>(See check register) | ($17,410.65) | |
| Net Cash: | | $24,611.52 |
| Cash Balance - December 31, 2007 | $108,957.17 | |

**Bank Account Balance**
**8283SV - Checking**
**Closing Date  12/31/07**

---

**Account Information**

| | |
|---|---|
| Code | 8283SV |
| Description | Checking |
| Acct # | 0370573148 |
| Stmt Date | 12/31/07 |
| Stmt Balance | 117,272.76 |

---

**Property Funds Detail**

| | | |
|---|---|---|
| 11 - 82nd-83rd St. Ven. {15,101 SF | 81,587.70 | 1020 - Cash-Operating |
| Total Funds | 81,587.70 | |

---

**Unreconciled Items**

**Unreconciled Checks**

| | | | |
|---|---|---|---|
| 5675 | 12/07/07 | City of White Plains | 50.00 |
| 5684 | 12/26/07 | Con Edison | 993.31 |
| 5685 | 12/26/07 | Con Edison | 187.36 |
| 5686 | 12/26/07 | Goldfarb & Fleece | 142.00 |
| 5687 | 12/26/07 | Monte & Son Exterminators Inc. | 135.47 |
| 5688 | 12/26/07 | Rael Sprinkler Maintenance Co. | 214.75 |
| 5689 | 12/26/07 | Verizon | 65.73 |
| 5690 | 12/26/07 | Vinton Fuel Oil Co. Inc. | 6,526.97 |

---

**Summary**

| | |
|---|---|
| G/L Balance as of 01/08 | 81,587.70 |
| Checks after 12/31/07 | 65,728.47 |
| Deposits after 12/31/07 | -41,509.95 |
| Receipts after 12/31/07 | 0.00 |
| Adjustments after 12/31/07 | 3,150.95 |
| Checkbook Balance as of 12/31/07 | 108,957.17 |
| + Unreconciled checks | 8,315.59 |
| - Unreconciled deposits | 0.00 |
| - Undeposited receipts | 0.00 |
| + Unreconciled adjustments | 0.00 |
| Adjusted Checkbook Balance | 117,272.76 |

Matches statement balance

**Deposit Register**
**8283SV - Checking**
**82nd-83rd St. Ven. {15,101 SF} - (11)**

| Number | Date | Memo | Amount |
|---|---|---|---|

### 834 X  12/03/07    (Ctrl# 11766)                                          5,002.07

| Ctrl# | Unit# | Payer | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|
| 20586 | 02,03 | Asteri      Vicki Weisse | Chk # 2249 | 12/03/07 | Base Rent (10/07) | | 5,002.07 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3040 - CAM & Added Services | | 1.00 | Chg#23478 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 2,916.72 | Chg#23596 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3040 - CAM & Added Services | | 973.35 | Chg#23597 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3130 - Real Estate Tax Passthru | | 1,111.00 | Chg#23598 | |

### 835 X  12/06/07    (Ctrl# 11787)                                         11,854.36

| Ctrl# | Unit# | Payer | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|
| 20653 | 06 | Crown      Kil Seong Kim d/b/a Crown Beaut | Chk # 1576 | 12/06/07 | Base Rent (12/07) | | 5,371.50 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 4,290.00 | Chg#24330 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3040 - CAM & Added Services | | 1,081.50 | Chg#24331 | |
| 20654 | 08 | Fashion      Fashion Town Corporation | Chk # 1430 | 12/06/07 | Base Rent (12/07) | | 3,450.00 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 3,450.00 | | |
| 20655 | 08 | Fashion      Fashion Town Corporation | Chk # 6621 | 12/06/07 | Base Rent (12/07) | | 3,032.86 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 850.00 | Chg#24335 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3040 - CAM & Added Services | | 1,018.86 | Chg#24336 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3130 - Real Estate Tax Passthru | | 1,164.00 | Chg#24337 | |

### 836 X  12/07/07    (Ctrl# 11798)                                          6,615.45

| Ctrl# | Unit# | Payer | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|
| 20672 | 07 | Guayara      Carlos Guayara & Jairo Guayara | Chk # 1316 | 12/07/07 | Base Rent (12/07) | | 6,615.45 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 4,375.00 | Chg#24332 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3040 - CAM & Added Services | | 1,045.45 | Chg#24333 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3130 - Real Estate Tax Passthru | | 1,195.00 | Chg#24334 | |

### 837 X  12/11/07    (Ctrl# 11810)                                          3,900.00

| Ctrl# | Unit# | Payer | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|
| 20692 | 09 | Camacho   Santiago Camacho | Chk # 117505 | 12/11/07 | Base Rent (12/07) | | 1,000.00 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 1,000.00 | Chg#24338 | |
| 20693 | 09 | Camacho   Santiago Camacho | Chk # 117505 | 12/11/07 | Base Rent (12/07) | | 900.00 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 900.00 | Chg#24338 | |
| 20694 | 09 | Camacho   Santiago Camacho | Chk # 100788 | 12/11/07 | Base Rent (12/07) | | 500.00 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 500.00 | Chg#24338 | |
| 20695 | 09 | Camacho   Santiago Camacho | Chk # 100788 | 12/11/07 | Base Rent (12/07) | | 500.00 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 500.00 | Chg#24338 | |
| 20696 | 09 | Camacho   Santiago Camacho | Chk # 100788 | 12/11/07 | Base Rent (12/07) | | 500.00 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 500.00 | Chg#24338 | |
| 20697 | 09 | Camacho   Santiago Camacho | Chk # 100788 | 12/11/07 | Base Rent (12/07) | | 500.00 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 500.00 | Chg#24338 | |

### 838 X  12/12/07    (Ctrl# 11826)                                          3,135.98

| Ctrl# | Unit# | Payer | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|
| 20739 | 05 | Freshi      Freshi's Stationary & Fruit Farm I | Chk # 6048 | 12/12/07 | Base Rent & CAM 12/07 | | 3,135.98 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | 2,632.18 | Chg#24328 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3040 - CAM & Added Services | | 503.80 | Chg#24329 | |

**Deposit Register**
**8283SV - Checking**
**82nd-83rd St. Ven. {15,101 SF} - (11)**

| Number | Date | Memo | Amount |
|--------|------|------|--------|

### 839 X  12/13/07    (Ctrl# 11830)                                    1,000.00

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|-------|-------|-------|-|--------|-------|-------|-|--------|
| 20745 | 01A | RSmith | Renee Smith | Chk # 200147 | 12/13/07 | Late Chg 6/07 Tax 7/07 | | 500.00 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3130 - Real Estate Tax Passthru | | | 328.35 | Chg#22610 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3090 - Late Charges | | | 171.65 | Chg#22758 | |
| 20746 | 01A | RSmith | Renee Smith | Chk # 200147 | 12/13/07 | Bal Tax 7/07 Partial Base Rent 8/07 | | 500.00 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3130 - Real Estate Tax Passthru | | | 210.50 | Chg#22610 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | | 289.50 | Chg#22938 | |

### 840 X  12/17/07    (Ctrl# 11842)                                    5,512.24

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|-------|-------|-------|-|--------|-------|-------|-|--------|
| 20759 | 01A | RSmith | Renee Smith | Chk # 117505 | 12/17/07 | Partial base Rent 8/07 | | 1,000.00 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | | 1,000.00 | Chg#22938 | |
| 20760 | 01B | Jenkris2 | Martinez Hardware, Inc. | Chk # 1067 | 12/17/07 | Base Rent, CAM & Tax 12/07 | | 4,512.24 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | | 2,600.00 | Chg#24320 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3040 - CAM & Added Services | | | 892.24 | Chg#24321 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3130 - Real Estate Tax Passthru | | | 1,020.00 | Chg#24322 | |

### 841 X  12/26/07    (Ctrl# 11860)                                    5,002.07

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|-------|-------|-------|-|--------|-------|-------|-|--------|
| 20795 | 02,03 | Asteri | Vicki Weisse | Chk # 2276 | 12/26/07 | Base Rent, CAM & Tax 11/07 | | 5,002.07 |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3130 - Real Estate Tax Passthru | | | 1.00 | Chg#23598 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3010 - Base Rents | | | 2,916.72 | Chg#23932 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3040 - CAM & Added Services | | | 973.35 | Chg#23933 | |
| | | 11 - 82nd-83rd St. Ven. {15,101 S | 3130 - Real Estate Tax Passthru | | | 1,111.00 | Chg#23934 | |

Total Deposits          42,022.17

## Check Register
### 8283SV - Checking
### 82nd-83rd St. Ven. {15,101 SF} - (11)

| Check# | Paid Post Payee | Name | Amount | Ctrl# | Note |
|--------|-----------------|------|--------|-------|------|
|        | Invoice#        | Inv Date/Notes | | | |
| 5667 X | 12/01/07 12/07 55chllc | 55 Church WP LLC | 997.00 | 28755 | |
|        | Inv # Payroll-30714 | 12/01/07 2007 Monthly Payroll Reimb. | 787.00 | 30714 | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 4610 - Gross Wages | | 787.00 | | |
|        | Inv # auto-30752 | 12/01/07 Auto Exp. Reimbursement | 210.00 | 30752 | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 4896 - Vehicle Expenses | | 210.00 | | |
| 5668 X | 12/01/07 12/07 DimeB | Dime Savings Bank of Williamsburgh | 2,125.00 | 28756 | |
|        | Inv # BANK-30705 | 12/01/07 ln#12-012158-2 | 2,125.00 | 30705 | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 1820 - Mortgage Amort. Payable | | 440.61 | | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 6210 - Interest Expense | | 1,667.39 | | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 4590 - Misc Operating Expenses | | 17.00 | | |
| 5669 X | 12/01/07 12/07 MGRMC | Minskoff Grant Realty & Mgmt. | 1,912.00 | 28757 | |
|        | Inv # MGMT-30652 | 12/01/07 Monthly Mgmt. fee-2007 | 1,862.00 | 30652 | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 5150 - Management Fees | | 1,862.00 | | |
|        | Inv # MiscOper-30732 | 12/01/07 Misc. Operating Exps. | 50.00 | 30732 | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 4590 - Misc Operating Expenses | | 50.00 | | |
| 5674 X | 12/07/07 12/07 atlas | Atlas Welding & Boiler Repair | 100.77 | 28992 | |
|        | Inv # 310448 | 11/30/07 Replace Vaccum/Pressure Gaug | 100.77 | 30932 | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 4520 - HVAC Maint & Repair | | 100.77 | | |
| 5675 | 12/07/07 12/07 cowpdps | City of White Plains | 50.00 | 28993 | |
|        | Inv # 120107/1342 | 12/01/07 Fire Alarm permit#1342-thru 12/3 | 50.00 | 30977 | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 4420 - Fire & Security Alarm Servi | | 50.00 | | |
| 5676 X | 12/07/07 12/07 cowpwatr | City of White Plains c/o Hudson Valley | 100.00 | 28994 | |
|        | Inv # 060307101-11/28/07 | 11/28/07 0603-071-01: Fire Line/Semi-Ann | 100.00 | 30947 | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 4830 - Water & Treatment Supplie | | 100.00 | | |
| 5677 X | 12/07/07 12/07 DeWit | DeWitt Stern Group, Inc. | 455.00 | 28995 | |
|        | Inv # 491139E | 10/15/07 CommProp: 10/15/07 Addt'l. | 455.00 | 30926 | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 4140 - Insurance | | 455.00 | | |
| 5678 X | 12/07/07 12/07 DrainKin | Drain King LLC | 536.46 | 28996 | |
|        | Inv # 50281 | 11/21/07 Crown Beauty: Cleared Sewer St | 536.46 | 30958 | |
|        | 11 - 82nd-83rd St. Ven. {15,101 SF 4540 - Plumbing- R & M | | 536.46 | | |
| 5679 X | 12/07/07 12/07 Elia | Yehezkel Elia | 2,290.00 | 28997 | |
|        | Inv # 120607 | 12/06/07 Sm. Claims Index #CC 2006.286 | 2,290.00 | 31008 | |

**Check Register**
**8283SV - Checking**
**82nd-83rd St. Ven. {15,101 SF} - (11)**

| Check# | Paid Invoice# | Post | Payee | Name Inv Date/Notes | Amount | Ctrl# | Note |
|--------|------|------|-------|------|--------|-------|------|
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 5170 - Legal | 2,290.00 | | |
| 5680 X | 12/07/07 | 12/07 | FSI | FSI Fire Systems, Inc. | 253.51 | 28998 | |
| | Inv # 162775 | | | 11/13/07 Ann. Inspect-10/30/07-Waterflow | 253.51 | 30955 | |
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 4420 - Fire & Security Alarm Servi | 253.51 | | |
| 5681 X | 12/07/07 | 12/07 | gold | Goldfarb & Fleece | 142.00 | 28999 | |
| | Inv # 79696 | | | 10/31/07 Yehezkel Elia: Small Claims 10/2 | 142.00 | 30679 | |
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 5170 - Legal | 142.00 | | |
| 5682 X | 12/07/07 | 12/07 | veri | Verizon | 65.59 | 29000 | |
| | Inv # 9147614941-11/13/0 | | | 11/13/07 914-761-4941: 11/13/07 | 65.59 | 30972 | |
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 4420 - Fire & Security Alarm Servi | 65.59 | | |
| 5683 X | 12/26/07 | 12/07 | 55chllc | 55 Church WP LLC | 117.73 | 29117 | |
| | Inv # 123107-11 | | | 12/31/07 Reimb: Uniforms-4Qt07-Cintas | 47.63 | 31116 | |
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 4450 - Supplies | 47.63 | | |
| | Inv # 123107-11. | | | 12/31/07 Reimb: Supplies-4Qt07-Burke | 70.10 | 31144 | |
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 4450 - Supplies | 70.10 | | |
| 5684 | 12/26/07 | 12/07 | coned | Con Edison | 993.31 | 29118 | |
| | Inv # 555546221000053-1 | | | 12/11/07 55-5546-2210-0005-3: 12/11/07 | 993.31 | 31052 | |
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 4820 - Electric | 993.31 | | |
| 5685 | 12/26/07 | 12/07 | coned | Con Edison | 187.36 | 29119 | |
| | Inv # 555546224000019-1 | | | 12/07/07 55-5546-2240-0001-9: 12/7/07 | 187.36 | 31053 | |
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 4820 - Electric | 187.36 | | |
| 5686 | 12/26/07 | 12/07 | gold | Goldfarb & Fleece | 142.00 | 29120 | |
| | Inv # 80165 | | | 11/30/07 Yehezkel: Deposit Return-11/8/0 | 142.00 | 31125 | |
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 5170 - Legal | 142.00 | | |
| 5687 | 12/26/07 | 12/07 | monte | Monte & Son Exterminators Inc. | 135.47 | 29121 | |
| | Inv # 1975 | | | 12/06/07 Exterminating: 12/6/07 | 135.47 | 31105 | |
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 4260 - Exterminating | 135.47 | | |
| 5688 | 12/26/07 | 12/07 | Rael | Rael Sprinkler Maintenance Co. | 214.75 | 29122 | |
| | Inv # SM06452 | | | 10/31/07 Annual Sprinkler Inspection | 214.75 | 31099 | |
| | | | | 11 - 82nd-83rd St. Ven. {15,101 SF 4420 - Fire & Security Alarm Servi | 214.75 | | |

## Check Register
### 8283SV - Checking
### 82nd-83rd St. Ven. {15,101 SF} - (11)

| Check# | Paid Invoice# | Post | Payee | Name Inv Date/Notes | Amount | Ctrl# | Note |
|--------|------|------|-------|---------------------|--------|-------|------|
| 5689 | 12/26/07 | 12/07 | veri | Verizon | 65.73 | 29123 | |
| | Inv # 9147614941-12/13/0 | | | 12/13/07 914-761-4941: 12/13/07 | 65.73 | 31152 | |
| | 11 - 82nd-83rd St. Ven. {15,101 SF 4420 - Fire & Security Alarm Servi | | | | 65.73 | | |
| 5690 | 12/26/07 | 12/07 | Vinton | Vinton Fuel Oil Co. Inc. | 6,526.97 | 29124 | |
| | Inv # 53492 | | | 11/30/07 3113: 198gls@2.860-11/19/07 | 619.92 | 31082 | |
| | 11 - 82nd-83rd St. Ven. {15,101 SF 4880 - Oil | | | | 619.92 | | |
| | Inv # 8123 | | | 11/30/07 3113: 1875gls@2.875-11/29/07 | 5,907.05 | 31083 | |
| | 11 - 82nd-83rd St. Ven. {15,101 SF 4880 - Oil | | | | 5,907.05 | | |

Total Checks     17,410.65

## Aged Receivables Summary
### 82nd-83rd St. Ven. {15,101 SF} (11)
### As of Date: 12/31/07

| Code | Name | Space | Amount Receivable | Not Yet Du | 0-30 Days | 30-60 Days | 60-90 Days | Over 90 Days | Available Prepay |
|------|------|-------|------------------|-----------|-----------|-----------|-----------|-------------|------------------|
| RSmith | Renee Smith | 01A | 24,124.57 | 0.00 | 4,512.24 | 4,512.24 | 0.00 | 15,100.09 | 0.00 |
| Jenkris2 | Martinez Hardware, Inc. | 01B | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Asteri | Vicki Weisse | 02,03 | 5,428.25 | 0.00 | 5,402.25 | 1.00 | 0.00 | 25.00 | 0.00 |
| Freshi | Freshi's Stationary & Fruit | 05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Crown | Kil Seong Kim d/b/a Crown | 06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Guayara | Carlos Guayara & Jairo Gu | 07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Fashion | Fashion Town Corporation | 08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Camacho | Santiago Camacho | 09 | 2,799.79 | 0.00 | 0.00 | 0.00 | 0.00 | 2,799.79 | 0.00 |
| | | | 32,352.61 | 0.00 | 9,914.49 | 4,513.24 | 0.00 | 17,924.88 | 0.00 |

# Rent Roll
## 82nd-83rd St. Ven. {15,101 SF} (11)
### As of 12/31/07

Page 1
2003
1/30/2008
11:55 AM

| Property | Space | Code | Name | Sq.Ft. | Rent Potential | Rent Actual | Rent/sq | Deposit | Lease From | Leased To |
|----------|-------|------|------|--------|----------------|-------------|---------|---------|------------|-----------|
| 11 | 01A | RSmith | Renee Smith | 1,500 | 2,600.00 | 2,600.00 | 20.80 | 5,850.00 | 11/24/03 | 09/30/14 |
| 11 | 01B | Jenkris2 | Martinez Hardware, Inc. | 1,500 | 2,600.00 | 2,600.00 | 20.80 | 18,000.00 | 11/24/03 | 08/31/13 |
| 11 | 02,03 | Asteri | Vicki Weisse | 1,618 | 2,916.72 | 2,916.72 | 21.63 | 6,310.00 | 07/01/03 | 09/30/13 |
| 11 | 04 | | VACANT | 2,277 | 6,612.50 | | | | | |
| 11 | 05 | Freshi | Freshi's Stationary & Fruit | 812 | 2,632.18 | 2,632.18 | 38.90 | 4,500.00 | 04/01/98 | 03/31/08 |
| 11 | 06 | Crown | Kil Seong Kim d/b/a Crown | 1,716 | 4,290.00 | 4,290.00 | 30.00 | 10,000.00 | 07/01/96 | 06/30/16 |
| 11 | 07 | Guayara | Carlos Guayara & Jairo Gu | 1,750 | 4,375.00 | 4,375.00 | 30.00 | 20,500.00 | 01/01/07 | 03/31/17 |
| 11 | 08 | Fashion | Fashion Town Corporation | 1,720 | 4,300.00 | 4,300.00 | 30.00 | 10,000.00 | 01/01/97 | 01/31/17 |
| 11 | 09 | Camacho | Santiago Camacho | 2,208 | 3,900.00 | 3,900.00 | 21.20 | 9,000.00 | 06/01/93 | 05/31/08 |
| | 9 | | Total - Less Excluded Units | 15,101 | 34,226.40 | 27,613.90 | 21.94 | 84,160.00 | | |
| | 8 | | Total Occupied | 12,824 | 27,613.90 | 27,613.90 | 25.84 | | | |
| | 88.89 | | % Occupied | 84.92 | 80.68 | 80.68 | | | | |
| | 1 | | Total Vacant | 2,277 | 6,612.50 | | 34.85 | | | |
| | 11.11 | | % Vacant | 15.08 | 19.32 | | | | | |

**Balance Sheet (Accrual)**
**82nd-83rd St. Ven. {15,101 SF} - (11)**
**Dec 07**

Page 1
2003
2/4/2008
02:45 PM

Prepared For:
All Owners

Prepared By:
Minskoff Grant Realty & Mgmt.
1350 Avenue of the Americas
32nd Floor
New York, NY 10019-4702

**ASSETS**
CASH
Cash-Operating | 108,957.17
TOTAL CASH | 108,957.17

CURRENT ASSETS
Accounts Receivable | 32,352.61

PREPAID EXPENSES
Prepaid Insurance | 6,108.39
TOTAL CURRENT ASSETS | 38,461.00

FIXED ASSETS
Land | 120,528.00
Building | 149,273.00
Accum Dep Building | -149,273.00
Building Improvements | 152,103.60
Accum Dep Bldg Improvements | -46,185.66
TOTAL FIXED ASSETS | 226,445.94

OTHER ASSETS
Unamoritized Mortgage Costs | 4,383.30
Unamoritized Leasing Costs | 87,358.23
Additional Sec. 754 basis | 166,889.00
Accum. Deprec. Sec 754 | -16,368.62
Tenant Security Deposits | 84,160.00
TOTAL OTHER ASSETS | 326,421.91

**TOTAL ASSETS** | 700,286.02

**LIABILITY & OWNERS EQUITY**

LIABILITIES
Accrued Expenses Payable | 14,856.22
Accounts Payable | 6,016.25
Mortgage Amort. Payable | 326,232.67
Tenant Security Payable | 84,160.00
TOTAL LIABILITY | 431,265.14

EQUITY
Partners Equity | 68,337.87
Additional basis- Sec 754 | 166,889.00
Partners Distributions | -230,000.00
Retained Earnings | 263,794.01
TOTAL EQUITY | 269,020.88

**TOTAL LIABILITY & EQUITY** | 700,286.02

**Budget Comparison (Accrual)**
**82nd-83rd St. Ven. {15,101 SF} - (11)**
**Oct 07 - Dec 07**

Prepared For:
All Owners

Prepared By:
Minskoff Grant Realty & Mgmt.
1350 Avenue of the Americas
32nd Floor
New York, NY 10019-4702

| | MTD Actual | MTD Budget | $ Var. | % Var. | YTD Actual | YTD Budget | $ Var. | % Var. | Annual |
|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | |
| **OPERATING INCOME** | | | | | | | | | |
| Base Rents | 74,950.30 | 102,678.00 | -27,727.70 | -27.00 | 379,277.26 | 409,190.00 | -29,912.74 | -7.31 | 409,190.00 |
| Concession-Free Rent | 0.00 | 0.00 | 0.00 | 0 | -13,125.00 | -13,125.00 | 0.00 | 0 | -13,125.00 |
| CAM & Added Services | 13,367.37 | 22,671.00 | -9,303.63 | -41.04 | 96,866.68 | 90,684.00 | 6,182.68 | 6.82 | 90,684.00 |
| Water & Sewer Rents | 0.00 | 0.00 | 0.00 | 0 | 0.00 | 1,000.00 | -1,000.00 | -100.0 | 1,000.00 |
| Late Charges | -98.82 | 0.00 | -98.82 | 0 | 1,399.99 | 0.00 | 1,399.99 | 0 | 0.00 |
| Bounce Check Charge | 0.00 | 0.00 | 0.00 | 0 | 75.00 | 0.00 | 75.00 | 0 | 0.00 |
| TOTAL OPERATING INCOME | 88,218.85 | 125,349.00 | -37,130.15 | -29.62 | 464,493.93 | 487,749.00 | -23,255.07 | -4.77 | 487,749.00 |
| **REIMBURSEMENT INCOME** | | | | | | | | | |
| Real Estate Tax Passthru | 9,674.21 | 12,132.00 | -2,457.79 | -20.26 | 91,375.33 | 70,923.00 | 20,452.33 | 28.84 | 70,923.00 |
| Supplies Passthru | 0.00 | 0.00 | 0.00 | 0 | 50.00 | 0.00 | 50.00 | 0 | 0.00 |
| TOTAL REIMBURSEMENT INC | 9,674.21 | 12,132.00 | -2,457.79 | -20.26 | 91,425.33 | 70,923.00 | 20,502.33 | 28.91 | 70,923.00 |
| **NON-OPERATING INCOME** | | | | | | | | | |
| Misc Income | 0.00 | 0.00 | 0.00 | 0 | 1,000.00 | 0.00 | 1,000.00 | 0 | 0.00 |
| TOTAL NON-OPERATING INC | 9,674.21 | 12,132.00 | -2,457.79 | -20.26 | 92,425.33 | 70,923.00 | 21,502.33 | 30.32 | 70,923.00 |
| **TOTAL INCOME** | 97,893.06 | 137,481.00 | -39,587.94 | -28.80 | 556,919.26 | 558,672.00 | -1,752.74 | -0.31 | 558,672.00 |
| **EXPENSES** | | | | | | | | | |
| **OPERATING EXPENSES** | | | | | | | | | |
| Real Estate Taxes | 0.00 | 0.00 | 0.00 | 0 | 115,601.61 | 115,916.00 | 314.39 | 0.27 | 115,916.00 |
| Insurance | 7,708.10 | 8,600.00 | 891.90 | 10.37 | 14,324.10 | 14,642.00 | 317.90 | 2.17 | 14,642.00 |
| Snow Removal & Addt'l Services | 0.00 | 0.00 | 0.00 | 0 | 188.77 | 200.00 | 11.23 | 5.62 | 200.00 |
| Exterminating | 626.53 | 405.00 | -221.53 | -54.70 | 1,992.07 | 1,880.00 | -112.07 | -5.96 | 1,880.00 |
| Fire & Security Alarm Service | 780.83 | 210.00 | -570.83 | -271.8 | 1,425.02 | 1,777.00 | 351.98 | 19.81 | 1,777.00 |
| Supplies | 117.73 | 150.00 | 32.27 | 21.51 | 377.95 | 600.00 | 222.05 | 37.01 | 600.00 |
| Maintenance & Repairs | 1,850.00 | 500.00 | -1,350.00 | -270.0 | 1,850.00 | 600.00 | -1,250.00 | -208.3 | 600.00 |
| HVAC Maint & Repair | 100.77 | 700.00 | 599.23 | 85.60 | 2,165.70 | 2,100.00 | -65.70 | -3.13 | 2,100.00 |
| Plumbing- R & M | 1,295.09 | 900.00 | -395.09 | -43.90 | 1,996.27 | 1,500.00 | -496.27 | -33.08 | 1,500.00 |
| Roof Maint & Repair | 377.56 | 0.00 | -377.56 | 0 | 9,493.00 | 9,350.00 | -143.00 | -1.53 | 9,350.00 |
| Misc Operating Expenses | 201.00 | 201.00 | 0.00 | 0.00 | 804.00 | 804.00 | 0.00 | 0.00 | 804.00 |
| Gross Wages | 2,909.16 | 2,361.00 | -548.16 | -23.22 | 9,992.16 | 9,444.00 | -548.16 | -5.80 | 9,444.00 |
| Electric | 3,766.60 | 600.00 | -3,166.60 | -527.7 | 7,026.81 | 2,400.00 | -4,626.81 | -192.7 | 2,400.00 |
| Water & Treatment Supplies | 100.00 | 100.00 | 0.00 | 0.00 | 3,079.20 | 6,450.00 | 3,370.80 | 52.26 | 6,450.00 |
| Oil | 9,774.55 | 3,500.00 | -6,274.55 | -179.2 | 20,258.55 | 16,000.00 | -4,258.55 | -26.62 | 16,000.00 |
| Vehicle Expenses | 210.00 | 210.00 | 0.00 | 0.00 | 810.00 | 810.00 | 0.00 | 0.00 | 810.00 |
| Management Fees | 5,586.00 | 5,586.00 | 0.00 | 0.00 | 22,291.00 | 22,344.00 | 53.00 | 0.24 | 22,344.00 |
| Accounting | 0.00 | 0.00 | 0.00 | 0 | 9,500.00 | 9,500.00 | 0.00 | 0.00 | 9,500.00 |
| Legal | 4,578.50 | 0.00 | -4,578.50 | 0 | 17,373.95 | 2,000.00 | -15,373.95 | -768.7 | 2,000.00 |
| Professional Fees | 0.00 | 0.00 | 0.00 | 0 | 4,300.00 | 1,000.00 | -3,300.00 | -330.0 | 1,000.00 |
| Fees & Permits | 0.00 | 0.00 | 0.00 | 0 | 650.00 | 530.00 | -120.00 | -22.64 | 530.00 |
| Bank Fees | 0.00 | 0.00 | 0.00 | 0 | 45.10 | 0.00 | -45.10 | 0 | 0.00 |
| Penalties & Violations | 0.00 | 0.00 | 0.00 | 0 | 15.00 | 0.00 | -15.00 | 0 | 0.00 |
| Telephone | 10.05 | 0.00 | -10.05 | 0 | 205.41 | 0.00 | -205.41 | 0 | 0.00 |
| TOTAL OPERATING EXPENSE | 39,992.47 | 24,023.00 | -15,969.47 | -66.48 | 245,765.67 | 219,847.00 | -25,918.67 | -11.79 | 219,847.00 |
| **NON-OPERATING EXPENSES** | | | | | | | | | |
| Interest Expense | 5,008.88 | 5,009.00 | 0.12 | 0.00 | 20,153.94 | 20,153.00 | -0.94 | 0.00 | 20,153.00 |
| Leasing Costs & Commissions | 7,283.14 | 7,284.00 | 0.86 | 0.01 | 27,205.64 | 27,209.00 | 3.36 | 0.01 | 27,209.00 |
| TOTAL NON-OPERATING EXPE | 12,292.02 | 12,293.00 | 0.98 | 0.01 | 47,359.58 | 47,362.00 | 2.42 | 0.01 | 47,362.00 |
| **DEPRECIATION & AMORTIZATION** | | | | | | | | | |
| **TOTAL EXPENSES** | 52,284.49 | 36,316.00 | -15,968.49 | -43.97 | 293,125.25 | 267,209.00 | -25,916.25 | -9.70 | 267,209.00 |
| **NET INCOME** | 45,608.57 | 101,165.00 | -55,556.43 | -54.92 | 263,794.01 | 291,463.00 | -27,668.99 | -9.49 | 291,463.00 |

# Income Statement and Cash Flow
## 82nd-83rd St. Ven. {15,101 SF} - (11)
### Oct 07 - Dec 07

Prepared For:
All Owners

Prepared By:
Minskoff Grant Realty & Mgmt.
1350 Avenue of the Americas
32nd Floor
New York, NY 10019-4702

| | Quarter to Date | % | Year to Date | % |
|---|---|---|---|---|
| **INCOME** | | | | |
| | | | | |
| OPERATING INCOME | | | | |
| Base Rents | 74,950.30 | 76.56 | 379,277.26 | 68.10 |
| Concession-Free Rent | 0.00 | 0.00 | -13,125.00 | -2.36 |
| CAM & Added Services | 13,367.37 | 13.66 | 96,866.68 | 17.39 |
| Late Charges | -98.82 | -0.10 | 1,399.99 | 0.25 |
| Bounce Check Charge | 0.00 | 0.00 | 75.00 | 0.01 |
| TOTAL OPERATING INCOME | 88,218.85 | 90.12 | 464,493.93 | 83.40 |
| | | | | |
| REIMBURSEMENT INCOME | | | | |
| Real Estate Tax Passthru | 9,674.21 | 9.88 | 91,375.33 | 16.41 |
| Supplies Passthru | 0.00 | 0.00 | 50.00 | 0.01 |
| TOTAL REIMBURSEMENT INC | 9,674.21 | 9.88 | 91,425.33 | 16.42 |
| | | | | |
| NON-OPERATING INCOME | | | | |
| Misc Income | 0.00 | 0.00 | 1,000.00 | 0.18 |
| TOTAL NON-OPERATING INC | 9,674.21 | 9.88 | 92,425.33 | 16.60 |
| | | | | |
| **TOTAL INCOME** | 97,893.06 | 100.00 | 556,919.26 | 100.00 |
| | | | | |
| **EXPENSES** | | | | |
| | | | | |
| OPERATING EXPENSES | | | | |
| Real Estate Taxes | 0.00 | 0.00 | 115,601.61 | 20.76 |
| Insurance | 7,708.10 | 7.87 | 14,324.10 | 2.57 |
| Snow Removal & Addt'l Services | 0.00 | 0.00 | 188.77 | 0.03 |
| Exterminating | 626.53 | 0.64 | 1,992.07 | 0.36 |
| Fire & Security Alarm Service | 780.83 | 0.80 | 1,425.02 | 0.26 |
| Supplies | 117.73 | 0.12 | 377.95 | 0.07 |
| Maintenance & Repairs | 1,850.00 | 1.89 | 1,850.00 | 0.33 |
| HVAC Maint & Repair | 100.77 | 0.10 | 2,165.70 | 0.39 |
| Plumbing- R & M | 1,295.09 | 1.32 | 1,996.27 | 0.36 |
| Roof Maint & Repair | 377.56 | 0.39 | 9,493.00 | 1.70 |
| Misc Operating Expenses | 201.00 | 0.21 | 804.00 | 0.14 |
| Gross Wages | 2,909.16 | 2.97 | 9,992.16 | 1.79 |
| Electric | 3,766.60 | 3.85 | 7,026.81 | 1.26 |
| Water & Treatment Supplies | 100.00 | 0.10 | 3,079.20 | 0.55 |
| Oil | 9,774.55 | 9.98 | 20,258.55 | 3.64 |
| Vehicle Expenses | 210.00 | 0.21 | 810.00 | 0.15 |
| Management Fees | 5,586.00 | 5.71 | 22,291.00 | 4.00 |
| Accounting | 0.00 | 0.00 | 9,500.00 | 1.71 |
| Legal | 4,578.50 | 4.68 | 17,373.95 | 3.12 |
| Professional Fees | 0.00 | 0.00 | 4,300.00 | 0.77 |
| Fees & Permits | 0.00 | 0.00 | 650.00 | 0.12 |
| Bank Fees | 0.00 | 0.00 | 45.10 | 0.01 |
| Penalties & Violations | 0.00 | 0.00 | 15.00 | 0.00 |
| Telephone | 10.05 | 0.01 | 205.41 | 0.04 |
| **TOTAL OPERATING EXPENSES** | 39,992.47 | 40.85 | 245,765.67 | 44.13 |

**Income Statement and Cash Flow**
**82nd-83rd St. Ven. {15,101 SF} - (11)**
**Oct 07 - Dec 07**

| | Quarter to Date | % | Year to Date | % |
|---|---|---|---|---|
| **NON-OPERATING EXPENSES** | | | | |
| Interest Expense | 5,008.88 | 5.12 | 20,153.94 | 3.62 |
| Leasing Costs & Commissions | 7,283.14 | 7.44 | 27,205.64 | 4.89 |
| TOTAL NON-OPERATING EXPENSE | 12,292.02 | 12.56 | 47,359.58 | 8.50 |
| **DEPRECIATION & AMORTIZATION** | | | | |
| **TOTAL EXPENSES** | 52,284.49 | 53.41 | 293,125.25 | 52.63 |
| **NET INCOME** | 45,608.57 | 46.59 | 263,794.01 | 47.37 |
| ADJUSTMENTS | | | | |
| **ASSETS** | | | | |
| Accounts Receivable | 23,732.13 | | -19,027.54 | |
| Accounts Receivable - Other | 0.00 | | 660.67 | |
| Prepaid Insurance | 2,548.10 | | 2,548.10 | |
| Tenant Security Deposits | 0.00 | | -22,298.95 | |
| Accrued Expenses Payable | 0.00 | | -3,948.50 | |
| Accounts Payable | 6,016.25 | | 6,016.25 | |
| Mortgage Amort. Payable | -1,315.12 | | -5,142.06 | |
| Tenant Security Payable | 0.00 | | 22,298.95 | |
| Partners Distributions | -57,500.00 | | -230,000.00 | |
| TOTAL ADJUSTMENTS | -26,518.64 | | -248,893.08 | |
| CASH FLOW | 19,089.93 | | 14,900.93 | |
| Beginning Cash | 89,867.24 | | | |
| Ending Balance | 108,957.17 | | | |

```
                                           Date 12/31/07              Page    1
                                           Account Number    @XXXXXXXXXXXXXX@
                                           Enclosures                       15
```

```
        82-83RD ST VENTURE                    Your Relationship Manager is:
        C/O MINSKOFF GRANT RLTY & MGMT CORP         Anthony M. Grosso
        1350 AVENUE OF THE AMERICAS FL 32    (212)935-4166; Cell (516)316-3862
        NEW YORK NY 10019-4801                    anthony.grosso@
                                                  sterlingbancorp.com
```

```
                          CHECKING ACCOUNT

            Account Title: 82-83RD ST VENTURE
                   C/O MINSKOFF GRANT RLTY & MGMT CORP
```

```
CHECKING                            Number of Enclosures              15
Account Number        @XXXXXXXXXXXXXX@   Statement Dates  12/03/07 thru 12/31/07
Previous Balance            104,097.37   Days in the statement period      29
    8 Deposits/Credits       42,022.17   Average Ledger             108,022.42
   15 Checks/Debits          28,846.78   Average Collected          105,944.72
```

```
New Balance                 117,272.76
```

```
   *****************************************************************

Activity in Date Order                 Checks/     Deposits/
Date    Description                     Debits      Credits    Daily Balance
12/03 CHECK                5655        17,767.50                    86,329.87
12/04 DEPOSIT                                        5,002.07       91,331.94
12/04 CHECK                5669         1,912.00                    89,419.94
12/04 CHECK                5667           997.00                    88,422.94
12/05 CHECK                5668         2,125.00                    86,297.94
12/05 CHECK                5670         1,850.00                    84,447.94
12/06 DEPOSIT                                       11,854.36       96,302.30
12/07 DEPOSIT                                        6,615.45      102,917.75
12/11 DEPOSIT                                        3,900.00      106,817.75
12/12 CHECK                5674           100.77                   106,716.98
12/13 DEPOSIT                                        3,135.98      109,852.96
12/13 DEPOSIT                                        1,000.00      110,852.96
12/13 CHECK                5677           455.00                   110,397.96
12/13 CHECK                5680           253.51                   110,144.45
12/13 CHECK                5681           142.00                   110,002.45
12/13 CHECK                5676           100.00                   109,902.45
12/14 CHECK                5682            65.59                   109,836.86
```

```
                                        Date 12/31/07              Page    2
                                        Account Number     @XXXXXXXXXXXXXX@
                                        Enclosures                       15
```

```
        82-83RD ST VENTURE
        C/O MINSKOFF GRANT RLTY & MGMT CORP
        1350 AVENUE OF THE AMERICAS FL 32
        NEW YORK NY 10019-4801
```

```
CHECKING                        @XXXXXXXXXXXXXX@   (Continued)

Activity in Date Order                    Checks/      Deposits/
Date    Description                       Debits       Credits     Daily Balance
12/18 DEPOSIT                                          5,512.24      115,349.10
12/18 CHECK                 5678          536.46                     114,812.64
12/19 CHECK                 5673          134.22                     114,678.42
12/20 CHECK                 5679        2,290.00                     112,388.42
12/27 DEPOSIT                                          5,002.07      117,390.49
12/28 CHECK                 5683          117.73                     117,272.76

*********************************************************************************
                        --- CHECKS IN NUMBER ORDER ---
Date    Check No               Amount    Date    Check No               Amount
12/03    5655              17,767.50    12/13    5677                    455.00
12/04    5667*                997.00    12/18    5678                    536.46
12/05    5668               2,125.00    12/20    5679                  2,290.00
12/04    5669               1,912.00    12/13    5680                    253.51
12/05    5670               1,850.00    12/13    5681                    142.00
12/19    5673*                134.22    12/14    5682                     65.59
12/12    5674                 100.77    12/28    5683                    117.73
12/13    5676*                100.00
* Denotes missing check numbers

        * * *   E N D   O F   S T A T E M E N T   * * *
```

# MGRMC
# Quarterly Reports
# Fourth Quarter
# 2007
# 77th Queens

**77TH QUEENS ASSOCIATES (13)**
**116-02/32 Queens Blvd.**
**Forest Hills, NY 11375**
**(38,196 Sq. Ft.)**

<u>Building Status Report</u>
<u>December 2007</u>

## <u>GENERAL:</u>

1.    None

**Follow-Up:**

1.    **Potential Garage/Change of C of O**: (See January 2006 and General, Number 1)

**June 2007 Update:** After nearly one year it is pretty clear to us that we have exhausted the number of people willing to walk up stairs to offices in this part of Queens. It is of course possible that someone will contact us tomorrow and be interested in the space; but it seems now that this is unlikely. We again ask that ownership considers the two proposals recommended that is to install an elevator and to turn the rear area into tenant parking. Even if the costs to do both were say at the outside $500,000 and we do not believe they will be that much. At $25/sf 10,364 sf generates $259,100 gross. Once leased you will make that up in rent in 2 years and have the potential to enjoy the income for the remainder of the leasehold until the end 2024. It is still an excellent investment and an excellent return on investment.

**July/August/September 2007 Update:** *We have not heard back from a majority of owners as yet on this issue.*

2.    **Asbestos Survey Test:**   (see September 2006)

3.    **Parking and Elevator Feasibility**: (See September 2006)

4.    **2007 Roof Assessment and Recommendations:** (See November 2007)

## <u>TENANT ACTIVITY:</u>

1.    Property occupancy is 67% leased (excluding the 8,994 square feet which is the potential parking garage space or warehouse storage space).

Vacancies:

-       8,994 sq. ft. vacant space available in the basement, potential garage or warehouse storage space.

L:\MGRMC\77Queens..13\Report 2007\13STAT1207.doc

77th Queens Associates (13)
Building Status Report
December 2007
Page 2


### TENANT ACTIVITY CONT'D.:

-        10,768 sq. ft. of office space on the 2nd Floor.  Two lease proposals sent out.

2.        Kane, Kane & Associates, LTD. [*KaneKane*, Space "04"] lease expires on April 30th 2007. We haven't heard from the tenant and assumed that they would be leaving. Upon receipt of the letter from our office to schedule a walkthrough of the space, we received a call from the tenant explaining that he wasn't leaving. The tenant has allowed the space to deteriorate considerably and isn't interested in putting anything back into the space to maintain it. He uses the space, especially the basement, mainly for storage of his junior varsity football league equipment He also explained that the reason he doesn't pay until the 15th every month is to maintain "good cash flow". The situation has been brought to the Owner's attention; the majority of the Owners would like to extend his lease for two years as of this writing. A Proposal was sent to the tenant including the items he will need to do to improve his space.

**June 2007 Update:** The tenant has received numerous phone calls and emails as well as the Super has dropped by to request he respond to the proposal sent as requested by the majority of owners.  The tenant is ignoring all contacts.  We suggest we begin eviction proceedings and that this may be the only thing that gets his attention and brings him to the negotiating table.

**July 2007 Update:**  A revised proposal was sent on July 16, 2007, no word until he was finally reached by Morgen on July 25th and he is still not in agreement with the current revision which decreased his obligations.  He stated that will be responding but nothing as of this writing.

**August 2007 Update:**  The property manager visited *KaneKane* to reach an agreement on work that will be their responsibility prior to renewing their lease. Following his visit a third lease renewal proposal was sent to Mr. Norman Kane.

**September 2007 – December Update:**  We are at a stalemate with the tenant, *KaneKane, who* will not pay more and the owners expect an increase.  We repeat our original recommendation as reported to you in June 2007 that is to proceed with eviction. The tenant has occupied the space for months and paid no rent. We are no longer accepting the amounts of $1980.00 for the old base rent amount. Our Leasing Manager, Elizabeth Cottrill has tried to contact *KaneKane* on several occasions with no reply.

3.        On August 31, 2007 the lease for US Coast Guard expired, [*US Coast Guard,* Space "08']. The Superintendent has scheduled a walk through with tenant this week, the space is being marketed.

**September 2007 Update:** The Superintendent completed the walk through for this space. *This, the month of December 2007 is the last time this will appear in the report.*

77th Queens Associates (13)
Building Status Report
December 2007
Page 3

**TENANT ACTIVITY CONT'D.:**

4.      Sonoma Coffee [*CNW*, Space "13'], we are still in lease negotiations with tenant and
their lawyer we hope to have signed leases soon.

**September 2007 Update:** Leases were sent out to Owners for signature on September
17, 2007 as of this writing the final executed leases are being distributed.

**October 2007 Update:** *CNW* has begun construction in their space. The Property
Manager has secured a Certificate of Insurance and Plans from the contractor. The
Property Manager is also securing an estimate for the installation of a sub meter for the
water in this space. The cost of this installation will be paid for by the tenant as per the
terms of the lease.

**November 2007 Update:** The Property Manager and Superintendent continue to monitor
*CNW* in regard to their compliance in regard to their build out. Iafe Plumbing has
installed a water meter for this space, all costs for this service will be reimbursed by the
tenant as per the terms of their lease.

**December 2007 Update:** The Property Manager and Superintendent continue to monitor
*CNW* during their build out.

5.      On September 30, 2007 the lease Bright Choices Inc. *[Tutors*, Space"265"] is
relinquishing the space, the tenant reported she needed space with an elevator, the owners
have not had a majority on how to proceed with this tenant. The Superintendent is
scheduled to do a walk through of this space on that date. *This, the month of December
2007 is the last time this will appear in the report.*

**Follow-Up:**

1.      Neptune Bath & Kitchen Des. Gallery Inc. [*Neptune*, Space "10"] (See January 2007)
Issue relating to Store Ownership, approval denied from owners for assignment.

**CONSTRUCTION/REPAIRS/TENANT BUILD OUT:**

1.      Some of the work completed by the Superintendent this month:
Showing the vacant spaces to prospective tenants, cleaning of the roof and sewer drains,
debris removal of back wooded area consisting of leaves and fallen branches.

Apple Bank for Savings [*Apple1*, Space "05"] has installed a new sign on the exterior. It
looks great, *photographs were attached to the April 2007 report*. They have also

77th Queens Associates (13)
Building Status Report
December 2007
Page 4

## CONSTRUCTION/REPAIRS/TENANT BUILD OUT CONT'D.:

submitted plans to install safe deposit boxes and a structural support in the basement. They will need to use the metal gate in the lower section of the building to install. *This, the month of December 2007 is the last time this will appear in the report.*

2.    The back walkway is starting to crack in spots bordering on the lower ramp to the basement. We will have to repair it in the next year or it will be much more extensive to repair.

3.    Emergency removal of tree in rear of building completed by Arnold's Tree Service at cost of $1,800.00.

**July 2007 Update:** Management has received a complaint from a neighbor "77-21 Kew Forest Lane" in a private home in the back of the store in regard to a tree branch growing on the roof of their property. The Property Manager has sent them a notice approving Arnold's Tree service to perform an estimate for the removal of these branches.

**October 2007 Update:** As of this writing we have not heard back from the neighbor behind our property, The Property Manager has contacted Howard's Tree Services for the purposes of obtaining an estimate for the maintenance pruning of all trees in the rear of the property. This estimate will be added to the Capital Budget for 2008.

4.    Superintendent Hector Gonzales is repairing and painting basement staircase walls.

5.    The Property Manager met with Gene Boone from Day and Night Air Conditioning to obtain a proposal for the replacement of steam traps in the building. The proposal has been received and will be addressed in the Capital Budget.

6.    The Property Manager has conducted an inspection of the windows in the rear of the premises. All tenants with broken glass or windows have been noticed to make the necessary repairs. The Property Manager is also securing proposals from glaziers in regard to this issue.  Tenants will be offered the opportunity to have the windows repaired by Management and billed back in order to avoid inconvenience and enhance compliance in regard to this issue. The Superintendent has also been instructed to scrape and paint as required in the rear of the premises. *See attached photographs taken of the rear of the premises.*

**Follow-Up:**

1.    **Richard Creditor LLC [*Creditor*, Space "01"], Leak /CAM & Real Estate Charges Legal Issue** (See March 2006 and December 2006).

77th Queens Associates (13)
Building Status Report
December 2007
Page 5


## VIOLATIONS/NOTICES:

1.    We have noticed Shalev ZGS Inc. [*KPizza*, Space "06"] in regard to damage to the roof from their A/C contractor and to provide us the Equipment Use Permit for the A/C unit. Ray Dean has been called to repair the roof, *KPizza* has also been noticed in regard to their responsibility for this expense.

    **December 2007 Update:** The property Manager has issued a final notice to *KPizza* to produce the Equipment Use Permit for this equipment.


## ARREARS:

1.    The arrears at the end of the month of December 2007 are for base rent and Real Estate taxes for Richard Creditor LLC [*Creditor,* Space "01"] who stopped paying rent for November and December, Zeller Tux 17 Inc. [*Zeller*, Space "03"] and Pawan Int. Corp [*GoldSp*, Space "09']. Shalev ZGS Inc. [*KPizza*, Space "06"] owes for base rent, CAM and late charges. Kane, Kane & Associates, LTD. [*KaneKane*, Space "04"] owes Real Estate tax escalations and CAM charges. It should be noted that *KaneKane* has occupied the space rent free since 4/30/07 (*see Activity # 2*). All other arrears relate to previously billed RE tax escalations and/ or CAM and late charges.

2.    See attached report - "Aged Receivables Summary."


## OTHER:

1.    None





















Minskoff Grant Realty and Mgmt. Corp.
**Management Report**
December 2007

**77th Queens Associates (13)**

*Sterling Bank*

| DETAILS: | FIGURES: | |
|---|---|---|
| Cash Balance - December 1, 2007 | $141,494.52 | |
| Cash Receipts: (See deposit register) Includes transfer from MMA | $194,679.47 | |
| Cash Disbursements: (See check register) | ($256,383.35) | |
| Net Cash: | | ($61,703.88) |
| Cash Balance - December 31, 2007 | $79,790.64 | |

Money Market

| DETAILS: | FIGURES: | |
|---|---|---|
| Cash Balance - December 1, 2007 | $323,915.01 | |
| Transfer to Oper. Acct. | -$87,000.00 | |
| Transfer to Capital Reserve acct. | -$18,900.00 | |
| Interest: December 2007 | $228.28 | |
| Net Cash: | | ($105,671.72) |
| Cash Balance - December 31, 2007 | $218,243.29 | |

Capital Reserve

| DETAILS: | FIGURES: | |
|---|---|---|
| Capital Reserve Balance-December 1, 2007 | $37,800.00 | |
| Transfer from MMA | $18,900.00 | |
| Net Cash: | | $18,900.00 |
| Capital Reserve Balance-December 31, 2007 | $56,700.00 | |

# Bank Account Balance
## 77thSter - Sterling Checking Account
### Closing Date  12/31/07

Page 1
2003
1/30/2008
12:00 PM

---

## Account Information

| | |
|---|---|
| Code | 77thSter |
| Description | Sterling Checking Account |
| Acct # | 3802546501 |
| Stmt Date | 12/31/07 |
| Stmt Balance | 201,219.90 |

---

## Property Funds Detail

| | | | |
|---|---|---|---|
| 13 - 77th Queens Assoc. {38,196 S | 121,823.47 | 1021 - Secondary Cash -Operating |
| Total Funds | 121,823.47 | |

---

## Unreconciled Items

### Unreconciled Checks

| | | | |
|---|---|---|---|
| 2101 | 12/26/07 | AVA Design & Construction | 1,600.00 |
| 2102 | 12/26/07 | Con Edison | 63.93 |
| 2103 | 12/26/07 | Con Edison | 801.49 |
| 2104 | 12/26/07 | William G. Iafe, Inc. | 1,002.47 |
| 2106 | 12/26/07 | Monte & Son Exterminators Inc. | 162.57 |
| 2107 | 12/26/07 | NYC Dept of Finance | 117,217.52 |
| 2109 | 12/26/07 | Royal Waste Services, Inc. | 563.55 |
| 2110 | 12/26/07 | Con Edison | 17.73 |

---

## Summary

| | |
|---|---|
| G/L Balance as of 01/08 | 121,823.47 |
| Checks after 12/31/07 | 36,797.33 |
| Deposits after 12/31/07 | -78,830.16 |
| Receipts after 12/31/07 | 0.00 |
| Adjustments after 12/31/07 | 0.00 |
| Checkbook Balance as of 12/31/07 | 79,790.64 |
| + Unreconciled checks | 121,429.26 |
| - Unreconciled deposits | 0.00 |
| - Undeposited receipts | 0.00 |
| + Unreconciled adjustments | 0.00 |
| Adjusted Checkbook Balance | 201,219.90 |

Matches statement balance

# Deposit Register
## 77thSter - Sterling Checking Account
## 77th Queens Assoc. {38,196 SF} - (13)

| Number | | Date | | Memo | | | Amount | |
|---|---|---|---|---|---|---|---|---|

**1053 X  12/03/07   (Ctrl# 11768)** — **16,785.20**

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20588 | 02 | GNC | Megan Broniecki General Nutritio | Chk # 288000 | 12/03/07 | Base Rent (12/07) R/E Tax | | 7,948.83 |
| | | 13 - 77th Queens Assoc. {38,196 | 3130 - Real Estate Tax Passthru | | | 1,789.36 | Chg#22510 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3130 - Real Estate Tax Passthru | | | 313.16 | Chg#24169 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3010 - Base Rents | | | 5,846.31 | Chg#24344 | |
| 20589 | 11 | TKSInc. | T.K.S., Inc. | Chk # 699077 | 12/03/07 | Base Rent (12/07) | | 7,200.00 |
| | | 13 - 77th Queens Assoc. {38,196 | 3010 - Base Rents | | | 5,312.33 | Chg#24355 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3040 - CAM & Added Services | | | 529.73 | Chg#24356 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3130 - Real Estate Tax Passthru | | | 820.52 | Chg#24357 | |
| | | 13 - 77th Queens Assoc. {38,196 | 1905 - Prepaid Rent | | | 537.42 | Chg#20784 | |
| 20590 | 255 | Smegg | Smegg Consulting, Inc. | Chk # 1189 | 12/03/07 | Base Rent (11/07) | | 1,636.37 |
| | | 13 - 77th Queens Assoc. {38,196 | 3010 - Base Rents | | | 1,492.83 | Chg#23984 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3014 - Electric Rents Inclusion | | | 143.54 | Chg#23985 | |

**1054 X  12/04/07   (Ctrl# 11777)** — **22,093.76**

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20638 | 08 | USCG | U.S. Coast Guard Recruiting | Chk # Wire12/ | 12/04/07 | CAM & Added Services 10/01/07 | | 22,093.76 |
| | | 13 - 77th Queens Assoc. {38,196 | 5280 - Penalties & Violations | | | 100.00 | Chg#21853 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3040 - CAM & Added Services | | | 26,578.91 | Chg#23499 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3040 - CAM & Added Services | | | -4,485.15 | Chg#24487 | |
| | | 13 - 77th Queens Assoc. {38,196 | 5280 - Penalties & Violations | | | -100.00 | Chg#24488 | |

**1055 X  12/06/07   (Ctrl# 11788)** — **14,995.28**

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20656 | 05 | Apple1 | Apple Bank For Savings | Chk # 400011 | 12/06/07 | Base Rent (12/07) | | 11,995.28 |
| | | 13 - 77th Queens Assoc. {38,196 | 3010 - Base Rents | | | 9,108.75 | Chg#24346 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3040 - CAM & Added Services | | | 2,886.53 | Chg#24347 | |
| 20657 | 06 | KPizza | Shalev ZGS Inc. | Chk # 1176 | 12/06/07 | Base Rent (11/07) | | 3,000.00 |
| | | 13 - 77th Queens Assoc. {38,196 | 3010 - Base Rents | | | 1,675.25 | Chg#23957 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3040 - CAM & Added Services | | | 509.36 | Chg#23958 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3130 - Real Estate Tax Passthru | | | 815.39 | Chg#24173 | |

**1056 X  12/07/07   (Ctrl# 11799)** — **4,791.94**

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20673 | 12 | AShoes | Abraham & Son Shoes, Inc. | Chk # 2033 | 12/07/07 | Base Rent (12/07) | | 4,791.94 |
| | | 13 - 77th Queens Assoc. {38,196 | 3010 - Base Rents | | | 4,750.00 | Chg#24358 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3040 - CAM & Added Services | | | 41.94 | Chg#24359 | |

**1057 X  12/11/07   (Ctrl# 11812)** — **8,324.01**

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20699 | 03 | Zeller | Zeller Tux 17 Inc. | Chk # 28972 | 12/11/07 | Base Rent (10/07) | | 4,613.05 |
| | | 13 - 77th Queens Assoc. {38,196 | 3010 - Base Rents | | | 4,613.05 | Chg#23618 | |
| 20700 | 260 | MC-Co | Menahem Chukroon | Chk # 1064 | 12/11/07 | Base Rent (12/07) | | 1,088.54 |
| | | 13 - 77th Queens Assoc. {38,196 | 3010 - Base Rents | | | 989.58 | Chg#24377 | |
| | | 13 - 77th Queens Assoc. {38,196 | 3014 - Electric Rents Inclusion | | | 98.96 | Chg#24378 | |
| 20701 | 07 | Milan | Milan Unisex Hairstylist Inc. | Chk # 202 | 12/11/07 | R/E Tax Esc 2nd Half 07/08 | | 227.25 |
| | | 13 - 77th Queens Assoc. {38,196 | 3130 - Real Estate Tax Passthru | | | 227.25 | Chg#24174 | |
| 20702 | 07 | Milan | Milan Unisex Hairstylist Inc. | Chk # 203 | 12/11/07 | Base Rent (12/07) | | 2,395.17 |
| | | 13 - 77th Queens Assoc. {38,196 | 3010 - Base Rents | | | 2,395.17 | Chg#24350 | |

**Deposit Register**
**77thSter - Sterling Checking Account**
**77th Queens Assoc. {38,196 SF} - (13)**

Page 2
2003
1/30/2008
12:00 PM

| Number | Date | Memo | Amount |
|---|---|---|---|

### 1058 X  12/12/07    (Ctrl# 11820)                                      3,818.10

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20731 | 14 | AlphaTax | Manjit Singh Alpha Tax Services I | Chk # 1021 | 12/12/07 | Base Rent & CAM 12/07 | | 3,818.10 |
| | | 13 - 77th Queens Assoc. {38,196 | | 3130 - Real Estate Tax Passthru | | 100.00 | Chg#24177 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3010 - Base Rents | | 2,960.53 | Chg#24364 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3040 - CAM & Added Services | | 757.57 | Chg#24365 | |

### 1059 X  12/12/07    (Ctrl# 11822)                                      2,161.25

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20734 | 245 | Kumar | Attn. Sushil Kumar Trinity Tax & F | Chk # 1640 | 12/12/07 | Base Rent & CAM 12/07 | | 2,161.25 |
| | | 13 - 77th Queens Assoc. {38,196 | | 3010 - Base Rents | | 1,971.67 | Chg#24373 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3014 - Electric Rents Inclusion | | 189.58 | Chg#24374 | |

### 1060 X  12/12/07    (Ctrl# 11825)                                      8,947.09

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20737 | 13 | CNW | CNW Associates Inc. | Chk # 1002 | 12/12/07 | | | 2,456.44 |
| | | 13 - 77th Queens Assoc. {38,196 | | 3040 - CAM & Added Services | | 1,479.63 | Chg#24361 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3130 - Real Estate Tax Passthru | | 976.81 | Chg#24363 | |
| 20738 | 230 | Ifraimof | Elliot Ifraimoff and Assoc PC | Chk # 2604 | 12/12/07 | Base Rent & CAM 12/07 | | 6,490.65 |
| | | 13 - 77th Queens Assoc. {38,196 | | 3010 - Base Rents | | 6,437.75 | Chg#24369 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3040 - CAM & Added Services | | 52.90 | Chg#24370 | |

### 1061 X  12/14/07    (Ctrl# 11832)                                      3,000.00

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20748 | 09 | GoldSp | Pawan Enterprises Inc. | Chk # 277 | 12/14/07 | Base Rent & CAM 11/07 & 12/07 | | 3,000.00 |
| | | 13 - 77th Queens Assoc. {38,196 | | 3010 - Base Rents | | 629.60 | Chg#23960 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3040 - CAM & Added Services | | 70.40 | Chg#23961 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3010 - Base Rents | | 2,300.00 | Chg#24351 | |

### 1062 X  12/19/07    (Ctrl# 11851)                                      5,964.50

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20778 | 15 | TacoMex | Lihua Teng | Chk # 1174 | 12/19/07 | Base Rent, CAM & Tax 12/07 12/07 | | 5,964.50 |
| | | 13 - 77th Queens Assoc. {38,196 | | 3010 - Base Rents | | 4,195.86 | Chg#24366 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3040 - CAM & Added Services | | 1,065.33 | Chg#24367 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3130 - Real Estate Tax Passthru | | 703.31 | Chg#24368 | |

### 1063 X  12/27/07    (Ctrl# 11866)                                      13,496.15

| Ctrl# | Unit# | Payer | | Check# | Rcv'd | Notes | | Amount |
|---|---|---|---|---|---|---|---|---|
| 20801 | 10 | Neptune | Neptune Bath & Kitchen Des. Gal | Chk # 2044 | 12/27/07 | Base Rent, CAM & Tax 12/07 | | 11,859.78 |
| | | 13 - 77th Queens Assoc. {38,196 | | 3130 - Real Estate Tax Passthru | | 3,498.68 | Chg#24176 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3010 - Base Rents | | 7,280.21 | Chg#24353 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3040 - CAM & Added Services | | 1,080.89 | Chg#24354 | |
| 20802 | 255 | Smegg | Smegg Consulting, Inc. | Chk # 1205 | 12/27/07 | | | 1,636.37 |
| | | 13 - 77th Queens Assoc. {38,196 | | 3010 - Base Rents | | 1,492.83 | Chg#24375 | |
| | | 13 - 77th Queens Assoc. {38,196 | | 3014 - Electric Rents Inclusion | | 143.54 | Chg#24376 | |

**Deposit Register**
**77thSter - Sterling Checking Account**
**77th Queens Assoc. {38,196 SF} - (13)**

| Number | Date | Memo | Amount |
|---|---|---|---|
| 1064 X  12/28/07  (Ctrl# 11871) | | | 302.19 |

| Ctrl# | Unit# | Payer | Check# | Rcv'd | Notes | Amount |
|---|---|---|---|---|---|---|
| 20810 | ---- | Rego Park 97 LLC<br>13 - 77th Queens Assoc. {38,196 | Chk # 1395<br>4450 - Supplies | 12/28/07 | Reimb: Supplies-4Qt07-Burke<br>100.73          No Chg | 100.73 |
| 20811 | ---- | Union & Utopia HJ LLC<br>13 - 77th Queens Assoc. {38,196 | Chk # 4299<br>4450 - Supplies | 12/28/07 | Reimb: Supplies-4Qt07-Burke<br>100.73          No Chg | 100.73 |
| 20812 | ---- | Quest 95 LLC<br>13 - 77th Queens Assoc. {38,196 | Chk # 2716<br>4450 - Supplies | 12/28/07 | Reimb: Supplies-4Qt07-Burke<br>100.73          No Chg | 100.73 |

| Number | Date | Memo | Amount |
|---|---|---|---|
| 1065 X  12/28/07  (Ctrl# 11875) | | | 87,000.00 |

| Ctrl# | Unit# | Payer | Check# | Rcv'd | Notes | Amount |
|---|---|---|---|---|---|---|
| 20828 | ---- | 77 Queens Assoc<br>13 - 77th Queens Assoc. {38,196 | Chk # Wire122<br>1160 - Loan and Exchange | 12/28/07 | Transfer From MM Acct<br>87,000.00          No Chg | 87,000.00 |

| Number | Date | Memo | Amount |
|---|---|---|---|
| 1066 X  12/28/07  (Ctrl# 11880) | | | 3,000.00 |

| Ctrl# | Unit# | Payer | Check# | Rcv'd | Notes | Amount |
|---|---|---|---|---|---|---|
| 20833 | 06 KPizza | Shalev ZGS Inc.<br>13 - 77th Queens Assoc. {38,196<br>13 - 77th Queens Assoc. {38,196 | Chk # 1182<br>3130 - Real Estate Tax Passthru<br>3010 - Base Rents | 12/28/07 | R/E Tax 2nd Half07/08<br>1,646.18          Chg#24173<br>1,353.82          Chg#24348 | 3,000.00 |

Total Deposits          194,679.47

# Check Register
## 77thSter - Sterling Checking Account
## 77th Queens Assoc. {38,196 SF} - (13)

| Check# | Paid Invoice# | Post | Payee | Name Inv Date/Notes | Amount | Ctrl# | Note |
|--------|------|------|-------|---------------------|--------|-------|------|
| 2068 X | 12/01/07 | 12/07 | 2220EMLP | 2220 Equities Management Limited Partne | 25,000.00 | 28763 | |
| | Inv # Dist-30686 | | | 12/01/07 Partner's Distribution-2007 | 25,000.00 | 30686 | |
| | 13 - 77th Queens Assoc. {38,196 S | | | 2230 - Partners Distributions | 25,000.00 | | |
| 2069 X | 12/01/07 | 12/07 | 55chllc | 55 Church WP LLC | 5,991.00 | 28764 | |
| | Inv # 120107. | | | 12/01/07 Addt'l. P/R Reimb | 2,663.00 | 30646 | |
| | 13 - 77th Queens Assoc. {38,196 S | | | 4610 - Gross Wages | 2,663.00 | | |
| | Inv # Payroll-30716 | | | 12/01/07 2007 Monthly Payroll Reimb. | 3,328.00 | 30716 | |
| | 13 - 77th Queens Assoc. {38,196 S | | | 4610 - Gross Wages | 3,328.00 | | |
| 2070 X | 12/01/07 | 12/07 | Delmar | Delmar Management Company | 5,083.33 | 28765 | |
| | Inv # RENT-30676 | | | 12/01/07 16-02/32 Queens Boulevard | 5,083.33 | 30676 | |
| | 13 - 77th Queens Assoc. {38,196 S | | | 5110 - Ground Rent | 5,083.33 | | |
| 2071 X | 12/01/07 | 12/07 | MLP1 | Minskoff LP I | 8,330.00 | 28766 | |
| | Inv # Dist-30694 | | | 12/01/07 Partner's Distribution | 8,330.00 | 30694 | |
| | 13 - 77th Queens Assoc. {38,196 S | | | 2230 - Partners Distributions | 8,330.00 | | |
| 2072 X | 12/01/07 | 12/07 | MYCALLC | MYCA LLC c/o Sara Minskoff Allan | 33,340.00 | 28767 | |
| | Inv # Dist-30685 | | | 12/01/07 Partner's Distribution-2007 | 33,340.00 | 30685 | |
| | 13 - 77th Queens Assoc. {38,196 S | | | 2230 - Partners Distributions | 33,340.00 | | |
| 2073 X | 12/01/07 | 12/07 | QCR77 | QCR 77 LLC | 33,330.00 | 28768 | |
| | Inv # Dist-30684 | | | 12/01/07 Partner's Distribution-2007 | 33,330.00 | 30684 | |
| | 13 - 77th Queens Assoc. {38,196 S | | | 2230 - Partners Distributions | 33,330.00 | | |
| 2074 X | 12/01/07 | 12/07 | MGRMC | Minskoff Grant Realty & Mgmt. | 835.20 | 28810 | |
| | Inv # Comm-120107 | | | 12/01/07 Comm: J. Luciano-pyt 3 of 3 | 835.20 | 30845 | |
| | 13 - 77th Queens Assoc. {38,196 S | | | 6720 - Leasing Costs & Commissi | 835.20 | | |
| 2084 X | 12/07/07 | 12/07 | amhess | Amerada Hess Corporation | 8,924.05 | 29004 | |
| | Inv # 900426333 | | | 11/28/07 Heat Oil: 2,803gls.@2.9134-11/2 | 8,924.05 | 30937 | |
| | 13 - 77th Queens Assoc. {38,196 S | | | 4880 - Oil | 8,924.05 | | |
| 2085 X | 12/07/07 | 12/07 | atlas | Atlas Welding & Boiler Repair | 903.73 | 29005 | |
| | Inv # 310345 | | | 11/29/07 Non-Contract Service: 11/27/07 | 903.73 | 30934 | |
| | 13 - 77th Queens Assoc. {38,196 S | | | 4520 - HVAC Maint & Repair | 903.73 | | |
| 2086 X | 12/07/07 | 12/07 | coned | Con Edison | 177.34 | 29006 | |

# Check Register
## 77thSter - Sterling Checking Account
## 77th Queens Assoc. {38,196 SF} - (13)

| Check# | Paid Invoice# | Post | Payee | Name Inv Date/Notes | Amount | Ctrl# | Note |
|---|---|---|---|---|---|---|---|
| | | | | Inv # 255968159000058-1  11/27/07  25-5968-1590-0005-8: 11/27/07 | 177.34 | 30994 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 177.34 | | |
| 2087 X | 12/07/07 | 12/07 coned | Con Edison | | 21.94 | 29007 | |
| | | | | Inv # 255968158000026-1  11/27/07  25-5968-1580-0002-6: 11/27/07 | 21.94 | 30997 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 21.94 | | |
| 2088 X | 12/07/07 | 12/07 coned | Con Edison | | 69.07 | 29008 | |
| | | | | Inv # 255968162000020-1  11/27/07  25-5968-1620-0002-0: 11/27/07 | 69.07 | 30998 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 69.07 | | |
| 2089 X | 12/07/07 | 12/07 coned | Con Edison | | 17.73 | 29009 | |
| | | | | Inv # 255968161500012-1  11/27/07  25-5968-1615-0001-2: 11/27/07 | 17.73 | 30999 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 17.73 | | |
| 2090 X | 12/07/07 | 12/07 coned | Con Edison | | 17.73 | 29010 | |
| | | | | Inv # 255968163500010-1  11/27/07  25-5968-1635-0001-0: 11/27/07 | 17.73 | 31000 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 17.73 | | |
| 2091 X | 12/07/07 | 12/07 coned | Con Edison | | 31.72 | 29011 | |
| | | | | Inv # 255968162500011-1  11/27/07  25-5968-1625-0001-1: 11/27/07 | 31.72 | 31002 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 31.72 | | |
| 2092 X | 12/07/07 | 12/07 coned | Con Edison | | 1,239.25 | 29012 | |
| | | | | Inv # 255968153000013-1  11/27/07  25-5968-1530-0001-3: 11/27/07 | 1,239.25 | 31003 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 1,239.25 | | |
| 2093 X | 12/07/07 | 12/07 coned | Con Edison | | 305.66 | 29013 | |
| | | | | Inv # 255968151000023-1  11/27/07  25-5968-1510-0002-3: 11/27/07 | 305.66 | 31004 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 305.66 | | |
| 2094 X | 12/07/07 | 12/07 coned | Con Edison | | 17.73 | 29014 | |
| | | | | Inv # 255968154000012-1  11/27/07  25-5968-1540-0001-2: 11/27/07 | 17.73 | 31005 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 17.73 | | |
| 2095 X | 12/07/07 | 12/07 DeWit | DeWitt Stern Group, Inc. | | 1,587.00 | 29015 | |
| | | | | Inv # 491139I                10/15/07 CommProp: 10/15/07 Addt'l. | 1,587.00 | 30922 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4140 - Insurance | 1,587.00 | | |

# Check Register
## 77thSter - Sterling Checking Account
## 77th Queens Assoc. {38,196 SF} - (13)

| Check# | Paid Invoice# | Post | Payee | Name Inv Date/Notes | Amount | Ctrl# | Note |
|--------|-----------|------|-------|---------------------|--------|-------|------|
| 2096 X | 12/07/07 | 12/07 | Iafe | William G. Iafe, Inc. | 3,901.50 | 29016 | |
| | Inv # 21018 | | | 11/29/07 Replcd. No-Hub Pipe/Waste Con | 3,901.50 | 30940 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4540 - Plumbing- R & M | 3,901.50 | | |
| 2097 X | 12/07/07 | 12/07 | lund | Lund Fire Products Company, Inc. | 80.20 | 29017 | |
| | Inv # S191956 | | | 11/26/07 Sprinkler Inpection: Nov07 | 80.20 | 30952 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4420 - Fire & Security Alarm Servi | 80.20 | | |
| 2098 X | 12/07/07 | 12/07 | Raymond | Raymond S. Dean, Inc. | 747.79 | 29018 | |
| | Inv # 4933 | | | 11/27/07 Fabricate/Install Pitch Pocket HV | 747.79 | 30913 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4550 - Roof Maint & Repair | 747.79 | | |
| 2099 X | 12/07/07 | 12/07 | Rego | Rego Park 97 L.L.C | 312.00 | 29019 | |
| | Inv # 112007-KC-13 | | | 11/20/07 Reimb: Auto/Supp-11/20/07-KC- | 92.54 | 30988 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4896 - Vehicle Expenses | 33.82 | | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4450 - Supplies | 57.34 | | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4898 - Travel Expense | 1.38 | | |
| | Inv # 112007-HG-13 | | | 11/20/07 Reimb: Auto/Supp-11/20/07-HG- | 219.46 | 30992 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4896 - Vehicle Expenses | 78.80 | | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4450 - Supplies | 140.66 | | |
| 2100 X | 12/07/07 | 12/07 | veri | Verizon | 140.84 | 29020 | |
| | Inv # 7185755453-11/22/0 | | | 11/22/07 718-575-5453: 11/22/07 | 140.84 | 30944 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 5895 - Telephone | 140.84 | | |
| 2101 | 12/26/07 | 12/07 | AVA | AVA Design & Construction | 1,600.00 | 29127 | |
| | Inv # 071203 | | | 12/17/07 Misc Removal of Materials | 1,600.00 | 31074 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4510 - Maintenance & Repairs | 1,600.00 | | |
| 2102 | 12/26/07 | 12/07 | coned | Con Edison | 63.93 | 29128 | |
| | Inv # 255968157000043-1 | | | 12/10/07 25-5968-1570-0004-3: 12/10/07 | 63.93 | 31056 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 63.93 | | |
| 2103 | 12/26/07 | 12/07 | coned | Con Edison | 801.49 | 29129 | |
| | Inv # 255968160500013-1 | | | 11/27/07 25-5968-1605-0001-3: 11/27/07 | 801.49 | 31155 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | 801.49 | | |
| 2104 | 12/26/07 | 12/07 | Iafe | William G. Iafe, Inc. | 1,002.47 | 29130 | |
| | Inv # 21057 | | | 12/11/07 Install New Water Meter-Sonoma | 1,002.47 | 31069 | |
| | | | | 13 - 77th Queens Assoc. {38,196 S 4540 - Plumbing- R & M | 1,002.47 | | |

# Check Register
## 77thSter - Sterling Checking Account
## 77th Queens Assoc. {38,196 SF} - (13)

| Check# | Paid Invoice# | Post | Payee | Name Inv Date/Notes | Amount | Ctrl# | Note |
|---|---|---|---|---|---|---|---|
| 2105 X | 12/26/07 | 12/07 | MGRMC | Minskoff Grant Realty & Mgmt. | 3,999.00 | 29131 | |
| | Inv # MGMT-30689 | | | 12/28/07 Monthly Mgmt Fee-2007 | 3,799.00 | 30689 | |
| | 13 - 77th Queens Assoc. {38,196 S 5150 - Management Fees | | | | 3,799.00 | | |
| | Inv # MiscOper-30726 | | | 12/01/07 Misc. Operating Exps. | 200.00 | 30726 | |
| | 13 - 77th Queens Assoc. {38,196 S 4590 - Misc Operating Expenses | | | | 200.00 | | |
| 2106 | 12/26/07 | 12/07 | monte | Monte & Son Exterminators Inc. | 162.57 | 29132 | |
| | Inv # 1972 | | | 12/04/07 Exterminating: 12/3/07 | 162.57 | 31107 | |
| | 13 - 77th Queens Assoc. {38,196 S 4260 - Exterminating | | | | 162.57 | | |
| 2107 | 12/26/07 | 12/07 | nycfinan | NYC Dept of Finance | 117,217.52 | 29133 | |
| | Inv # 13-Prop Tax-010108 | | | 12/31/07 Prop.2nd Half 2007/08-Blk3346/L | 117,217.52 | 31149 | |
| | 13 - 77th Queens Assoc. {38,196 S 4130 - Real Estate Taxes | | | | 117,217.52 | | |
| 2108 X | 12/26/07 | 12/07 | Quest | Quest 95 L.L.C | 550.28 | 29134 | |
| | Inv # 123107-13 | | | 12/31/07 Reimb: Uniforms-4Qt07-Cintas | 208.68 | 31112 | |
| | 13 - 77th Queens Assoc. {38,196 S 4450 - Supplies | | | | 208.68 | | |
| | Inv # 123107-13. | | | 12/31/07 Reimb: Supplies-4Qt07-Burke | 341.60 | 31140 | |
| | 13 - 77th Queens Assoc. {38,196 S 4450 - Supplies | | | | 341.60 | | |
| 2109 | 12/26/07 | 12/07 | Royal | Royal Waste Services, Inc. | 563.55 | 29135 | |
| | Inv # 252831 | | | 12/05/07 1247: Dec07 | 563.55 | 31094 | |
| | 13 - 77th Queens Assoc. {38,196 S 4850 - Garbage Removal | | | | 563.55 | | |
| 2110 | 12/26/07 | 12/07 | coned | Con Edison | 17.73 | 29136 | |
| | Inv # 255968163000011-1 | | | 11/27/07 25-5968-1630-0001-1: 11/27/07 | 17.73 | 31163 | |
| | 13 - 77th Queens Assoc. {38,196 S 4820 - Electric | | | | 17.73 | | |

Total Checks                256,383.35

# Aged Receivables Summary
## 77th Queens Assoc. {38,196 SF} (13)
### As of Date: 12/31/07

| Code | Name | Space | Amount Receivable | Not Yet Du | 0-30 Days | 30-60 Days | 60-90 Days | Over 90 Days | Available Prepay |
|------|------|-------|-------------------|------------|-----------|------------|------------|--------------|------------------|
| Creditor | Richard Creditor, LLC | 01 | 27,830.88 | 0.00 | 14,865.44 | 9,135.38 | 0.00 | 3,830.06 | 0.00 |
| GNC | General Nutrition Corp. | 02 | 1,789.36 | 0.00 | 1,789.36 | 0.00 | 0.00 | 0.00 | 0.00 |
| Zeller | Zeller Tux 17 Inc. | 03 | 10,148.79 | 0.00 | 4,797.58 | 4,982.11 | 0.00 | 369.10 | 0.00 |
| KaneKane | Kane, Kane & Associates, | 04 | 2,898.71 | 0.00 | 890.90 | 0.00 | 0.00 | 2,007.81 | 0.00 |
| Apple1 | Apple Bank For Savings | 05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| KPizza | Shalev ZGS Inc. | 06 | 2,320.05 | 0.00 | 2,320.05 | 0.00 | 0.00 | 0.00 | 0.00 |
| Milan | Milan Unisex Hairstylist Inc. | 07 | 2,000.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| GoldSp | Pawan Enterprises Inc. | 09 | 2,461.53 | 0.00 | 2,377.37 | 84.16 | 0.00 | 0.00 | 0.00 |
| Neptune | Neptune Bath & Kitchen De | 10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TKSInc. | T.K.S., Inc. | 11 | -537.42 | 0.00 | -537.42 | 0.00 | 0.00 | 0.00 | -537.42 |
| AShoes | Abraham & Son Shoes, Inc | 12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CNW | CNW Associates Inc. | 13 | 1,002.47 | 0.00 | 1,002.47 | 0.00 | 0.00 | 0.00 | 0.00 |
| AlphaTax | Alpha Tax Services Inc. | 14 | 2,900.77 | 0.00 | 2,900.77 | 0.00 | 0.00 | 0.00 | 0.00 |
| TacoMex | Lihua Teng | 15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Ifraimof | Elliot Ifraimoff and Assoc P | 230 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| JLuciano | Juan P. Luciano, Esq. | 240 | 1,191.68 | 0.00 | 1,191.68 | 0.00 | 0.00 | 0.00 | 0.00 |
| Kumar | Trinity Tax & Financial Solu | 245 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Smegg | Smegg Consulting, Inc. | 255 | 65.46 | 0.00 | 65.46 | 0.00 | 0.00 | 0.00 | 0.00 |
| MC-Co | Chukroon | 260 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | 54,072.28 | 0.00 | 33,663.66 | 14,201.65 | 0.00 | 6,206.97 | -537.42 |

# Rent Roll

## 77th Queens Assoc. {38,196 SF} (13)
### As of 12/31/07

| Property | Space | Code | Name | Sq.Ft. | Rent Potential | Rent Actual | Rent/sq | Deposit | Lease From | Leased To |
|---|---|---|---|---|---|---|---|---|---|---|
| 13 | 01 | Creditor | Richard Creditor, LLC | 2,606 | 8,549.90 | 8,549.90 | 39.37 | 5,000.00 | 12/23/74 | 12/31/10 |
| 13 | 02 | GNC | General Nutrition Corp. | 1,585 | 5,846.31 | 5,846.31 | 44.26 | 0.00 | 07/29/98 | 12/31/08 |
| 13 | 03 | Zeller | Zeller Tux 17 Inc. | 1,458 | 4,613.05 | 4,613.05 | 37.97 | 9,226.10 | 12/23/98 | 02/28/09 |
| 13 | 04 | KaneKane | Kane, Kane & Associates, | 606 | 1,980.00 | 1,980.00 | 39.21 | 1,736.00 | 12/04/89 | 04/30/07 |
| 13 | 05 | Apple1 | Apple Bank For Savings | 2,284 | 9,108.75 | 9,108.75 | 47.86 | 0.00 | 01/01/07 | 12/30/24 |
| 13 | 06 | KPizza | Shalev ZGS Inc. | 790 | 2,304.17 | 2,396.33 | 36.40 | 10,000.00 | 01/01/06 | 03/31/16 |
| 13 | 07 | Milan | Milan Unisex Hairstylist Inc. | 962 | 2,395.17 | 2,395.17 | 29.88 | 2,600.00 | 06/01/77 | 05/31/10 |
| 13 | 08 | | VACANT | 1,079 | 4,243.60 | | | | | |
| 13 | 09 | GoldSp | Pawan Enterprises Inc. | 523 | 2,250.00 | 2,300.00 | 52.77 | 13,975.00 | 05/01/92 | 09/30/10 |
| 13 | 10 | Neptune | Neptune Bath & Kitchen De | 2,219 | 7,280.21 | 7,280.21 | 39.37 | 15,000.00 | 07/01/01 | 10/31/11 |
| 13 | 11 | TKSInc. | T.K.S, Inc. | 1,600 | 5,627.54 | 5,796.37 | 43.47 | 5,500.00 | 01/19/88 | 01/31/14 |
| 13 | 12 | AShoes | Abraham & Son Shoes, Inc | 1,856 | 4,750.00 | 4,750.00 | 30.71 | 12,500.00 | 12/01/05 | 03/31/16 |
| 13 | 13 | CNW | CNW Associates Inc. | 1,120 | 3,733.33 | 3,733.33 | 40.00 | 12,000.00 | 10/01/07 | 12/30/17 |
| 13 | 14 | AlphaTax | Alpha Tax Services Inc. | 976 | 2,846.67 | 2,960.53 | 36.40 | 6,500.00 | 11/01/05 | 04/30/16 |
| 13 | 15 | TacoMex | Lihua Teng | 1,356 | 4,195.86 | 4,321.74 | 38.25 | 20,000.00 | 01/01/05 | 03/31/15 |
| 13 | 200 | | VACANT | 6,246 | 13,012.50 | | | | | |
| 13 | 210 | | VACANT | 1,013 | 2,110.42 | | | | | |
| 13 | 215 | | VACANT | 450 | 937.50 | | | | | |
| 13 | 220 | | VACANT | 875 | 1,822.92 | | | | | |
| 13 | 225 | | VACANT | 404 | 841.67 | | | | | |
| 13 | 230 | Ifraimof | Elliot Ifraimoff and Assoc P | 3,145 | 6,437.75 | 6,437.75 | 24.56 | 15,000.00 | 05/01/06 | 07/31/11 |
| 13 | 235 | | VACANT | 315 | 656.25 | | | | | |
| 13 | 240 | JLuciano | Juan P. Luciano, Esq. | 500 | 1,041.67 | 1,041.67 | 25.00 | 2,300.00 | 03/01/07 | 04/30/12 |
| 13 | 243 | | VACANT | 380 | 791.67 | | | | | |
| 13 | 245 | Kumar | Trinity Tax & Financial Solu | 910 | 1,971.67 | 1,971.67 | 26.00 | 4,400.00 | 08/01/05 | 09/30/10 |
| 13 | 250 | | VACANT | 1,085 | 2,260.42 | | | | | |
| 13 | 255 | Smegg | Smegg Consulting, Inc. | 689 | 1,435.42 | 1,492.83 | 26.00 | 3,350.00 | 09/01/05 | 11/30/15 |
| 13 | 260 | MC-Co | Chukroon | 475 | 989.58 | 989.58 | 25.00 | 2,140.00 | 10/01/06 | 11/30/11 |
| 13 | 265 | | VACANT | 689 | 1,492.83 | | | | | |
| | 29 | | Total - Less Excluded Units | 38,196 | 105,526.83 | 77,965.19 | 24.49 | 141,227.10 | | |
| | 19 | | Total Occupied | 25,660 | 77,357.05 | 77,965.19 | 36.46 | | | |
| | 65.52 | | % Occupied | | 67.18 | 73.31 | 73.88 | | | |
| | 10 | | Total Vacant | 12,536 | 28,169.78 | | 26.97 | | | |
| | 34.48 | | % Vacant | | 32.82 | 26.69 | | | | |

**Balance Sheet (Accrual)**
**77th Queens Assoc. {38,196 SF} - (13)**
**Dec 07**

Prepared For:
All Owners

Prepared By:
Minskoff Grant Realty & Mgmt.
1350 Avenue of the Americas
32nd Floor
New York, NY 10019-4702

**ASSETS**

CASH

| | |
|---|---|
| Secondary Cash -Operating Cash | 79,790.64 |
| Money Market- Capital Reserve | 56,700.00 |
| Money Market Funds | 218,243.29 |
| TOTAL CASH | 354,733.93 |

CURRENT ASSETS

| | |
|---|---|
| Accounts Receivable | 54,609.70 |
| Accrued Interest Receivable | 337.37 |

PREPAID EXPENSES

| | |
|---|---|
| Prepaid Insurance | 20,208.37 |
| Prepaid Real Estate Taxes | 117,217.52 |
| TOTAL CURRENT ASSETS | 192,372.96 |

FIXED ASSETS

| | |
|---|---|
| Tenant Improvements | 238,347.85 |
| Accum Amort Tenant Improvement | -73,421.00 |
| Leasehold Improvements | 732,012.50 |
| Accum. Deprec. LImprovements | -344,287.80 |
| TOTAL FIXED ASSETS | 552,651.55 |

OTHER ASSETS

| | |
|---|---|
| Unamoritized Leasing Costs | 187,968.44 |
| Tenant Security Deposits | 141,227.10 |
| TOTAL OTHER ASSETS | 329,195.54 |

| | |
|---|---|
| **TOTAL ASSETS** | 1,428,953.98 |

**LIABILITY & OWNERS EQUITY**

LIABILITIES

| | |
|---|---|
| Accrued Expenses Payable | 17,674.77 |
| Accounts Payable | 13,717.54 |
| Tenant Security Payable | 141,227.10 |
| TOTAL LIABILITY | 172,619.41 |

EQUITY

| | |
|---|---|
| Partners Equity | 1,159,362.94 |
| Partners Distributions | -400,000.00 |
| Retained Earnings | 496,971.63 |
| TOTAL EQUITY | 1,256,334.57 |

| | |
|---|---|
| **TOTAL LIABILITY & EQUITY** | 1,428,953.98 |

**Budget Comparison (Accrual)**
**77th Queens Assoc. {38,196 SF} - (13)**
**Oct 07 - Dec 07**

Page 1
2003
2/4/2008
02:56 PM

| Prepared For: | Prepared By: |
|---|---|
| All Owners | Minskoff Grant Realty & Mgmt. |
| | 1350 Avenue of the Americas |
| | 32nd Floor |
| | New York, NY 10019-4702 |

| | MTD Actual | MTD Budget | $ Var. | % Var. | YTD Actual | YTD Budget | $ Var. | % Var. | Annual |
|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | |
| **OPERATING INCOME** | | | | | | | | | |
| Base Rents | 227,218.52 | 245,541.00 | -18,322.48 | -7.46 | 963,127.04 | 983,077.00 | -19,949.96 | -2.03 | 983,077.00 |
| Electric Rents Inclusion | 1,608.75 | 1,980.00 | -371.25 | -18.75 | 7,771.03 | 7,920.00 | -148.97 | -1.88 | 7,920.00 |
| Concession-Free Rent | -7,466.66 | 0.00 | -7,466.66 | 0 | -43,314.00 | -27,327.00 | -15,987.00 | 58.50 | -27,327.00 |
| CAM & Added Services | 49,525.52 | 14,625.00 | 34,900.52 | 238.64 | 125,894.60 | 58,500.00 | 67,394.60 | 115.20 | 58,500.00 |
| Water & Sewer Rents | 0.00 | 200.00 | -200.00 | -100.0 | 0.00 | 800.00 | -800.00 | -100.0 | 800.00 |
| Income-Security acct interest | 317.25 | 250.00 | 67.25 | 26.90 | 1,332.75 | 1,000.00 | 332.75 | 33.28 | 1,000.00 |
| Income-Money Market Interest | 1,157.62 | 900.00 | 257.62 | 28.62 | 6,296.78 | 3,600.00 | 2,696.78 | 74.91 | 3,600.00 |
| Income Other | 1,130.21 | 0.00 | 1,130.21 | 0 | 1,458.34 | 0.00 | 1,458.34 | 0 | 0.00 |
| Late Charges | 868.88 | 225.00 | 643.88 | 286.17 | 3,002.45 | 900.00 | 2,102.45 | 233.61 | 900.00 |
| TOTAL OPERATING INCOME | 274,360.09 | 263,721.00 | 10,639.09 | 4.03 | 1,065,568.99 | 1,028,470.00 | 37,098.99 | 3.61 | 1,028,470.00 |
| **REIMBURSEMENT INCOME** | | | | | | | | | |
| Real Estate Tax Passthru | 45,957.43 | 45,118.00 | 839.43 | 1.86 | 113,621.36 | 112,387.00 | 1,234.36 | 1.10 | 112,387.00 |
| TOTAL REIMBURSEMENT INC | 45,957.43 | 45,118.00 | 839.43 | 1.86 | 113,621.36 | 112,387.00 | 1,234.36 | 1.10 | 112,387.00 |
| **NON-OPERATING INCOME** | | | | | | | | | |
| Tenant Sec Dep Forfeit | 0.00 | 0.00 | 0.00 | 0 | 10,458.88 | 0.00 | 10,458.88 | 0 | 0.00 |
| TOTAL NON-OPERATING INC | 45,957.43 | 45,118.00 | 839.43 | 1.86 | 124,080.24 | 112,387.00 | 11,693.24 | 10.40 | 112,387.00 |
| **TOTAL INCOME** | 320,317.52 | 308,839.00 | 11,478.52 | 3.72 | 1,189,649.23 | 1,140,857.00 | 48,792.23 | 4.28 | 1,140,857.00 |
| **EXPENSES** | | | | | | | | | |
| **OPERATING EXPENSES** | | | | | | | | | |
| Real Estate Taxes | 0.00 | 0.00 | 0.00 | 0 | 237,425.46 | 253,929.60 | 16,504.14 | 6.50 | 253,929.60 |
| Insurance | 24,544.36 | 26,749.00 | 2,204.64 | 8.24 | 43,985.36 | 44,930.00 | 944.64 | 2.10 | 44,930.00 |
| Cleaning | 0.00 | 150.00 | 150.00 | 100.0 | 0.00 | 600.00 | 600.00 | 100.0 | 600.00 |
| Snow Removal & Addt'l Services | 0.00 | 0.00 | 0.00 | 0 | 96.39 | 0.00 | -96.39 | 0 | 0.00 |
| Gardening & Grounds Maint | 0.00 | 0.00 | 0.00 | 0 | 1,955.70 | 1,000.00 | -955.70 | -95.57 | 1,000.00 |
| Exterminating | 487.71 | 489.00 | 1.29 | 0.26 | 1,951.95 | 1,956.00 | 4.05 | 0.21 | 1,956.00 |
| Fire & Security Alarm Service | 460.55 | 228.00 | -232.55 | -102.0 | 1,362.57 | 1,016.00 | -346.57 | -34.11 | 1,016.00 |
| Supplies | 3,013.86 | 1,500.00 | -1,513.86 | -100.9 | 6,310.63 | 6,000.00 | -310.63 | -5.18 | 6,000.00 |
| Maintenance & Repairs | 3,079.32 | 1,490.00 | -1,589.32 | -106.6 | 9,029.10 | 7,357.00 | -1,672.10 | -22.73 | 7,357.00 |
| Asbestos Testing | 0.00 | 0.00 | 0.00 | 0 | 1,180.00 | 0.00 | -1,180.00 | 0 | 0.00 |
| HVAC Maint & Repair | 1,944.13 | 981.00 | -963.13 | -98.18 | 12,321.04 | 4,981.00 | -7,340.04 | -147.3 | 4,981.00 |
| Plumbing- R & M | 4,853.00 | 600.00 | -4,253.03 | -708.8 | 9,831.78 | 5,900.00 | -3,931.78 | -66.64 | 5,900.00 |
| Roof Maint & Repair | 379.32 | 0.00 | -379.32 | 0 | 5,521.71 | 3,895.00 | -1,626.71 | -41.76 | 3,895.00 |
| Misc Operating Expenses | 627.16 | 600.00 | -27.16 | -4.53 | 3,577.24 | 2,400.00 | -1,177.24 | -49.05 | 2,400.00 |
| Gross Wages | 17,457.65 | 9,984.00 | -7,473.65 | -74.86 | 47,409.65 | 39,936.00 | -7,473.65 | -18.71 | 39,936.00 |
| Electric | 9,070.85 | 1,800.00 | -7,270.85 | -403.9 | 30,997.69 | 25,700.00 | -5,297.69 | -20.61 | 25,700.00 |
| Water & Treatment Supplies | 749.96 | 0.00 | -749.96 | 0 | 749.96 | 0.00 | -749.96 | 0 | 0.00 |
| Water & Sewer | 0.00 | 10,000.00 | 10,000.00 | 100.0 | 0.00 | 26,000.00 | 26,000.00 | 100.0 | 26,000.00 |
| Garbage Removal | 1,690.65 | 1,695.00 | 4.35 | 0.26 | 6,762.60 | 6,780.00 | 17.40 | 0.26 | 6,780.00 |
| Oil | 21,219.12 | 17,700.00 | -3,519.12 | -19.88 | 53,379.34 | 45,700.00 | -7,679.34 | -16.80 | 45,700.00 |
| Vehicle Expenses | 462.25 | 600.00 | 137.75 | 22.96 | 1,316.57 | 2,400.00 | 1,083.43 | 45.14 | 2,400.00 |
| Ground Rent | 15,249.99 | 15,249.00 | -0.99 | -0.01 | 60,999.96 | 60,996.00 | -3.96 | -0.01 | 60,996.00 |
| Management Fees | 11,397.00 | 11,397.00 | 0.00 | 0.00 | 45,588.00 | 45,588.00 | 0.00 | 0.00 | 45,588.00 |
| Accounting | 0.00 | 0.00 | 0.00 | 0 | 8,650.00 | 8,650.00 | 0.00 | 0.00 | 8,650.00 |
| Legal | 11,039.30 | 4,770.00 | -6,269.30 | -131.4 | 43,555.18 | 19,080.00 | -24,475.18 | -128.2 | 19,080.00 |
| Fees & Permits | 180.00 | 0.00 | -180.00 | 0 | 720.00 | 1,520.00 | 800.00 | 52.63 | 1,520.00 |
| Penalties & Violations | 100.00 | 0.00 | -100.00 | 0 | 100.00 | 0.00 | -100.00 | 0 | 0.00 |
| Postage | 0.00 | 0.00 | 0.00 | 0 | 21.26 | 0.00 | -21.26 | 0 | 0.00 |
| Telephone | 585.95 | 705.00 | 119.05 | 16.89 | 1,626.03 | 2,820.00 | 1,193.97 | 42.34 | 2,820.00 |
| TOTAL OPERATING EXPENSE | 128,592.16 | 106,687.00 | -21,905.16 | -20.53 | 636,425.17 | 619,134.60 | -17,290.57 | -2.79 | 619,134.60 |
| **NON-OPERATING EXPENSES** | | | | | | | | | |
| Advertising | 0.00 | 900.00 | 900.00 | 100.0 | 284.20 | 3,600.00 | 3,315.80 | 92.11 | 3,600.00 |
| Leasing Costs & Commissions | 25,609.34 | 26,945.00 | 1,335.66 | 4.96 | 55,968.23 | 101,491.00 | 45,522.77 | 44.85 | 101,491.00 |
| TOTAL NON-OPERATING EXPE | 25,609.34 | 27,845.00 | 2,235.66 | 8.03 | 56,252.43 | 105,091.00 | 48,838.57 | 46.47 | 105,091.00 |

# Budget Comparison (Accrual)
## 77th Queens Assoc. {38,196 SF} - (13)
### Oct 07 - Dec 07

| | PTD Actual | PTD Budget | $ Var. | % Var. | YTD Actual | YTD Budget | $ Var. | % Var. | Annual |
|---|---|---|---|---|---|---|---|---|---|
| **DEPRECIATION & AMORTIZATION** | | | | | | | | | |
| **TOTAL EXPENSES** | 154,201.50 | 134,532.00 | -19,669.50 | -14.62 | 692,677.60 | 724,225.60 | 31,548.00 | 4.36 | 724,225.60 |
| **NET INCOME** | 166,116.02 | 174,307.00 | -8,190.98 | -4.70 | 496,971.63 | 416,631.40 | 80,340.23 | 19.28 | 416,631.40 |

# Income Statement and Cash Flow
## 77th Queens Assoc. {38,196 SF} - (13)
### Oct 07 - Dec 07

Page 1
2003
2/4/2008
03:05 PM

Prepared For:
All Owners

Prepared By:
Minskoff Grant Realty & Mgmt.
1350 Avenue of the Americas
32nd Floor
New York, NY 10019-4702

| | Quarter to Date | % | Year to Date | % |
|---|---|---|---|---|
| **INCOME** | | | | |
| **OPERATING INCOME** | | | | |
| Base Rents | 227,218.52 | 70.94 | 963,127.04 | 80.96 |
| Electric Rents Inclusion | 1,608.75 | 0.50 | 7,771.03 | 0.65 |
| Concession-Free Rent | -7,466.66 | -2.33 | -43,314.00 | -3.64 |
| CAM & Added Services | 49,525.52 | 15.46 | 125,894.60 | 10.58 |
| Income-Security acct interest | 317.25 | 0.10 | 1,332.75 | 0.11 |
| Income-Money Market Interest | 1,157.62 | 0.36 | 6,296.78 | 0.53 |
| Income Other | 1,130.21 | 0.35 | 1,458.34 | 0.12 |
| Late Charges | 868.88 | 0.27 | 3,002.45 | 0.25 |
| TOTAL OPERATING INCOME | 274,360.09 | 85.65 | 1,065,568.99 | 89.57 |
| **REIMBURSEMENT INCOME** | | | | |
| Real Estate Tax Passthru | 45,957.43 | 14.35 | 113,621.36 | 9.55 |
| TOTAL REIMBURSEMENT INC | 45,957.43 | 14.35 | 113,621.36 | 9.55 |
| **NON-OPERATING INCOME** | | | | |
| Tenant Sec Dep Forfeit | 0.00 | 0.00 | 10,458.88 | 0.88 |
| TOTAL NON-OPERATING INC | 45,957.43 | 14.35 | 124,080.24 | 10.43 |
| **TOTAL INCOME** | 320,317.52 | 100.00 | 1,189,649.23 | 100.00 |
| **EXPENSES** | | | | |
| **OPERATING EXPENSES** | | | | |
| Real Estate Taxes | 0.00 | 0.00 | 237,425.46 | 19.96 |
| Insurance | 24,544.36 | 7.66 | 43,985.36 | 3.70 |
| Snow Removal & Addt'l Services | 0.00 | 0.00 | 96.39 | 0.01 |
| Gardening & Grounds Maint | 0.00 | 0.00 | 1,955.70 | 0.16 |
| Exterminating | 487.71 | 0.15 | 1,951.95 | 0.16 |
| Fire & Security Alarm Service | 460.55 | 0.14 | 1,362.57 | 0.11 |
| Supplies | 3,013.86 | 0.94 | 6,310.63 | 0.53 |
| Maintenance & Repairs | 3,079.32 | 0.96 | 9,029.10 | 0.76 |
| Asbestos Testing | 0.00 | 0.00 | 1,180.00 | 0.10 |
| HVAC Maint & Repair | 1,944.13 | 0.61 | 12,321.04 | 1.04 |
| Plumbing- R & M | 4,853.03 | 1.52 | 9,831.78 | 0.83 |
| Roof Maint & Repair | 379.32 | 0.12 | 5,521.71 | 0.46 |
| Misc Operating Expenses | 627.16 | 0.20 | 3,577.24 | 0.30 |
| Gross Wages | 17,457.65 | 5.45 | 47,409.65 | 3.99 |
| Electric | 9,070.85 | 2.83 | 30,997.69 | 2.61 |
| Water & Treatment Supplies | 749.96 | 0.23 | 749.96 | 0.06 |
| Garbage Removal | 1,690.65 | 0.53 | 6,762.60 | 0.57 |
| Oil | 21,219.12 | 6.62 | 53,379.34 | 4.49 |
| Vehicle Expenses | 462.25 | 0.14 | 1,316.57 | 0.11 |
| Ground Rent | 15,249.99 | 4.76 | 60,999.96 | 5.13 |
| Management Fees | 11,397.00 | 3.56 | 45,588.00 | 3.83 |
| Accounting | 0.00 | 0.00 | 8,650.00 | 0.73 |
| Legal | 11,039.30 | 3.45 | 43,555.18 | 3.66 |

# Income Statement and Cash Flow
## 77th Queens Assoc. {38,196 SF} - (13)
### Oct 07 - Dec 07

| | Quarter to Date | % | Year to Date | % |
|---|---|---|---|---|
| Fees & Permits | 180.00 | 0.06 | 720.00 | 0.06 |
| Penalties & Violations | 100.00 | 0.03 | 100.00 | 0.01 |
| Postage | 0.00 | 0.00 | 21.26 | 0.00 |
| Telephone | 585.95 | 0.18 | 1,626.03 | 0.14 |
| **TOTAL OPERATING EXPENSES** | 128,592.16 | 40.15 | 636,425.17 | 53.50 |
| | | | | |
| **NON-OPERATING EXPENSES** | | | | |
| Advertising | 0.00 | 0.00 | 284.20 | 0.02 |
| Leasing Costs & Commissions | 25,609.34 | 7.99 | 55,968.23 | 4.70 |
| TOTAL NON-OPERATING EXPENSE | 25,609.34 | 7.99 | 56,252.43 | 4.73 |
| | | | | |
| **DEPRECIATION & AMORTIZATION** | | | | |
| | | | | |
| **TOTAL EXPENSES** | 154,201.50 | 48.14 | 692,677.60 | 58.23 |
| | | | | |
| **NET INCOME** | 166,116.02 | 51.86 | 496,971.63 | 41.77 |
| ADJUSTMENTS | | | | |
| **ASSETS** | | | | |
| Accounts Receivable | -23,632.05 | | -25,059.69 | |
| Accrued Interest Receivable | 7.29 | | 7.29 | |
| Prepaid Insurance | 6,528.36 | | 6,528.36 | |
| Prepaid Real Estate Taxes | -117,217.52 | | 2,990.42 | |
| Tenant Security Deposits | -12,000.00 | | -486.03 | |
| Accrued Expenses Payable | 0.00 | | -20,197.96 | |
| Accounts Payable | 13,717.54 | | 13,717.54 | |
| Tenant Security Payable | 12,000.00 | | 486.03 | |
| Prepaid Rent | -1,130.21 | | 0.00 | |
| Partners Distributions | -100,000.00 | | -400,000.00 | |
| TOTAL ADJUSTMENTS | -221,726.59 | | -422,014.04 | |
| | | | | |
| **CASH FLOW** | -55,610.57 | | 74,957.59 | |
| | | | | |
| Beginning Cash | 0.00 | | | |
| Ending Balance | 0.00 | | | |

```
                                        Date 12/31/07              Page    1
                                        Account Number  @XXXXXXXXXXXXXX@
                                        Enclosures                      28
```

```
77TH QUEENS ASSOCIATES                  Your Relationship Manager is:
C/O MINSKOFF GRANT RLTY & MGMT CORP          Anthony M. Grosso
1350 AVENUE OF THE AMERICAS FL 32       (212)935-4166; Cell (516)316-3862
NEW YORK NY 10019-4801                       anthony.grosso@
                                             sterlingbancorp.com
```

```
*********************************************************************
                  S U M M A R Y   O F   A C C O U N T S
Account Number      Type of Account             Current Balance
@XXXXXXXXXXXXXX@    CHECKING                         201,219.90        28
@XXXXXXXXXXXXXX@    Sterling Silver MM Business      274,943.29
```

```
                          CHECKING ACCOUNT

      Account Title: 77TH QUEENS ASSOCIATES
                     C/O MINSKOFF GRANT RLTY & MGMT CORP

CHECKING                                Number of Enclosures          28
Account Number      @XXXXXXXXXXXXXX@    Statement Dates  12/03/07 thru 12/31/07
Previous Balance            153,657.09  Days in the statement period     29
   14 Deposits/Credits      194,679.47  Average Ledger           165,545.10
   28 Checks/Debits         147,116.66  Average Collected        160,929.25

New Balance                 201,219.90
```

```
*********************************************************************
Activity in Date Order                  Checks/      Deposits/
Date        Description                  Debits       Credits      Daily Balance
12/04 EDI MISC  US TREASURY 310 CTX                   22,093.76      175,750.85
      70060000          /
      ST*820*008000250
      BPR*C*22093.76*C*ACH*CTX*01*10
      1036151*Z*70060000*70060000  *
      *01*026007773*DA*3802546501*07
      1204*VEN
      REF*72*VC7337A
```

```
                                        Date 12/31/07            Page    2
                                        Account Number  @XXXXXXXXXXXXXX@
                                        Enclosures                      28



        77TH QUEENS ASSOCIATES
        C/O MINSKOFF GRANT RLTY & MGMT CORP
        1350 AVENUE OF THE AMERICAS FL 32
        NEW YORK NY 10019-4801


CHECKING                        @XXXXXXXXXXXXXX@   (Continued)

Activity in Date Order                 Checks/      Deposits/
Date   Description                      Debits      Credits     Daily Balance
       N1*PE*77TH QUEENS ASSOCIATES*F
       I*136337259
       N1*PR*UNITED STATES COAST
       ENT*120
       RMR*IV*11618QUEENSBLVD*AI*2209
       3.76*22093.76*0
       SE*8*008000250
12/04 DEPOSIT                                        16,785.20    192,536.05
12/04 CHECK               2071         8,330.00                   184,206.05
12/04 CHECK               2069         5,991.00                   178,215.05
12/04 CHECK               2074           835.20                   177,379.85
12/06 DEPOSIT                                        14,995.28    192,375.13
12/07 DEPOSIT                                         4,791.94    197,167.07
12/10 CHECK               2070         5,083.33                   192,083.74
12/11 DEPOSIT                                         8,324.01    200,407.75
12/11 CHECK               2099           312.00                   200,095.75
12/12 DEPOSIT                                         8,947.09    209,042.84
12/12 DEPOSIT                                         3,818.10    212,860.94
12/12 DEPOSIT                                         2,161.25    215,022.19
12/12 CHECK               2072        33,340.00                   181,682.19
12/12 CHECK               2096         3,901.50                   177,780.69
12/12 CHECK               2085           903.73                   176,876.96
12/12 CHECK               2081           162.57                   176,714.39
12/13 CHECK               2095         1,587.00                   175,127.39
12/13 CHECK               2092         1,239.25                   173,888.14
12/13 CHECK               2093           305.66                   173,582.48
12/13 CHECK               2086           177.34                   173,405.14
12/13 CHECK               2088            69.07                   173,336.07
12/13 CHECK               2091            31.72                   173,304.35
12/13 CHECK               2087            21.94                   173,282.41
12/13 CHECK               2089            17.73                   173,264.68
12/13 CHECK               2090            17.73                   173,246.95
12/13 CHECK               2094            17.73                   173,229.22
12/14 DEPOSIT                                         3,000.00    176,229.22
12/14 CHECK               2098           747.79                   175,481.43
12/14 CHECK               2100           140.84                   175,340.59
12/17 CHECK               2084         8,924.05                   166,416.54
12/18 CHECK               2097            80.20                   166,336.34
12/19 DEPOSIT                                         5,964.50    172,300.84
```

```
                                           Date 12/31/07              Page    3
                                           Account Number    @XXXXXXXXXXXXXX@
                                           Enclosures                       28


          77TH QUEENS ASSOCIATES
          C/O MINSKOFF GRANT RLTY & MGMT CORP
          1350 AVENUE OF THE AMERICAS FL 32
          NEW YORK NY 10019-4801


CHECKING                          @XXXXXXXXXXXXXX@   (Continued)

Activity in Date Order                      Checks/      Deposits/
Date      Description                       Debits       Credits      Daily Balance
12/19 CHECK               2073           33,330.00                       138,970.84
12/24 CHECK               2068           25,000.00                       113,970.84
12/24 CHECK               2023           12,000.00                       101,970.84
12/28 Trsf from 77STERMM                             87,000.00           188,970.84
      to Op Acct
      Confirmation number 1228070128
12/28 DEPOSIT                                        13,496.15           202,466.99
12/28 DEPOSIT                                         3,000.00           205,466.99
12/28 DEPOSIT                                           302.19           205,769.18
12/28 CHECK               2105            3,999.00                       201,770.18
12/28 CHECK               2108              550.28                       201,219.90

*****************************************************************************
                     --- CHECKS IN NUMBER ORDER ---
Date    Check No              Amount    Date   Check No                 Amount
12/24     2023            12,000.00    12/13     2089                    17.73
12/24     2068*           25,000.00    12/13     2090                    17.73
12/04     2069             5,991.00    12/13     2091                    31.72
12/10     2070             5,083.33    12/13     2092                 1,239.25
12/04     2071             8,330.00    12/13     2093                   305.66
12/12     2072            33,340.00    12/13     2094                    17.73
12/19     2073            33,330.00    12/13     2095                 1,587.00
12/04     2074               835.20    12/12     2096                 3,901.50
12/12     2081*              162.57    12/18     2097                    80.20
12/17     2084*            8,924.05    12/14     2098                   747.79
12/12     2085               903.73    12/11     2099                   312.00
12/13     2086               177.34    12/14     2100                   140.84
12/13     2087                21.94    12/28     2105*                3,999.00
12/13     2088                69.07    12/28     2108*                  550.28
* Denotes missing check numbers

---------------------------------------------------------------------------
          Account Title: 77TH QUEENS ASSOCIATES
                         C/O MINSKOFF GRANT RLTY & MGMT CORP
```

```
                                              Date 12/31/07              Page    4
                                              Account Number    @XXXXXXXXXXXXXX@
                                              Enclosures                       28


        77TH QUEENS ASSOCIATES
        C/O MINSKOFF GRANT RLTY & MGMT CORP
        1350 AVENUE OF THE AMERICAS FL 32
        NEW YORK NY 10019-4801


Sterling Silver MM Business              Number of Enclosures             0
Account Number        @XXXXXXXXXXXXXX@   Statement Dates  12/03/07 thru 12/31/07
Previous Balance            361,715.01   Days in the statement period           29
     Deposits/Credits              .00   Average Ledger                 349,715.01
  1 Checks/Debits            87,000.00   Average Collected              349,715.01

Interest Paid                  228.28
New Balance                 274,943.29   2007 Interest Paid               6,296.78

*****************************************************************************

Activity in Date Order                   Checks/     Deposits/
Date    Description                       Debits      Credits      Daily Balance
12/28 Transf to 77TH STER               87,000.00                    274,715.01
      to Op Acct
      Confirmation number 1228070128
12/31 Interest Credit                                   228.28       274,943.29

          * * *   E N D   O F   S T A T E M E N T   * * *
```

# MGRMC
# Executive Summaries
# Halstead &  Harrison
# 82nd & 83rd
# 77th Queens

# MINSKOFF GRANT

## REALTY & MANAGEMENT CORP.

Dear Owners,

At the suggestion of an owner of many of the properties, we have prepared for you what we are calling "Executive Summary", a general one which covers the Portfolio and a specific one for each property.

This gives us the opportunity to capture a moment in time, a snapshot if you will of where we are now, where we have come from and where we would like to go.

The specific reports describe the successes and present the most immediate challenges as they relate to the properties.

We hope that these are helpful in your thinking about your property and the future planning for its success.

We do not now plan to prepare these every year but will do them periodically.

We extend to you our many thanks for your continued confidence in everyone here at Minskoff Grant Realty and Management Corp.

Jeannie Minskoff Grant

## Executive Summary
## MGMRC
## January 1, 2006 – December 31, 2006

## Development:

**Reports:** At the end of 2005 we moved from Print to Email for our distribution of reports, budgets, photos etc. We have now completed a successful calendar year of emailed Monthly and Quarterly reports for all of the properties

**Website:** was designed and launched in 2006. The website is another tool that management uses to market each property. It also offers a great place to welcome new tenants and showcase our tenants through posting articles, websites and other write-ups.

Now when you enter MGRMC in search engines, www.minskoffgrant.com pops up as number one (1), two (2) or three (3) on the list.

**Property Summary Binders:** Binders were created for each property. Listing Vendors, their Certificates of Insurance, All work contracts as well as important Building Information, and Contact Information. These are distributed to each Superintendent and updated as needed to ease operations, track vendor's responsibilities, maintain historical records for the buildings and keep track of communications between the main office and the site.

**Tenant Policy Books:** Tenant books were made for all properties with office tenants. The books will be used and updated periodically with a detailed summary of the rules and regulations of their building, important contacts, fire safety and other helpful information.

**Staff:** We have a dedicated Property Manager and dedicated Leasing Specialist on the team.

## Property Management:

**Supervision:** In 2006 the Property Manager, Virginia Manning, has been a great asset, she is dedicated to the properties and visits every property once or twice per week. Superintendent and staff were on location at least one (1) time per day.

Our Property Manager has put an emphasis on construction management, assuring that Ownership would get the best job possible for the most reasonable price. We had success in each of our projects through bidding out work and bringing on new vendors from the Queens, and Westchester Communities. A great deal of attention is made to correcting violations, attending legal action/depositions for and liability cases. We also help the tenants cure their violation and navigating the renovation process to ensure their longevity.

## Leasing:

Thank you to the creative and successful leasing and financing team of T Grant & Morgen Larsen.

- 10 of 17 Properties Managed are Fully Leased
- Portfolio did 13 new leases in 2006
- Leased 73, 836sf in 2006
- Completed 8 renewals in 2006

## Fiscal:

Thank you to Bob Tilton and Kendall Bridgwater for their very hard work of collections and billing calculations.

- Portfolio Collected $8,120,000 in 2006 up from $6,106,000 in 2005.
- Portfolio Collected $974,000 in 2006 in CAM charges.
- Portfolio Collected $1,413,000 in 2006 in Real Estate Tax Escalations.

**82nd-83rd Street Venture (11)**
**Property Summary**
**January – December 31, 2006**

## Successes:

**Leasing:** Shopping center is now fully leased.  Almost all tenants in the center are triple net tenants.

**Renewal:** MGRMC renewed Fashion Town (08) for ten (10) years at $30 Triple Net.  This was a $5.93/sf increase in rent, increased security deposit, as well as added holdover rent clause.  Tenant now pays straight pass thru for both taxes and CAM.

**Sidewalk Project:**  All sidewalks at this center were replaced in 2006.  They look great!

**Arborvitae Installation and Maintenance:**  New trees and greenery were added around center.  They have brought added aesthetical value to the center, and superintendent and staff are working hard with vendors to maintain.

## Challenges:

**179 Martine Avenue:**  It was a challenge renting this space.  Most tenants were looking for less than 1,000sf or closer to 2,500 sf.  MGRMC finally rented the space to a credit tenant in the end of December 2006 after receiving approval from Ownership.

**Assignment and Assumption of Lease:**  The assignment and assumption of the Jenkris Hardware lease was a challenge for MGRMC.  After a few weeks of negotiations we were finally able to move forward with the deal.  Jenkris Hardware is now owned and operated by Martinez Hardware, Inc.

**Halstead – Harrison Associates (12)**
**Property Summary**
**January – December 31, 2006**


## Successes:

**Leasing:** Awaiting occupancy when CVS will occupy Spaces 01, 02. Their lease starts January 1, 2007. We worked with CVS to expedite occupancy in 2007. CVS will be paying $ 23,833.33/month plus Real Estate Taxes and CAM.

## Challenges:

**Basement:** Property Manager, Superintendent and Staff have watched basement very closely during the storms of 2006 to ensure that basement flooding was not an issue. They were on call on weekends, and throughout year routinely sumped –out basement and sewer drains to prevent flooding.

**Trees on Site:** Removed problem trees from property. Part of the removal was performed by staff and the larger trees were removed by our Landscaping contractor. Property Manager also finally got in contact with MTA Metro North to fix the fencing in the parking lot that was damaged from a tree that fell into our lot from their property.

**Cashflow:** Managing until CVS occupies the space.

**77th Queens Associates (13)**
**Property Summary**
**January – December 31, 2006**

## Successes:

**Leasing:**  Retail Spaces on first floor are fully leased, property is 72% occupied.

**Apple Bank for Savings:** We negotiated an eighteen (18) year lease with Apple Bank for Savings at $45 Triple Net.   This tenant will be a great addition to the building.

**Boiler:**  Property Manager repaired all outstanding boiler violations and completed work to prevent future violations.  The boiler room ceiling section and door were repaired, as well as the backflow preventor, condensate pan, and steam-pipe.  This is an ongoing project.

**Tenant Directory Installed:**  A new Tenant Directory was installed at this building.  It looks great!

## Challenges:

**Project Bids:**  It has been a challenge collecting bids for some of the smaller sized projects we have at this building.  Property Management has been looking for lower cost vendors to complete work that has been very pricey in the past.  With time and effort she has been able to find good vendors who will do the work for less which has greatly benefited the building.

**Leasing:**  It has been a challenge to rent the Office Spaces on the second (2nd) floor. Most of our prospective tenants either want an elevator in the building or parking on site. Other interested tenants are able to find vacant space across, and down the street at a lesser rent.  In 2006 we leased two (2) spaces for a total of 3,620 square feet, bringing the second floor occupancy up to 6,312 square feet.  We hope that we will be able to rent more of the 2nd floor in 2007.  In the absence of the elevator and parking we may need to consider lowering the asking rent.  10,864 square feet leased at $20/sf results in a gross rental increase of approximately $217,000.00 while $25/sf results in $271,600.00/year.

L:\MGRMC\Exectutive Summary\77thQueensAssociates2006.doc

# MGRMC
# Draft Budgets
# 2008

# 2008 Budget Preliminary & Tentative Notes Section

**INTRODUCTION:**     This notes section elaborates on the budget estimates used to assist you in your review.  The notes reflect assumptions used in budgeting and amplification of primarily non-recurring items specific to the 2008 budgets.

*MRGMC:  Is recommending for all our properties that we consider capital improvement decisions through the lens of 'Green' optics.  Through the Urban Land Institute (ULI) we are learning more about this and see what is becoming a trend may become a mandate in the future, we may need to be ahead of this trend.*

A. **Vacancies:**  We are conservative; that is we budget the costs but not the income in the first year in order to account for brokerage and legal costs also, recognizing that free rent may absorb potential income in the first year.  The exceptions are for new or renewing tenants where the deal is in progress and we have a high degree of confidence the deal will be finalized and of course any deal completed prior to the issuance of the 'Final Budget' will be included.

B. **CAPITAL RESERVE:**  In regards to the Capital Reserve for future roof replacement/Capital Improvements, we have included an amount on the budget(s) where partners have agreed upon a specific amount, that amount was reserved as of December 2007 will be shown in Budget notes and not on the Budget, so that it does not alter the "Cash in the budget for operations".  For properties without a current established roof reserve; we ask that you please look again at the two alternatives for potential roof replacement costs listed here, for those properties where a decision was not formalized in 2007.

   1) Where we were given a useful range life span we have conservatively used the lower number and have updated them as per 2007 reports, some reports are still in preparation.

   2) For 2008: We are still using $4.50/ sq. foot as an estimate if at the time we only need add a layer of roofing, and

   3) For 2008: We are still using $10.50/ sq. foot as an estimate if at the time a complete "rip" is needed (taking the roof off completely) and replacing it from the bottom up.

   These two costs were used to calculate the per year amount to accumulate the estimated respective costs.

   As the majority of owners determine the alternative with which they are most comfortable, we are including a projected capital reserve for roof replacement

in the budget.  The actual cash transferred to a capital reserve account during the operating year will depend upon fund availability at the time of the projected transfers; in general it will be scheduled for December 2008.

C.  **BEGINNING OPERATING CASH:**  Actual Beginning Operating Cash have been entered on the final copy of each Budget.  The 2007 and prior capital reserve balance are not on the Budget so that it does not alter the cash in the budget.  Reserves, for properties where they exist, are noted on Monthly Reports.

D.  Base Rents are actual Rents per leases, with actual increases as they occur.

E.  **REAL ESTATE TAX:**  The Real Estate Tax budgeted amounts are actual for RE Tax bill due January 2008, all other taxes are based on 2007 assessed value times a slight increase in rates spread over the payment schedule.

F.  **INSURANCE:**  An insurance budget amount for April 2008 is the actual amount for April 2007.  The budget amount for October 2008 is the actual amount, for November 2007.

G.  **GROSS WAGES:** Gross Wages are allocated to the properties on a percentage basis related to the time the men spend on the properties.  The increase in 2008 reflects the men receiving an increase of 4% the first in approximately 2 years; this also reflects a major increase in health insurance.

H.  Most budgets show an increase in monthly miscellaneous fee.  This is the first increase, in four years.

I.  BUDGET CATEGORY 'Total of All': Yardi provides a final category on the budgets called "Total of All," this is equal to "Net Balance Sheet" items that is: Beginning Cash less total Distributions, less total mortgage principal and less any net prepaid items (usually a small number), less approved capital reserves.

# 2008 Budget Preliminary & Tentative Notes Section

**INTRODUCTION:**    This notes section elaborates on the budget estimates used to assist you in your review.  The notes reflect assumptions used in budgeting and amplification of primarily non-recurring items specific to the 2008 budgets.

*MRGMC:  Is recommending for all our properties that we consider capital improvement decisions through the lens of 'Green' optics.  Through the Urban Land Institute (ULI) we are learning more about this and see what is becoming a trend may become a mandate in the future, we may need to be ahead of this trend.*

A.  **Vacancies:  We are conservative; that is we budget the costs but not the income in the first year in order to account for brokerage and legal costs also, recognizing that free rent may absorb potential income in the first year.  The exceptions are for new or renewing tenants where the deal is in progress and we have a high degree of confidence the deal will be finalized and of course any deal completed prior to the issuance of the 'Final Budget' will be included.**

B.  **CAPITAL RESERVE:  In regards to the Capital Reserve for future roof replacement/Capital Improvements, we have included an amount on the budget(s) where partners have agreed upon a specific amount, that amount was reserved as of December 2007 will be shown in Budget notes and not on the Budget, so that it does not alter the "Cash in the budget for operations".  For properties without a current established roof reserve; we ask that you please look again at the two alternatives for potential roof replacement costs listed here, for those properties where a decision was not formalized in 2007.**

   1)  **Where we were given a useful range life span we have conservatively used the lower number and have updated them as per 2007 reports, some reports are still in preparation.**

   2)  **For 2008: We are still using $4.50/ sq. foot as an estimate if at the time we only need add a layer of roofing, and**

   3)  **For 2008: We are still using $10.50/ sq. foot as an estimate if at the time a complete "rip" is needed (taking the roof off completely) and replacing it from the bottom up.**

**These two costs were used to calculate the per year amount to accumulate the estimated respective costs.**

**As the majority of owners determine the alternative with which they are most comfortable, we are including a projected capital reserve for roof replacement**

in the budget.  The actual cash transferred to a capital reserve account during the operating year will depend upon fund availability at the time of the projected transfers; in general it will be scheduled for December 2008.

C.  **BEGINNING OPERATING CASH:**  Actual Beginning Operating Cash have been entered on the final copy of each Budget.  The 2007 and prior capital reserve balance are not on the Budget so that it does not alter the cash in the budget.  Reserves, for properties where they exist, are noted on Monthly Reports.

D.  Base Rents are actual Rents per leases, with actual increases as they occur.

E.  **REAL ESTATE TAX:**  The Real Estate Tax budgeted amounts are actual for RE Tax bill due January 2008, all other taxes are based on 2007 assessed value times a slight increase in rates spread over the payment schedule.

F.  **INSURANCE:**  An insurance budget amount for April 2008 is the actual amount for April 2007.  The budget amount for October 2008 is the actual amount, for November 2007.

G.  **GROSS WAGES:** Gross Wages are allocated to the properties on a percentage basis related to the time the men spend on the properties.  The increase in 2008 reflects the men receiving an increase of 4% the first in approximately 2 years; this also reflects a major increase in health insurance.

H.  Most budgets show an increase in monthly miscellaneous fee.  This is the first increase, in four years.

I.  **BUDGET CATEGORY 'Total of All':** Yardi provides a final category on the budgets called "Total of All," this is equal to "Net Balance Sheet" items that is: Beginning Cash less total Distributions, less total mortgage principal and less any net prepaid items (usually a small number), less approved capital reserves.

**Budget Notes**
**Halstead Harrison Avenue Venture (12) (13,450 Sq. Ft.)**
**Months: Jan 2008 - Dec 2008**

*Engineering estimates (Jan 4, 2007) for re-routing the Culvert came in at $60,000 and waterproofing came in at $98,000. Doubt will need to change Culvert.*

1021 Secondary Cash -Operating Cash
1024 Money Market- Capital Reserve:  Roof Res:  3-5 yrs. @ $4.5/sf=$60,525=$20,175 per year
                                                              @ $10.5/sf=$141,225=$47,075/yr.
**This property currently has no roof reserve.**
2230 Partners Distributions:  Recommending distribution of $ 175,000 and return of Partners contribution of $50,000
3010 Base Rents:  Property 100% rented
3040 CAM & Added Services
3060 Parking Rent
3070 Income-Security acct interest
3080 Income-Money Market Interest
3090 Late Charges
3130 Real Estate Tax Pass thru
4130 Real Estate Taxes
4140 Insurance
4210 Cleaning
4240 Gardening Tree maintenance in June 2008
4260 Exterminating
4420 Fire & Security Alarm Service
4450 Supplies
4510 Maintenance & Repairs:  We have determined that the fence is the MTA's and not ours
4540 Plumbing- R & M:  Drain Pipe work not done in 2003/2004 scheduled for $2200 in June 2008 see reports (remaining in the budget but will not go forward until plan of action is made for waterproofing/lot repairs).  Metro North successfully blocked the drainage pipe leading into the culvert. Roding the lines will need to be done quarterly at $510.03 (including tax) each visit. This will be necessary there with the current drain issues at that building.
4550 Roof Maint & Repair:  Aluminum Coating:  $7,500 scheduled in June of 2008 (the budget but until plan of action is made for all property issues including roof/waterproofing/lot repairs).  Awaiting CVS3 approved plans.
4590 Misc Operating Expenses
4610 Gross Wages: Reflects 6% of the Cost of 3 on-site employees in Westchester.
4820 Electric
4830 Water & Treatment Supplies
4890 Gas
5150 Management Fees
5160 Accounting:    Reflects a 7% Increase over 2007
5170 Legal: $1000 in June place holder general Certiorari
5190 Fees & Permits
5895 Telephone
6460 Advertising
6720 Leasing Costs & Commissions:
6940  Bad Debts

Preliminary & Tentative
Signature_____

Page 1
2003
3/13/2008
04:34 PM

# Budget Detail (Accrual)
## Halstead-Harrison Ave {13,450} - (12)
### Jan 08 - Dec 08

| Account | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | |
| CASH | | | | | | | | | | | | | |
| Cash-Operating | 45,287 | | | | | | | | | | | | 45,287 |
| TOTAL CASH | 45,287 | | | | | | | | | | | | 45,287 |
| CURRENT ASSE | | | | | | | | | | | | | |
| TOTAL ASSETS | 45,287 | | | | | | | | | | | | 45,287 |
| **LIABILITY & OWN** | | | | | | | | | | | | | |
| LIABILITIES | | | | | | | | | | | | | |
| EQUITY | | | | | | | | | | | | | |
| Partners Contribut | | | | | | | 50,000 | | | | | | 50,000 |
| Partners Distributi | | | 43,750 | | | 43,750 | | | 43,750 | | | 43,750 | 175,000 |
| TOTAL EQUITY | | | 43,750 | | | 43,750 | 50,000 | | 43,750 | | | 43,750 | 225,000 |
| TOTAL LIABILIT | | | 43,750 | | | 43,750 | 50,000 | | 43,750 | | | 43,750 | 225,000 |
| **INCOME** | | | | | | | | | | | | | |
| OPERATING INC | | | | | | | | | | | | | |
| Base Rents | 24,433 | 24,433 | 24,433 | 24,433 | 24,433 | 24,433 | 24,433 | 24,433 | 24,433 | 24,433 | 24,433 | 24,433 | 293,196 |
| CAM & Added S | 4,420 | 4,420 | 4,420 | 4,420 | 4,420 | 4,420 | 4,420 | 4,420 | 4,420 | 4,420 | 4,420 | 4,420 | 53,040 |
| TOTAL OPER | 28,853 | 28,853 | 28,853 | 28,853 | 28,853 | 28,853 | 28,853 | 28,853 | 28,853 | 28,853 | 28,853 | 28,853 | 346,236 |
| REIMBURSEME | | | | | | | | | | | | | |
| Real Estate Tax | 14,243 | 7,374 | | 11,753 | | 7,374 | | | 14,955 | | | | 55,699 |
| TOTAL REIM | 14,243 | 7,374 | | 11,753 | | 7,374 | | | 14,955 | | | | 55,699 |
| NON-OPERATIN | | | | | | | | | | | | | |
| TOTAL NON- | 14,243 | 7,374 | | 11,753 | | 7,374 | | | 14,955 | | | | 55,699 |
| TOTAL INC | 43,096 | 36,227 | 28,853 | 40,606 | 28,853 | 36,227 | 28,853 | 28,853 | 43,808 | 28,853 | 28,853 | 28,853 | 401,935 |
| **EXPENSES** | | | | | | | | | | | | | |
| OPERATING EX | | | | | | | | | | | | | |
| Real Estate Tax | 14,243 | 7,374 | | 11,753 | | 7,374 | | | 14,955 | | | | 55,699 |
| Insurance | | | | | 5,660 | | | | | 5,444 | 4,045 | | 15,149 |
| Gardening & Gr | | | | | | 400 | | | | | | | 400 |
| Plumbing- R & | | | 510 | | | 2,200 | | | 510 | | | 510 | 3,730 |
| Roof Maint & Re | | | | | | 7,500 | | | | | | | 7,500 |
| Misc Operating | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Gross Wages | 787 | 787 | 787 | 787 | 787 | 787 | 787 | 787 | 787 | 787 | 787 | 787 | 9,444 |
| Electric | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Water & Treatm | | | 550 | | | | | | | 450 | | | 1,000 |
| Vehicle Expense | | | 200 | | | 200 | | | 200 | | | 210 | 810 |
| Management Fe | 1,507 | 1,507 | 1,507 | 1,507 | 1,507 | 1,507 | 1,507 | 1,507 | 1,507 | 1,507 | 1,507 | 1,507 | 18,084 |
| Accounting | | | | 3,370 | | | | | | | | | 3,370 |
| Legal | | | | | | 1,000 | | | | | | | 1,000 |
| TOTAL OPER | 17,087 | 10,218 | 4,104 | 17,967 | 8,504 | 21,518 | 2,844 | 2,844 | 18,509 | 8,738 | 6,889 | 3,564 | 122,786 |
| NON-OPERATIN | | | | | | | | | | | | | |
| Interest Expense | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 16,476 |
| TOTAL NON- | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 | 16,476 |
| DEPRECIATION | | | | | | | | | | | | | |
| TOTAL EX | 18,460 | 11,591 | 5,477 | 19,340 | 9,877 | 22,891 | 4,217 | 4,217 | 19,882 | 10,111 | 8,262 | 4,937 | 139,262 |
| NET INCOME | 24,636 | 24,636 | 23,376 | 21,266 | 18,976 | 13,336 | 24,636 | 24,636 | 23,926 | 18,742 | 20,591 | 23,916 | 262,673 |
| TOTAL OF ALL | 45,287 | | -43,750 | | | -43,750 | -50,000 | | -43,750 | | | -43,750 | -179,713 |

# 2008 Budget Preliminary & Tentative Notes Section

**INTRODUCTION:**    This notes section elaborates on the budget estimates used to assist you in your review.  The notes reflect assumptions used in budgeting and amplification of primarily non-recurring items specific to the 2008 budgets.

*MRGMC: Is recommending for all our properties that we consider capital improvement decisions through the lens of 'Green' optics.  Through the Urban Land Institute (ULI) we are learning more about this and see what is becoming a trend may become a mandate in the future, we may need to be ahead of this trend.*

A.  **Vacancies:  We are conservative; that is we budget the costs but not the income in the first year in order to account for brokerage and legal costs also, recognizing that free rent may absorb potential income in the first year.  The exceptions are for new or renewing tenants where the deal is in progress and we have a high degree of confidence the deal will be finalized and of course any deal completed prior to the issuance of the 'Final Budget' will be included.**

B.  **CAPITAL RESERVE:  In regards to the Capital Reserve for future roof replacement/Capital Improvements, we have included an amount on the budget(s) where partners have agreed upon a specific amount, that amount was reserved as of December 2007 will be shown in Budget notes and not on the Budget, so that it does not alter the "Cash in the budget for operations".  For properties without a current established roof reserve; we ask that you please look again at the two alternatives for potential roof replacement costs listed here, for those properties where a decision was not formalized in 2007.**

1)  **Where we were given a useful range life span we have conservatively used the lower number and have updated them as per 2007 reports, some reports are still in preparation.**

2)  **For 2008: We are still using $4.50/ sq. foot as an estimate if at the time we only need add a layer of roofing, and**

3)  **For 2008: We are still using $10.50/ sq. foot as an estimate if at the time a complete "rip" is needed (taking the roof off completely) and replacing it from the bottom up.**

**These two costs were used to calculate the per year amount to accumulate the estimated respective costs.**

**As the majority of owners determine the alternative with which they are most comfortable, we are including a projected capital reserve for roof replacement**

in the budget. The actual cash transferred to a capital reserve account during the operating year will depend upon fund availability at the time of the projected transfers; in general it will be scheduled for December 2008.

C. **BEGINNING OPERATING CASH:** Actual Beginning Operating Cash have been entered on the final copy of each Budget. The 2007 and prior capital reserve balance are not on the Budget so that it does not alter the cash in the budget. Reserves, for properties where they exist, are noted on Monthly Reports.

D. Base Rents are actual Rents per leases, with actual increases as they occur.

E. **REAL ESTATE TAX:** The Real Estate Tax budgeted amounts are actual for RE Tax bill due January 2008, all other taxes are based on 2007 assessed value times a slight increase in rates spread over the payment schedule.

F. **INSURANCE:** An insurance budget amount for April 2008 is the actual amount for April 2007. The budget amount for October 2008 is the actual amount, for November 2007.

G. **GROSS WAGES:** Gross Wages are allocated to the properties on a percentage basis related to the time the men spend on the properties. The increase in 2008 reflects the men receiving an increase of 4% the first in approximately 2 years; this also reflects a major increase in health insurance.

H. Most budgets show an increase in monthly miscellaneous fee. This is the first increase, in four years.

I. **BUDGET CATEGORY 'Total of All':** Yardi provides a final category on the budgets called "Total of All," this is equal to "Net Balance Sheet" items that is: Beginning Cash less total Distributions, less total mortgage principal and less any net prepaid items (usually a small number), less approved capital reserves.

**Budget Notes**
**82ⁿᵈ-83ʳᵈ Street Venture (11) (15, 101 Sq. Ft.)**
**Months: Jan 2008 - Dec 2008**

1021 Secondary Cash -Operating Cash
1024 Money Market- Capital Reserve: Roof Reserve-Minus the roof over section being repaired in 2007 (originally scheduled for 2004) For Roof Reserve purposes we used 13,300 sq, ft:  Rev. 12/04 3-5 yrs. @ $4.5/sf=$59, 850=$19,950/yr   @ $10.5/sf=$139,650=$46,550/yr. This Property currently has no roof reserve.
2230 Partners Distributions:  Recommend eliminating the distributions of $230,000 because it represents 200% of budgeted net income.
3010 Base Rents:  Four (4) tenants have rent increases this year, Renee Smith will likely be moving out, with a bad debt write off.
3017 Concession Rent:
3040 CAM & Added Services:
3060 Parking Rent
3070 Income-Security acct interest
3080 Income-Money Market Interest
3090 Late Charges
3130 Real Estate Tax Pass thru:
4130 Real Estate Taxes:  All Estimates except January are the actual will harden numbers as the tax bills are received, they reflect the large increase for which certiorari has been filed.
4140 Insurance
4210 Cleaning
4260 Exterminating January-April 2008: The construction nearby and we will need to continue increased service for the first part of the year.
4420 Fire & Security Alarm Service
4450 Supplies
4510 Maintenance & Repairs:
4540 Plumbing- R & M:
4550 Roof Maint & Repair:
4590 Misc Operating Expenses
4610 Gross Wages:  Reflects 6% of the Cost of 3 on-site employees in Westchester.
4820 Electric
4830 Water & Treatment Supplies
4890 Gas
4896 Vehicle Expense
5150 Management Fees
5160 Accounting:    Reflects a 7% Increase over 2007
5170 Legal:  $8000 in April for tenant replacements listed below
5180   Professional fees:
5190 Fees & Permits
5895 Telephone
6310 Capital:  $46,900 for drain work.
6460 Advertising:
6720 Leasing Costs & Commissions: BagelEmp tenant replacement and Camacho

Preliminary & Tentative
Signature_____

# Budget Detail (Accrual)
## 82nd-83rd St. Ven. {15,101 SF} - (11)
### Jan 08 - Dec 08

Page 1
2003
3/13/2008
04:34 PM

| Account | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | |
| **CASH** | | | | | | | | | | | | | |
| Cash-Operating | 108,957 | | | | | | | | | | | | 108,957 |
| TOTAL CASH | 108,957 | | | | | | | | | | | | 108,957 |
| **CURRENT ASSE** | | | | | | | | | | | | | |
| TOTAL ASSETS | 108,957 | | | | | | | | | | | | 108,957 |
| **LIABILITY & OWN** | | | | | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | | | | | |
| Mortgage Amort. | 443 | 445 | 447 | 450 | 452 | 454 | 457 | 459 | 461 | 464 | 466 | 468 | 5,466 |
| TOTAL LIABILITY | 443 | 445 | 447 | 450 | 452 | 454 | 457 | 459 | 461 | 464 | 466 | 468 | 5,466 |
| **EQUITY** | | | | | | | | | | | | | |
| Partners Distributi | | 57,500 | | | 57,500 | | | 57,500 | | | 57,500 | | 230,000 |
| TOTAL EQUITY | | 57,500 | | | 57,500 | | | 57,500 | | | 57,500 | | 230,000 |
| TOTAL LIABILIT | 443 | 57,945 | 447 | 450 | 57,952 | 454 | 457 | 57,959 | 461 | 464 | 57,966 | 468 | 235,466 |
| **INCOME** | | | | | | | | | | | | | |
| **OPERATING INC** | | | | | | | | | | | | | |
| Base Rents | 25,014 | 25,014 | 25,014 | 25,146 | 25,146 | 25,341 | 25,616 | 25,616 | 25,616 | 25,616 | 25,616 | 25,616 | 304,371 |
| CAM & Added S | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 66,180 |
| Water & Sewer | | | 1,000 | | | | | | | | | | 1,000 |
| TOTAL OPER | 30,529 | 30,529 | 31,529 | 30,661 | 30,661 | 30,856 | 31,131 | 31,131 | 31,131 | 31,131 | 31,131 | 31,131 | 371,551 |
| **REIMBURSEME** | | | | | | | | | | | | | |
| Real Estate Tax | 4,491 | 4,491 | 4,491 | 4,491 | 4,491 | 4,491 | 17,733 | 4,491 | 4,491 | 4,491 | 4,491 | 4,491 | 67,134 |
| TOTAL REIM | 4,491 | 4,491 | 4,491 | 4,491 | 4,491 | 4,491 | 17,733 | 4,491 | 4,491 | 4,491 | 4,491 | 4,491 | 67,134 |
| **NON-OPERATIN** | | | | | | | | | | | | | |
| TOTAL NON- | 4,491 | 4,491 | 4,491 | 4,491 | 4,491 | 4,491 | 17,733 | 4,491 | 4,491 | 4,491 | 4,491 | 4,491 | 67,134 |
| TOTAL INC | 35,020 | 35,020 | 36,020 | 35,152 | 35,152 | 35,347 | 48,864 | 35,622 | 35,622 | 35,622 | 35,622 | 35,622 | 438,685 |
| **EXPENSES** | | | | | | | | | | | | | |
| **OPERATING EX** | | | | | | | | | | | | | |
| Real Estate Tax | 47,937 | | | 19,400 | | | 56,300 | | | | | | 123,637 |
| Insurance | | | | | 6,616 | | | | | | 4,705 | | 11,321 |
| Snow Removal | | 100 | 100 | | | | | | | | | | 200 |
| Exterminating | 200 | 200 | 200 | 200 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 1,880 |
| Fire & Security A | 70 | 70 | 70 | 70 | 70 | 377 | 70 | 380 | 390 | 70 | 70 | 70 | 1,777 |
| Supplies | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Maintenance & | | | | 100 | | | | | | | | 500 | 600 |
| HVAC Maint & R | 900 | 500 | | | | | | | | | 700 | | 2,100 |
| Plumbing- R & | | | | 600 | | | | | | 600 | | 300 | 1,500 |
| Roof Maint & Re | | | | | | 360 | 350 | | | | | | 710 |
| Misc Operating | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 1,404 |
| Gross Wages | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 10,932 |
| Electric | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| Water & Treatm | 4,600 | | | | 100 | 750 | 900 | | | | 100 | | 6,450 |
| Oil | 5,600 | 5,100 | 3,500 | | 1,500 | | | | | | 3,000 | 5,500 | 24,200 |
| Vehicle Expense | | | | 200 | | 200 | | | 200 | | | 210 | 810 |
| Management Fe | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 17,544 |
| Accounting | | | | 10,165 | | | | | | | | | 10,165 |
| Legal | | | | 8,000 | | | | | | | | | 8,000 |
| Professional Fe | | | | 1,000 | | | | | | | | | 1,000 |
| Fees & Permits | | | | 30 | | | | | | 500 | | | 30 |
| TOTAL OPER | 62,047 | 8,710 | 6,810 | 42,305 | 11,161 | 4,562 | 60,495 | 3,255 | 3,965 | 3,545 | 11,450 | 9,455 | 227,760 |
| **NON-OPERATIN** | | | | | | | | | | | | | |
| Interest Expense | 1,665 | 1,663 | 1,661 | 1,658 | 1,656 | 1,654 | 1,651 | 1,649 | 1,647 | 1,644 | 1,642 | 1,640 | 19,830 |
| Capital Improve | | | | | | | 46,900 | | | | | | 46,900 |
| Leasing Costs & | | | | 9,600 | | | | 9,600 | | | | 9,600 | 28,800 |
| TOTAL NON- | 1,665 | 1,663 | 1,661 | 11,258 | 1,656 | 1,654 | 48,551 | 11,249 | 1,647 | 1,644 | 1,642 | 11,240 | 95,530 |

Preliminary & Tentative
Signature_____

**Budget Detail (Accrual)**
**82nd-83rd St. Ven. {15,101 SF} - (11)**
**Jan 08 - Dec 08**

Page 2
2003
3/13/2008
04:34 PM

| Account | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DEPRECIATION | | | | | | | | | | | | | |
| TOTAL EX | 63,712 | 10,373 | 8,471 | 53,563 | 12,817 | 6,216 | 109,046 | 14,504 | 5,612 | 5,189 | 13,092 | 20,695 | 323,290 |
| NET INCOME | -28,692 | 24,647 | 27,549 | -18,411 | 22,335 | 29,131 | -60,182 | 21,118 | 30,010 | 30,433 | 22,530 | 14,927 | 115,395 |
| TOTAL OF ALL | 108,514 | -57,945 | -447 | -450 | -57,952 | -454 | -457 | -57,959 | -461 | -464 | -57,966 | -468 | -126,509 |

## 2008 Budget Preliminary & Tentative
## Notes Section

**INTRODUCTION:**      This notes section elaborates on the budget estimates used to assist you in your review.   The notes reflect assumptions used in budgeting and amplification of primarily non-recurring items specific to the 2008 budgets.

*MRGMC:  Is recommending for all our properties that we consider capital improvement decisions through the lens of 'Green' optics.  Through the Urban Land Institute (ULI) we are learning more about this and see what is becoming a trend may become a mandate in the future, we may need to be ahead of this trend.*

A.  **Vacancies:  We are conservative; that is we budget the costs but not the income in the first year in order to account for brokerage and legal costs also, recognizing that free rent may absorb potential income in the first year.  The exceptions are for new or renewing tenants where the deal is in progress and we have a high degree of confidence the deal will be finalized and of course any deal completed prior to the issuance of the 'Final Budget' will be included.**

B.  **CAPITAL RESERVE:  In regards to the Capital Reserve for future roof replacement/Capital Improvements, we have included an amount on the budget(s) where partners have agreed upon a specific amount, that amount was reserved as of December 2007 will be shown in Budget notes and not on the Budget, so that it does not alter the "Cash in the budget for operations".  For properties without a current established roof reserve; we ask that you please look again at the two alternatives for potential roof replacement costs listed here, for those properties where a decision was not formalized in 2007.**

   1)  **Where we were given a useful range life span we have conservatively used the lower number and have updated them as per 2007 reports, some reports are still in preparation.**

   2)  **For 2008: We are still using $4.50/ sq. foot as an estimate if at the time we only need add a layer of roofing, and**

   3)  **For 2008: We are still using $10.50/ sq. foot as an estimate if at the time a complete "rip" is needed (taking the roof off completely) and replacing it from the bottom up.**

   **These two costs were used to calculate the per year amount to accumulate the estimated respective costs.**

   **As the majority of owners determine the alternative with which they are most comfortable, we are including a projected capital reserve for roof replacement**

in the budget.  The actual cash transferred to a capital reserve account during the operating year will depend upon fund availability at the time of the projected transfers; in general it will be scheduled for December 2008.

C.  BEGINNING OPERATING CASH:  Actual Beginning Operating Cash have been entered on the final copy of each Budget.  The 2007 and prior capital reserve balance are not on the Budget so that it does not alter the cash in the budget.  Reserves, for properties where they exist, are noted on Monthly Reports.

D.  Base Rents are actual Rents per leases, with actual increases as they occur.

E.  REAL ESTATE TAX:  The Real Estate Tax budgeted amounts are actual for RE Tax bill due January 2008, all other taxes are based on 2007 assessed value times a slight increase in rates spread over the payment schedule.

F.  INSURANCE:  An insurance budget amount for April 2008 is the actual amount for April 2007.  The budget amount for October 2008 is the actual amount, for November 2007.

G.  GROSS WAGES: Gross Wages are allocated to the properties on a percentage basis related to the time the men spend on the properties.  The increase in 2008 reflects the men receiving an increase of 4% the first in approximately 2 years; this also reflects a major increase in health insurance.

H.  Most budgets show an increase in monthly miscellaneous fee.  This is the first increase, in four years.

I.  BUDGET CATEGORY 'Total of All': Yardi provides a final category on the budgets called "Total of All," this is equal to "Net Balance Sheet" items that is: Beginning Cash less total Distributions, less total mortgage principal and less any net prepaid items (usually a small number), less approved capital reserves.

**Budget Notes**
**77th Queens Associates (13) (38,196 Sq. Ft.)**
**For Roof (Two Stories): 21,000 sf (corrected 2/7/05)**
**Months: Jan 2008 - Dec 2008**

1021 Secondary Cash -Operating Cash
1024 Money Market- Capital Reserve Roof Res:  5 + yrs. @ $4.5/sf=$94,500=$18,900 per year was established the ***Total at the end of 2008 will be $75,600***
2230 Partners Distributions:  $400,000 held the same as 2007 which is 143% of budgeted net income
3010 Base Rents: Six (6) tenants have increases in 2008
3017 Concession Rent:  Space "13" CNW in January and Space "05" Apple Bank for Savings in April;
3040 CAM & Added Services
3060 Parking Rent
3070 Income-Security acct interest
3080 Income-Money Market Interest
3090 Late Charges
3130 Real Estate Tax Pass thru
4130 Real Estate Taxes
4140 Insurance
4210 Cleaning
4260 Exterminating
4420 Fire & Security Alarm Service
4240 Gardening $18,000 in April Tree Pruning
4450 Supplies
4510 Maintenance & Repairs: $990 each (of 2 x per year) June/Oct. 2008 for window washing.
4520 HVAC Maintenance & Repairs:  General boiler repair January-April.
4540 Plumbing $6597 in June for replacing steam traps
4550 Roof Maint & Repair:  Current Roof Report $1250 in April (or sooner) for Roof Coating
4590 Misc Operating Expenses
4610 Gross Wages:  Reflects  40% of the Cost of 2 on-site employees in NYC
4820 Electric
4830 Water & Treatment Supplies
4859 Garbage Removal:
4890 Gas
4896 Vehicle Expense:
5150 Management Fees
5160 Accounting:  Reflects a 7% Increase over 2007
5170 Legal:  Second floor tenants, remaining 11437 sf of vacancies on second floor
5190 Fees & Permits:
5895 Telephone
6310 Capital Improvements:
6460 Advertising
6720 Leasing Costs & Commissions: Renting Pro Forma attached here
6940  Bad Debts

Preliminary & Tentative
Signature _____

**Budget Detail (Accrual)**
**77th Queens Assoc. {38,196 SF} - (13)**
**Jan 08 - Dec 08**

Page 1
2003
3/13/2008
04:34 PM

| Account | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | |
| CASH | | | | | | | | | | | | | |
| Secondary Cash - | 79,791 | | | | | | | | | | | | 79,791 |
| Money Market Fun | 218,243 | | | | | | | | | | | -18,900 | 199,343 |
| TOTAL CASH | 298,034 | | | | | | | | | | | -18,900 | 279,134 |
| CURRENT ASSE | | | | | | | | | | | | | |
| PREPAID EXPEN | | | | | | | | | | | | | |
| Prepaid Real Esta | 117,218 | | | | | | | | | | | -117,218 | |
| TOTAL CURREN | 117,218 | | | | | | | | | | | -117,218 | |
| TOTAL ASSETS | 415,252 | | | | | | | | | | | -136,118 | 279,134 |
| **LIABILITY & OWN** | | | | | | | | | | | | | |
| LIABILITIES | | | | | | | | | | | | | |
| EQUITY | | | | | | | | | | | | | |
| Partners Distributi | | | 100,000 | | | 100,000 | | | 100,000 | | | 100,000 | 400,000 |
| TOTAL EQUITY | | | 100,000 | | | 100,000 | | | 100,000 | | | 100,000 | 400,000 |
| TOTAL LIABILIT | | | 100,000 | | | 100,000 | | | 100,000 | | | 100,000 | 400,000 |
| **INCOME** | | | | | | | | | | | | | |
| OPERATING INC | | | | | | | | | | | | | |
| Base Rents | 67,266 | 67,435 | 67,435 | 67,435 | 67,628 | 67,628 | 67,628 | 67,628 | 67,628 | 67,718 | 67,718 | 67,908 | 811,055 |
| Electric Rents In | 536 | 536 | 536 | 536 | 536 | 536 | 536 | 536 | 536 | 536 | 536 | 536 | 6,432 |
| Concession-Fre | -3,733 | | | -9,109 | | | | | | | | | -12,842 |
| CAM & Added S | 8,558 | 8,558 | 8,558 | 8,558 | 8,558 | 8,558 | 8,558 | 8,558 | 8,558 | 8,558 | 8,558 | 8,558 | 102,696 |
| Water & Sewer | | 200 | | | 200 | | | 200 | | | 200 | | 800 |
| Income-Security | 250 | | | 250 | | | 250 | | | 250 | | | 1,000 |
| Income-Money | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Late Charges | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 900 |
| TOTAL OPER | 73,252 | 77,104 | 76,904 | 68,045 | 77,297 | 77,097 | 77,547 | 77,097 | 77,097 | 77,637 | 77,187 | 77,377 | 913,641 |
| REIMBURSEME | | | | | | | | | | | | | |
| Real Estate Tax | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 35,170 | 2,500 | 2,500 | 2,500 | 2,500 | 35,170 | 95,340 |
| TOTAL REIM | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 35,170 | 2,500 | 2,500 | 2,500 | 2,500 | 35,170 | 95,340 |
| NON-OPERATIN | | | | | | | | | | | | | |
| TOTAL NON- | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 35,170 | 2,500 | 2,500 | 2,500 | 2,500 | 35,170 | 95,340 |
| TOTAL INC | 75,752 | 79,604 | 79,404 | 70,545 | 79,797 | 79,597 | 112,717 | 79,597 | 79,597 | 80,137 | 79,687 | 112,547 | 1,008,98 |
| **EXPENSES** | | | | | | | | | | | | | |
| OPERATING EX | | | | | | | | | | | | | |
| Real Estate Tax | 117,218 | | | | | 117,218 | | | | | | | 234,436 |
| Insurance | | | | 19,441 | | | | | | | 16,429 | | 35,870 |
| Cleaning | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Gardening & Gr | 18,000 | | | | | | 1,000 | | | | | | 19,000 |
| Exterminating | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 1,956 |
| Fire & Security A | 76 | 76 | 76 | 76 | 76 | 76 | 76 | 76 | 180 | 76 | 76 | 76 | 1,016 |
| Supplies | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Maintenance & | | | | | | 990 | | | | | 990 | 500 | 2,480 |
| HVAC Maint & R | 1,000 | 1,000 | 1,000 | 1,000 | | | | | | 981 | | | 4,981 |
| Plumbing- R & | | | | | | 6,597 | | | 600 | | | 600 | 7,797 |
| Roof Maint & Re | | | | 1,250 | | | | | | | | | 1,250 |
| Misc Operating | 400 | 400 | 400 | 400 | 400 | 1,500 | 400 | 400 | 400 | 400 | 400 | 1,835 | 7,335 |
| Gross Wages | 3,988 | 3,988 | 3,988 | 3,988 | 3,988 | 3,988 | 3,988 | 3,988 | 3,988 | 3,988 | 3,988 | 3,988 | 47,856 |
| Electric | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 4,000 | 4,000 | 4,000 | 4,000 | 2,600 | 2,600 | 2,600 | 36,800 |
| Water & Treatm | | | 550 | | | | | | | 450 | | | 1,000 |
| Water & Sewer | | | | 4,000 | | | 12,000 | | | | | 10,000 | 26,000 |
| Garbage Remov | 565 | 565 | 565 | 565 | 565 | 565 | 565 | 565 | 565 | 565 | 565 | 565 | 6,780 |
| Oil | 12,800 | 11,700 | 6,300 | 6,000 | | | | | | 3,000 | 6,000 | 9,000 | 54,800 |
| Vehicle Expense | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| Ground Rent | 5,083 | 5,083 | 5,083 | 5,083 | 5,083 | 5,083 | 5,083 | 5,083 | 5,083 | 5,083 | 5,083 | 5,083 | 60,996 |
| Management Fe | 3,363 | 3,363 | 3,363 | 3,363 | 3,363 | 3,363 | 3,363 | 3,363 | 3,363 | 3,363 | 3,363 | 3,363 | 40,356 |

**Preliminary & Tentative**
Signature_____

# Budget Detail (Accrual)
## 77th Queens Assoc. {38,196 SF} - (13)
### Jan 08 - Dec 08

| Account | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounting | | | 9,255 | | | | | | | | | | 9,255 |
| Legal | 1,678 | 1,678 | 1,678 | 1,678 | 1,678 | 1,678 | 1,678 | 1,678 | 1,678 | 1,678 | 1,678 | 1,678 | 20,136 |
| Fees & Permits | 800 | 720 | | | | | | | | | | | 1,520 |
| Telephone | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 2,820 |
| TOTAL OPER | 168,719 | 32,871 | 35,456 | 50,592 | 18,901 | 146,206 | 33,301 | 20,405 | 20,901 | 24,322 | 41,330 | 40,436 | 633,440 |
| | | | | | | | | | | | | | |
| NON-OPERATIN | | | | | | | | | | | | | |
| Advertising | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Leasing Costs & | | 5,110 | 11,148 | 7,688 | | 19,509 | | 12,798 | 19,509 | | | 16,049 | 91,811 |
| TOTAL NON- | 300 | 5,410 | 11,448 | 7,988 | 300 | 19,809 | 300 | 13,098 | 19,809 | 300 | 300 | 16,349 | 95,411 |
| | | | | | | | | | | | | | |
| DEPRECIATION | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| TOTAL EX | 169,019 | 38,281 | 46,904 | 58,580 | 19,201 | 166,015 | 33,601 | 33,503 | 40,710 | 24,622 | 41,630 | 56,785 | 728,851 |
| NET INCOME | -93,267 | 41,323 | 32,500 | 11,965 | 60,596 | -86,418 | 79,116 | 46,094 | 38,887 | 55,515 | 38,057 | 55,762 | 280,130 |
| | | | | | | | | | | | | | |
| TOTAL OF ALL | 415,252 | | -100,000 | | | -100,000 | | | -100,000 | | | -236,118 | -120,866 |

MINSKOFF GRANT
77th QUEENS LEASING COMMISSIONS & LEGAL FEES
BUDGET 2008

| Property | Space | Tenant | Annual Rate | SF | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 | 13 | CNW Associates dba Sonoma Coffee | | | | $5,110.43 | | | | | | $ 5,110.43 | | | | | 10,220.86 |
| 13 | 4 | Consider Vacant (Kane & Kane) 10 yr (3 payments in 2008) | 40.00 | 606 | | | | $2,765.00 | | | | $ 2,765.00 | | | | $2,765.00 | $ 8,295.00 |
| 13 | 8 | Vacant (USCG) 10 yr (3 payments in 2008) | 40.00 | 1079 | | | | $4,923.00 | | | | $ 4,923.00 | | | | $ 4,923.00 | $ 14,769.00 |

For Vacancy :
Vacancy SqFt   11,457
Est. Occupancy 95% total SqFt   10,884
Base Rent @$25.00 per Sq Ft   $272,104
Commissions for 95% of SF on 2nd Floor   $ 66,888.17
(7,401 sf - 5 year deals and 3,483 sf - 10 year deals)
(to Be disbursed in 3 payments)

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 3 Pmt in 2008 50% of Total Commissions | | | | | $11,148.03 | | | $11,148.03 | | | $11,148.03 | | | | $ 33,444.08 |
| | | 2 Pmt in 2008 25% of Total Commissions | | | | | | | | | | | $8,361.02 | | | $8,361.02 | $ 16,722.04 |
| | | 1 Pmt in 2008 25% of Total Commissions | | | | | | | | | | | | | | $8,361.02 | $ 8,361.02 |

| | | Total | | | $ - | $ 5,110.43 | $11,148.03 | $ 7,688.00 | $ - | $ 19,509.05 | $ - | $ 12,798.43 | $ 19,509.05 | $ - | $ - | $ 16,049.02 | $ 91,812.01 |

| | | Legal 10,887sf x $1.85/sf | | | $1,678 | $1,678 | $1,678 | $1,678 | $1,678 | $1,678 | $1,678 | $1,678 | $1,678 | $1,678 | $1,678 | $1,678 | $20,136 |

Total w/Legal   $ 111,948.61

68% of Vacancy- 5 Year Leases (with 4% rent increases every 2 years)

| Rate | SF | % | Amount |
|---|---|---|---|
| 25.00 | 7,401 | 5.00% | 9,251.53 |
| 25.00 | 7,401 | 4.00% | 7,401.22 |
| 26.00 | 7,401 | 4.00% | 7,697.27 |
| 26.00 | 7,401 | 3.50% | 6,735.11 |
| 27.04 | 7,401 | 3.00% | 6,003.87 |
| | | Sub Total | 37,089.00 |

32% of Vacancy - 10 Year Leases (with 4% rent increases every 2 years)

| Rate | SF | % | Amount |
|---|---|---|---|
| 25.00 | 3483 | 5.00% | 4,353.75 |
| 25.00 | 3483 | 4.00% | 3,483.00 |
| 26.00 | 3483 | 4.00% | 3,622.32 |
| 26.00 | 3483 | 3.50% | 3,169.53 |
| 27.04 | 3483 | 3.00% | 2,825.41 |
| 27.04 | 3483 | 2.50% | 2,354.51 |
| 28.12 | 3483 | 2.50% | 2,448.69 |
| 28.12 | 3483 | 2.50% | 2,448.69 |
| 29.25 | 3483 | 2.50% | 2,546.64 |
| 29.25 | 3483 | 2.50% | 2,546.64 |
| | | Sub Total | 29,799.17 |
| | | Total | $ 66,888.17 |

| | |
|---|---|
| *Rob Allan:* | This is a meeting of Halstead Harrison Associates.  The date is November 30th.  The time is 3:06 P.M. East Coast time.  I'd like to call a roll of the owners of Halstead Harrison Venture.  I have it as both Venture and Associates.  On behalf of 2220 Equities Management LP, Royanne Minskoff. |
| *Royanne Minskoff:* | Present. |
| *Rob Allan:* | On behalf of Jean Minskoff Grant.  Apparently not present.  On behalf of Mica LLC, Sara Minskoff. |
| *Sara Minskoff:* | Present. |
| *Rob Allan:* | And I'm Rob Allan. |
| | Alright.  Since the combined interest of those present is 66 percent, we have a quorum.  I would like to suggest that we might not begin this meeting for a few more minutes to see if Miss Grant is going to have an opportunity to join us. |
| | Hello.  Royanne? |
| *Royanne Minskoff:* | I heard a beep so it – |
| *Rob Allan:* | Me, too. |
| *Royanne Minskoff:* | -- sounds like somebody's joined us. |
| *Rob Allan:* | I thought, but I haven't heard any voice. |
| *Jean Minskoff Grant:* | Hello? |
| *Rob Allan:* | Ah, Jean.  Welcome.  Timing is perfect.  We just started recording the call.  So, I'm going to call you as part of the roll.  Jean Grant, are you present? |
| *Jean Minskoff Grant:* | I am. |
| *Rob Allan:* | Okay.  Then we have 100 percent of the ownership for the Halstead Harrison venture. |
| | We called this meeting by notice of e-mail on November 25th, which was sent out to all of the partners.  The agenda of the meeting was to discuss the status of current management and legal services. |

To take those in somewhat reverse order I thought I would bring everybody up to date on the status of the legal representation of this property.

There was a meeting of the partners by telephone in February at which time a majority voted to change the legal services of the property and to designate a legal committee comprised of Royanne Minskoff and myself to identify alternative legal representation.

At the time I think the intended law firm that we discussed was Delbello –

*Jean Minskoff Grant:*  Can you speak a little bit louder?

*Rob Allan:*  I'm sorry?

*Jean Minskoff Grant;*  Can you speak louder?

*Rob Allan:*  At the time of that meeting I believe that the law firm that was being considered was Delbello.  As I e-mailed everybody about a week or ten days later, subsequent to that meeting there was an event at Delbello that undermined the confidence of some of us in that as a choice of firm.

In the alternative we chose instead to engage Thelen Reid.  As a result David Olisoff and Thelen Reid have now been conducting the legal affairs of the property – of the partnership I should say.  Any further comments or questions on legal representation?

Alright.  Well, in that case the next issue on the agenda was a discussion of current management.  We have received a proposal for management services from a firm known as Armstrong Realty Management, the principle of which is a fellow named Mark Massey who's affiliated with Massey Knakal – was affiliated with Massey Knakal.  Obviously he's _____running Armstrong

*Jean Minskoff Grant:*  Rob?  I'm calling in from England and when you move away from the phone I cannot hear you.  I have not seen any such proposal because I have not been in a place where I can get anything like e-mail.

*Rob Allan:*  Well, that's unfortunate.  We did send out the proposal by e-mail –

*Jean Minskoff Grant:*  I mean what was sent in the package with the five day notice of the meeting?

*Rob Allan:*            I'm sorry.  You were cut off.

*Jean Minskoff Grant:* I didn't receive anything attached to the five day notice of the meeting.

*Rob Allan:*            Correct; we received –

*Jean Minskoff Grant:* I haven't seen any such agreement and certainly I've never heard of any firm called Armstrong in the New York area though I trust they exist.

*Rob Allan:*            Alright.

*Jean Minskoff Grant:* But in absence of the timely presence of any proposal that I could review, it would seem to me the best thing to do would be to postpone this and I think it might just be common courtesy till I'm back in the United States.

*Rob Allan:*            Am I to entertain that as a motion to postpone?

*Jean Minskoff Grant:* Motion to postpone?

*Rob Allan:*            I'll take that as a motion to postpone.  Does anybody want to second that?

*Jean Minskoff Grant:* I _____ _____ the three partners having a discussion.  This isn't some major corporation.  This is one store in the town of Harrison –

*Rob Allan:*            Alright; well, if you're not going to –

*Jean Minskoff Grant:* It's a partnership; it's not a company.

*Rob Allan:*            -- if you don't want to bother with the formalities of Roberts' then I have heard your request to postpone.  I'm not inclined to do so.  Does anybody else want to postpone this meeting?  Alright.  It doesn't sound like anybody else does so I think we should go –

*Jean Minskoff Grant:* Maybe you won't mind if I ask my lawyer to call in and he can listen in.

*Rob Allan:*            Your lawyer can listen in, but he can't participate –

*Jean Minskoff Grant:* Yes, well you are not acting even with common business courtesy of five days notice.  You are going to discuss a management agreement.  I am not in my office.  I don't have my own current

management agreement to check all the rules and regs of that governing document as of today and I have not –

**Rob Allan:** Jean, I'm sorry that you're offended, but –

**Jean Minskoff Grant:** I haven't had one day to review any proposal from anybody else. If it was a firm that somebody heard of or knew about, that might be different –

**Rob Allan:** Well, why don't you be quiet for a second and let me tell you what the _____ _____ --

**Jean Minskoff Grant:** -- but I haven't heard of this firm. How many employees do they have? Where are they located? How long have they been in business?

**Royanne Minskoff:** We can answer those questions, Rob.

**Jean Minskoff Grant:** How many retail operations do they manage? I mean I don't know anything.

**Royanne Minskoff:** We can answer those questions.

**Rob Allan:** Jean has raised a number of questions –

**Jean Minskoff Grant:** I would like to see a written document that shows they're incorporated, that they have a license to practice in New York, that they operate more than 100,000 square feet say that they're not some fly-by-night organization that just started less than five years ago. I'd really like some proper information.

**Rob Allan:** Well, if you'd be quiet perhaps we'd be able to tell you some of that information. So I'd like you to hold your questions for the moment until I finish discussing the nature of the proposal that's been received.

**Jean Minskoff Grant:** Well, I'd actually now like to make a formal motion that in light of the lack of business-like manner in which you are planning to conduct this meeting. It doesn't sound like it's Armstrong Management. It sounds like its strong arm management to me.

I want to propose a motion that the meeting be postponed until all the partners can be on the same continent, that all the partners can have the same information in front of them and an opportunity to review it. All partners can review the documents with their own

|  |  |
|---|---|
|  | personal legal counsel and review the existing governing documents with their legal counsel. |
| *Rob Allan:* | Anybody wish to second that motion? |
| *Jean Minskoff Grant:* | Motion so proposed, even though I don't think any partnership needs to – |
| *Rob Allan:* | Jean? |
| *Jean Minskoff Grant:* | -- operate under these – |
| *Rob Allan:* | You need to be quiet so it can be made and voted on.  So is there anybody willing to second that motion?  Alright.  Motion is not passed. |
| *Jean Minskoff Grant:* | This is being recorded, yes, Rob?  Are you recording this? |
| *Rob Allan:* | Yes, I am. |
| *Jean Minskoff Grant:* | I heard when I got on the recording had started.  I'd like your assurance that timely access to the recording will be made, unlike previous times when it has taken – |

*[End of Audio]*

# 77TH QUEENS ASSOCIATES

December 11, 2007

*Via email and Federal Express*

Jean Grant
Minskoff Grant Realty & Mgmt. Co.
1350 Avenue of the Americas
New York, NY 10019

Subject: replacement of property management and leasing services
77th Queens Associates

Dear Ms. Grant:

Please be advised that, pursuant to a vote of the partnership at 77th Queens Associates, we hereby inform you that the partnership has elected to retain the services of a successor management firm (Armstrong Realty Management, Corp.) and leasing firm, effective January 1, 2008.

This advice is not an acknowledgment that the partnership is bound by any of the purported management and leasing agreements that your office claims to have with the partnership. Among other things, despite repeated requests, your office has failed to provide these agreements to the partners.

Please assemble and be prepared to deliver all books, electronic records, checks, funds, bank statements, leases, related correspondence, and other partnership records and property to us or to our designated agents at the end of the month of December, 2007. You or your accountants should ensure that you retain copies of such documents as you consider necessary to prepare a final accounting of your services to the partnership.

Please acknowledge receipt of this letter at your early convenience.

Sincerely,

_____
Sara Minskoff Allan
Partner

_____
Royanne Minskoff
Partner

cc:   Robb Aley Allan
Alan Minskoff
Michael Breede
Dr. James Sterling

---

220 SUNRISE AVENUE, PALM BEACH, FLORIDA 33480 • 561.832.4013 VOICE • 561.832.3960 FAX

# COURT MARTINE ASSOCIATES

December 11, 2007

*Via email and Federal Express*

Jean Grant
Minskoff Grant Realty & Mgmt. Co.
1350 Avenue of the Americas
New York, NY 10019

Subject:  replacement of property management and leasing services
          Court Martine Associates

Dear Ms. Grant:

Please be advised that, pursuant to a vote of the partnership at Court Martine Associates, we hereby inform you that the partnership has elected to retain the services of a successor management firm (Armstrong Realty Management, Corp.) and leasing firm, effective January 1, 2008.

This advice is not an acknowledgment that the partnership is bound by any of the purported management and leasing agreements that your office claims to have with the partnership. Among other things, despite repeated requests, your office has failed to provide these agreements to the partners.

Please assemble and be prepared to deliver all books, electronic records, checks, funds, bank statements, leases, related correspondence, and other partnership records and property to us or to our designated agents at the end of the month of December, 2007. You or your accountants should ensure that you retain copies of such documents as you consider necessary to prepare a final accounting of your services to the partnership.

Please acknowledge receipt of this letter at your early convenience.

Sincerely,

_____              _____
Sara Minskoff Allan                   Royanne Minskoff
Partner                               Partner

cc:    Robb Aley Allan
       Alan Minskoff
       Stacey Essenfeld
       Michael Breede

# HALSTEAD HARRISON AVENUE VENTURE

December 11, 2007

*Via email and Federal Express*

Jean Grant
Minskoff Grant Realty & Mgmt. Co.
1350 Avenue of the Americas
New York, NY 10019

Subject: replacement of property management and leasing services
          Halstead Harrison Avenue Venture

Dear Ms. Grant:

Please be advised that, pursuant to a vote of the partnership at Halstead Harrison Avenue Venture, we hereby inform you that the partnership has elected to retain the services of a successor management firm (Armstrong Realty Management, Corp.) and leasing firm, effective January 1, 2008.

This advice is not an acknowledgment that the partnership is bound by any of the purported management and leasing agreements that your office claims to have with the partnership. Among other things, despite repeated requests, your office has failed to provide these agreements to the partners.

Please assemble and be prepared to deliver all books, electronic records, checks, funds, bank statements, leases, related correspondence, and other partnership records and property to us or to our designated agents at the end of the month of December, 2007. You or your accountants should ensure that you retain copies of such documents as you consider necessary to prepare a final accounting of your services to the partnership.

Please acknowledge receipt of this letter at your early convenience.

Sincerely,


_____          _____
Sara Minskoff Allan                       Royanne Minskoff
Partner                                   Partner


cc:   Robb Aley Allan
      Alan Minskoff

# CERTIFICATE OF SERVICE

The undersigned, a member in good standing of the bar of this Court, certifies that on

March 26, 2008, he caused a copy of the foregoing document to be served via e-mail, pursuant to

an agreement, upon the following:

Philip H. Gitlen
Whiteman Osterman & Hanna LLP
Once Commerce Plaza
Albany, New York  12260
pgitlen@woh.com


Christopher E. Buckley
Whiteman Osterman & Hanna LLP
Once Commerce Plaza
Albany, New York  12260
cbuckley@woh.com


Michael D. Lockard
Akin Gump Strauss Hauer Feld LLP
590 Madison Avenue
New York, New York  10022-2524
mlockard@akingump.com


Rebecca N. Loubriel
Akin Gump Strauss Hauer Feld LLP
590 Madison Avenue
New York, New York  10022-2524
rloubriel@akingump.com

Thomas H. Golden